In The United States District Court

Northern District Of Texas

Lubbock Division



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 1  2020

CLERK, U.S. DISTRICT COURT
By
Deputy

| | | |
|---|---|---|
| Lonnie Kade Welsh, | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Cause No. 5-20-Cv-024 |
| | § | |
| Lamb County, | § | |
| Et al Defendants | § | |

## <u>Objections to Magistrates Report and Recommendations</u>

## <u>and</u>

## <u>Request For Leave To Amend Complaint</u>

i

# Table Of Contents

I. Standard of Review..................................................................pg.1

II Objection To The Report and Recommendations.................................pg.2

    1. Welsh Objects to the Dismissal of Substantive Right Count V........................pg.2

        A. Welsh Objects To The Injuries Being De Minimis...............................pg.2

        B. The Defendants Violated Welsh's Liberty Interest Created By State Law................pg. 5

        C.. If The Claim Is De Minimis It Still Cannot Be Dismissed........................pg.6

    2. Welsh Objects To His Punishment R & R pg. 26-30..................................pg.7

        A. Welsh Objects To Being Punished For Acts Outside His Control Count VI #19............pg.7

        B. Welsh had a State Created Liberty and Property Interest In Count VII #20................pg.10

        C. Welsh Cannot Suffer Punishment by Retribution Even If He Had Control................pg.11

    3. Welsh's Objects To The Dismissal of Claim Count VIII Right to Make Bail ......pg.14

    4. Welsh Objects to the Dismissal Access To The Courts I & II.........................pg.16

        A. Failure To Provide Access To The Court Due To Self Representation......................pg.16

        B. Welsh Objects to The Magistrates Findings of Facts To Injury Access To The Courts.....pg.20

    5. Welsh Objects To The Dismissal Fourth Amendment Claim Count IV.................pg. 22

    6. A Right To Order Books Welsh Objects to the Dismissal Cause XII.....................pg.24

    7. Objection To Facts About The Use Of Force Count III................................pg.27

    8. Welsh Objects Diaz Is Liable For The Force Used Count III..........................pg.28

    9. Welsh Moves The Court To Amend The Use Of Force Claim III....................pg.28

10. Welsh Objects To The Dismissal Of Count IX and X..................................................pg.29

    A. The Bell Standard and The Right To Live Comfortably.....................................pg.29

    B. The Defendants Extorted Welsh's Needs .......................................................pg.32

    C. How The Federal Government Punishes Is Instructive......................................pg.34

11. The Magistrate Did Not Dismiss Count XII Welsh Objects To Its Dismissal.....pg. 35

12. Welsh Request The Court To Consider the Attachments...............................pg.37

13. Welsh Request Opportunity To Amend To Plead His Best Case....................pg.37

III Prayer...........................................................................................................pg.41

IV. Table Of Appendix........................................................................................pg.41

# Index of Authorities

Agency for International Development v.
Alliance for Open Society International, Inc. 186 L. Ed. 2d 398...........................................pg.32

Alberti v. Klevenhagen 790 F.2d 1220 (CA5 1986) ..........................................................pg.2

Alberti v. Klevenhagen 790 F.2d 1220, 1224 (5th Cir. 1986) ...............................................pg.3

Albright v. Oliver, 510 U.S.266..........................................................................................pg.23

Arnett v Kennedy, 416 U.S.134..........................................................................................pg.11

Ashcroft v. Iqbal, 556 U.S. 662..........................................................................................pg.1

Bailey v. Drexel Furniture Co., 259 U.S. 20..........................................................................pg.33

Beard v. Banks, 548 U.S. 521...............................................................................pg.26

Bell Atl. Corp. v. Twombly, 550 U.S. 544.............................................................pg.1

Bell v. Wolfish, 441 U.S. 520, 60 L Ed 2d 447....................pg.2,3,4,5,12,15,19,29,30,31,33,35,37,38

Block v. Rutherford, 468 U.S. 576)......................................................................pg.5

Board of Regents v. Roth, 408 U.S. 564, 575.   ...............................................pg.16

Boddie v. Connecticut, 401 U.S. 371 ...............................................................pg.22

Bose Corp. v Consumers Union of United States, Inc., 466 US 485...................pg.26

Bounds v. Smith, 430 U.S. 817..........................................................................pg.22

Brewster v. Dretke, 587 F.3d 764 (5th Cir. 2009) ............................................pg.1

Brown v. Lynch, 524 F. App'x 69 (5th Cir. 2013) .............................................pg.4

Brown v. Taylor, 911 F.3d 235, 246 (5th Cir. 2018) ........................................pg.40

California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508...............pg.21

Carey v. Piphus, 435 U.S. 247...........................................................................pg.6

Castellano v. Fragozo, 352 F.3d 939(CA5 2003)(en banc) ...............................pg.23

Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285 (5th Cir. 2004) .........pg.37

Chambers v. Baltimore & Ohio Railroad, 207 U.S. 142....................................pg.21

City of Ontario v. Quon, 177 L. Ed. 2d 216......................................................pg.23

Cleavinger v. Saxner, 474 U.S. 193...................................................................pg.14

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532.........................................pg.11

Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358 (5th Cir.1983) .............pg.21

Coleman v. Wilson, 912 F. Supp. 1282 (E.D. Cal. 1995) ..................................pg.8

Collins v. Morgan Stanley Dean Witter, 224 F.3d 496 (5th Cir. 2000). ............pg.37

Conroy v. Aniskoff 507 US 511................................................................pg.11

Cortez v. McCauley, 478 F.3d 1108 (10th Cir. 2007) .................................pg.4

Cowans v. Wyrick, 862 F.2d 697(8th Cir. 1988) ......................................pg.4

Crews v. Petrosky, 509 F. Supp 1199(W.D. Penn. 1981)............................pg.22

Crews v. Petrosky, 509 F. Supp. 1199(W.D.Pa.1981). ..............................pg.21

Cummings v Missouri (US) 4 Wall 277.....................................................pg.13

Daniels v Williams, 474 US, 327, 331.....................................................pg.10

Degrate v. Godwin 84 F.3d 768 (CA5 1996) .......................................pg.16,17

Delaney v. DeTella, 256 F.3d 67 (7th Cir. 2001) .....................................pg.4

DeMarco v. Davis, 914 F.3d 383 (CA5 2019) .........................................pg.26

Dent v West Virginia, 129 US 114......................................................pg.16,32

Denton v. Hernandez, 504 U.S. 25.........................................................pg.1

Dep't of Revenue of Montana v. Kurth Ranch, 511 U.S. 767........................pg.33

Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594 (5th Cir.1981)..........pg.29,40

Elrod v. Burns, 427 U.S. 347..............................................................pg.32

Enters. v. Apfel, 524 U.S. 498 ............................................................pg.34

Estep v. United States 327 U.S. 114,120-121 . .......................................pg.28

Evans v. United States 504 U.S. 255......................................................pg.32

Ex parte Hull, 312 US 546................................................................pg.14

Flemming v Nestor, 363 US,603).........................................................pg.29

Florence v. Board of Chosen Freeholders 132 S. Ct. 1510..........................pg.23,24

Gates v. Cook, 376 F.3d 323 (5th Cir. 2004) ..........................................pg.3

Google v. Hood III Google, Inc. v. Hood, 822 F.3d 212 (5th Cir. 2016) ……………………..……....pg.31

Graham v. Connor, 490 U.S. 386…………………………………………………………pg.23

Grayned v City of Rockford, 408 US 104……………………………………………………pg.26

Greenholtz v Nebraska Penal Inmates, 442 US 1……………………………………..…………pg.6

Griffin v. Wisconsin 483 U.S. 868……………………………..……………………………pg.13

Gross v. Normand 576 F. App'x 318 (CA5 2014) ……………………………………………pg.23

Haines v. Kerner, 404 U.S. 519…………………………………………………………pg.1

Hamilton v. Lyons, 74 F.3d 99(CA5 1996)…………………………………………………pg.2

Harmelin v. Michigan, 501 U.S. 957……………………………………………………pg.34

Harris v. Hegmann, 198 F.3d 153 (5th Cir. 1999) …………………………………….…….pg.1

Hewitt v. Helms, 459 U.S. 460)………………………………………………..……………..pg.5

Hill v. Estelle, 537 F.2d 214(CA5 1976)……………………………………………..…………pg.29

Hudson v. Palmer 468 U.S. 517………………………………………………………pg.23

Hudson, v. McMillian 503 U.S. 1………………………………………………………pg.4

Huntington v. Attrill, 146 U. S. 666…………………………………………………..pg.33

Hustler Magazine, Inc. v. Falwell, 485 U.S. 46……………………………………………pg.26

Ikerd v. Blair, 101 F.3d 430 (5th Cir. 1996)…………………………………………………pg.4

In re Katrina Canal Breaches Litig., 495 F.3d 191(5th Cir. 2007) …………………………pg.37

Ingraham v. Wright, 430 U.S. 651…………………………………………………………pg.11

Jackson v. Phelps, 575 Fed. Appx. 79 (3d Cir. 2014) …………………………………………pg.3,4

Jimenez v. Wood County, 660 F.3d 841 (CA5 2011)……………………………………………pg.38

Johnson v Avery, 393 US 483……………………………………………………………pg.14

Johnson v. Avery, 393 U.S. 483.................................................................pg.21

Johnson v. Owens, 612 Fed. Appx. 707(5th Cir. 2015).....................................pg.35

Johnson-El v. Schoemehl, 878 F.2d 1043, 1051 (8th Cir. 1989) ........................pg.18

Jones v. City of Jackson, 203 F.3d 875 (5th Cir. 2000) ...................................pg.16

Kahler v. Kansas 206 L. Ed. 2d 312.......................................................pg.9,29

Kansas v. Crane 534 U.S. 407...............................................................pg.7

Kansas v. Hendricks 521 U.S.346........................................................pg.9,10

Kelly v. Foti, 77 F.3d 819 (5th Cir. 1996)..................................................pg.38

Kennedy v Mendoza-Martinez, 372 US 144............................................pg.12,29

Kingsley v. Hendrickson, 192 L. Ed. 2d 416).................................pg.5,12,15,25,26

Kokkonen v. Guardian Life Ins. Co. 511 U.S. 37.........................................pg.30

Lee v Washington, 390 US 333.............................................................pg.14

Lewis v. Casey, 518 U.S. 343............................................................pg.18,19

Lewis v. Woods, 848 F.2d 649, 651 (5th Cir. 1988) ........................................pg.6

Logan v Zimmerman Brush Co. 455 U.S. 422............................................pg.11

M.D. v. Abbott 907 F.3d 237 (CA5 2018)...................................................pg.3

Mabry v. Lee 849 F3d 232 (CA5 2017) ...................................................pg.23

Maine v. Moulton, 474 U.S. 159............................................................pg.18

Mann v. Smith, 796 F.2d 79, 86 (5th Cir. 1986)............................................pg.6

Marbury v. Madison, 1 Cranch 137.........................................................pg.14

Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n, 751 F.3d 368 (5th Cir. 2014) .......pg.40

Mayfield v. Texas Dep't Of Criminal Justice, 529 F.3d 599 (5th Cir. 2008) ..............pg.26

McDonald v. City of Chicago 177 L Ed 2d 894.................................................................pg.36

Memphis Community School Dist. v. Stachura, 106 S. Ct. 2537, 2544 n. 11..............................pg.6

Meyer v. Nebraska, 262 U.S. 390.........................................................................................pg.26

Mills v. Rogers, 457 U.S. 291..............................................................................................pg.11

Mills v. Rogers, 457 U.S. 291..............................................................................................pg.6

Minnesota ex rel. Pearson v Probate Court of Ramsey Cty., 309 US 270.............................pg.9

Mitchum v. Purvis, 650 F.2d 647(CA5 1981)........................................................................pg.21

Murray v. Giarratano, 492 U.S. 1........................................................................................pg.19

N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.898 F.3d 461(CA5 2018) ...........pg.40

NAACP v. Button, 371 U.S. 415...........................................................................................pg.21

Neitzke v. Williams, 490 U.S. 319........................................................................................pg.1

Norris v. Hurst Trust, 500 F.3d 454 (5th Cir. 2007)..............................................................pg.37

Olmstead v. United States, 277 U.S. 438..............................................................................pg.37

Oregon v Hass, 420 US 714.................................................................................................pg.6

O'Sullivan v. Felix, 233 U.S. 318, ......................................................................................pg.33

Overton v. Bazzetta, 539 U.S. 126.......................................................................................pg.26

Oyama v. California, 332 U.S. 633.......................................................................................pg.7

Palko v. Connecticut 302 U.S. 319 ......................................................................................pg.4

Palmer v. Waxahachie Indep. Sch. Dist., 579 F.3d 502 (5th Cir. 2009).................................pg.32

Patterson v. New York  432 U.S. 197....................................................................................pg.7

Perry v. Leeke, 488 U.S. 272...............................................................................................pg.19

Prison Legal News, 683 F.3d, 201 (CA5 2012) ....................................................................pg.26

Procunier v. Martinez, 416 U.S. 396..............................................................pg.19,31

R2 Invs. LDC v. Phillips, 401 F.3d 638(CA5 2005) .......................................pg.37

Rivers v. Roadway Express, Inc., 511 U.S. 298.............................................pg.31

Robinson v. California  370 U.S. 660.............................................................pg.8

Rudolph v. Locke, 594 F.2d 1076 (5th Cir.1979)............................................pg.22

Rudolph v. Locke, 594 F.2d 1076, 1077 (5th Cir. 1979) .................................pg.26

Ruiz v. Estelle, 679 F.2d 1115, 1139 (5th Cir.) modified 688 F.2d 266 (5th Cir.1982) .................pg.3

Ruiz V. Leblanc 643 Fed. Appx. 358  (CA5 2016) .........................................pg.3

Ryland v. Shapiro, 708 F.2d 967, 976 (5th Cir. 1983)....................................pg.6

Ryland v. Shapiro, 708 F.2d 967(CA5 1983)..............................................pg.21,31

Samford v. Dretke 562 F.3d 674( CA5 2009) ...............................................pg.1

Samson v. California, 547 U.S. 843...............................................................pg.35

Schmidt v. United States, 145 Ct.Cl. 632 ........ ............................................pg.28

Seminole Tribe of Florida v. Florida 517 U.S. 44..........................................pg.31

Simi Inv. Co. v. Harris County, 236 F.3d 240, 249-51 (5th Cir. 2000)..............pg.5

Simmons v. United States, 390 U.S. 377.......................................................pg.17

Slaughter-House Cases, 16 Wall. 36.............................................................pg.36

Soldal v Cook County, 506 US 56.................................................................pg.25

Sorrell v. IMS Health, Inc., 180 L Ed 2d 544................................................pg.31

Stack v. Boyle, 342 U.S. 1............................................................................pg.15,16

Stauffer v. Gearhart, 741 F.3d 574 (5th Cir. 2014) .......................................pg.35

Stewart v. Lubbock Cnty., Tex., 767 F.2d 153(5th Cir. 1985)..........................pg.38

ix

Thompson v. Solomon, 995 F.2d 221, 1993 WL 209926 (5th Cir. 1993) .................................pg.26

Timbs v. Indiana, 203 L. Ed. 2d 11............................................................................pg.34

Tran v. Mukasey, 515 F.3d 478 (CA5 2008)...............................................................pg.31

Union Planters National Leasing, Inc. v. Woods, 687 F.2d 117 (5th Cir.1982)..........................pg.40

United States v. Chouteau, 102 U. S. 603............................................................................pg.33

United States v. Constantine, 296 U.S. 287.........................................................................pg.33

United States v. James Daniel 510 U.S. 43..........................................................................pg.25

United States v. Johnson 476 F2d 1251 (CA5 1973) ...............................................pg.28

United States v. Locke, 482 F.3d 764 (5th Cir. 2007) ...............................................pg.35

United States v. Lyons, 731 F.2d 2439(5th Cir. 1984)(en banc) ......................................pg.8

United States v. Playboy Entm't Grp., Inc., 529 U.S. 803.........................................................pg.31

United States v. Stevens 176 L Ed 2d 435........................................................................pg.14

Village of Euclid v. Ambler Realty Co 278 U.S. 116...............................................................pg.33

Vitek v Jones, 445 U.S. 480......................................................................................pg.11

Watson v. Ault, 525 F.2d 886 (5th Cir. 1976)........................................................................pg.27

Watson v. Ault, 525 F.2d 886, 892 (5th Cir. 1976).................................................................pg.15

Watts v Indiana, 338 US 49 .........................................................................................pg.4

Weeks v. U.S. 232 U.S.383..........................................................................................pg.23

Westfall v. Luna, 903 F.3d 534......................................................................................pg.1

Wilkins v. Moore 40 F.3d 954 (CA8 1994) .........................................................................pg.3

Wilson v. Seiter 501 U.S. 294........................................................................................pg.13

Wilson v. Thompson, 593 F.2d 1375 (5th Cir.1979) ...............................................pg.21

x

Wolf v. McDonnell 418 U.S. 539 ..................................................pg.16,32

Wolff v. McDonnell, 418 U.S. 539 ...............................................pg.21

Zinermon v. Burch, 494 U.S. 113................................................pg.10

Zinermon v. Burch, 494 U.S. 113................................................pg.11

## Index of Persuasive Authority

Benefield v. McDowall, 241 F.3d 1267 (10th Cir. 2001) .......................pg.4

Benjamin v. Fraser 264 f.3d 175(CA2 2001) ................................pg.17

 Braggs v. Dunn, 257 F. Supp. 3d 1171(M.D. Ala. 2017) ....................pg.8

Cameron v. Tomes783 F. Supp. 1511(D. mass 1992)
aff'd as modified 990 f.2d 14 21 (1st Cir. 1993) ............................pg.8

Chandler v. Baird 926 F.2d 1057 (CA11 1991) .............................pg.4

Corby v. Conboy, 457 F.2d 251, 253 (2d Cir.1972) .........................pg.22

Corfield v. Coryell,, 6 F. Cas. 546, ........................................pg.36

Doe v. Harris, 772 F.3d 563 (9th Cir. 2014) ................................pg.35

Duckworth v Franzen, 780 F.2d 645, 652 (CA7 1985)........................pg.14

Hanks v. Hill 373 F. Supp. 3d 1237 (D. Minn. 2017) .......................pg.8

Harris v. Pate, 440 F.2d 315 (7th Cir.1971) ................................pg.21

Harris v. Pate, 440 F.2d 315, 317 (7th Cir.1971) ...........................pg.22

Hobbs v. Lockhart, 46 F.3d 864(8th Cir. 1995) .............................pg.4

In re Oakes, 8 Law Rep. 122, 125 (Mass. 1845) (Shaw, C. J.) ................pg.9

Inmates of Occoquan v. Barry 717 F. Supp 854,868(D.DC 1989) .............pg.8

Jordan v. Gardner, 986 F.2d 1521 (9th Cir. 1993) ...................................................pg.4

Langley v. Coughlin 715 F. Supp 854,868(SDNY 1988) .........................................pg.8

Madrid v. Gomez 889 f. Supp 1146, 1265-1266 (N.D. Cal 1995). .........................pg.8

Magluta v. Samples, 375 F.3d 1269, 1273 (11th Cir. 2004) )...................................pg.5

McCray v. Maryland, 456 F.2d  (4th Cir.1972) .................................................pg.21,22

 McMillian v. Johnson, 88 F.3d 1554, 1564 (11th Cir.), amended 101 F.3d 1363 (11th Cir. 1996).....pg.5

Owen v. Lash, 682 F.2d 648, (7th Cir.1982) .......................................................pg.31

Pizzolato v. Perez, 524 F. Supp. 914 (E.D.La.1981) ............................................pg.21

Rickerson v. Rust Civil Action No. 5:17-CV-172, 2019 WL 8500865 (E.D. Tex. Nov. 13, 2019). ....pg.23

Romero v. Story 672 F.3d 880 (10th Cir. 2012) ..................................................pg.28

Ruiz v. Estell 37 F. Supp 2d 855( S.D. Tex 1999);
rev'd and remanded on other grounds 243 F.3d 941( CA5 2001),
adhered to on remand 154 F. Supp 2d 975, 984-986(S.D. Tex. 2001) ....................pg.8

Sigafus v. Brown, 416 F.2d 105 (7th Cir.1969) ..................................................pg.22

Simpson v. Gallant 223 F. Supp 2d 286 ( D. Me. Sept 25, 20002) .........................pg.14

State ex rel. Pearson v Probate Court of Ramsey Cty, 205 Minn. 545..........................pg.9

Storey v. Taylor, 696 F.3d 987 (10th Cir. 2012) ..................................................pg.28

United States v. Bright, 24 F. Cas. 1232, 1238, F. Cas. No. 14647 (C.C. Pa. 1809) .........pg.28

United States. v. Jones, 26 F. Cas. 653 F. Cas. No. 15494 (C.C. Pa. 1813) ...................pg.28

Wolfish v. Levi, 573 F.2d 118, 133 (2d Cir. 1978)
rev'd other grounds Bell v. Wolfish, 441 U.S. 520........................................pg.18,19

# Index of Scholarly Authorities

1 W. Hawkins, Pleas of the Crown 316 (6th ed 1787) ……….…………………..…….…….pg.32

2 Edward Coke Institutes of the Laws of England § 405 p. 247b (1628)…………….………pg.7

3 Edward Coke, Institutes on the Laws of England *542……………………………..……pg.32

4  William Blackstone Commentaries on the Laws of England 20………………..……………….pg.8

 4 William Blackstone Commentaries on the Laws of England *141 ……………………….pg.32

 4 W. Blackstone, Commentaries on the Laws of England 372 (1769) ………………………pg.34

4 William Blackstone Commentaries on the Laws of England 24(1769)…………….…….…...…..pg.7

4 William Blackstone Laws on the Commentaries of England *300……………….………....…….pg.29

 A. Deutsch, The Mentally Ill in America 419-420 (1949) ……………………….……………..….pg.9

Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489 (1977)…….pg.6

Moore, "Ethics" (1963)………………………………..…………………….………..…….pg.9

Gustatson, Voluntary and Involuntary  24 Phi. L. & Phenomenological Res. 493………………..…….pg.9

Wright, The Progressive Logic of Criminal Responsibility and the Circumstances of the Most Deprived, 43 Cath. Univ. L. Rev. 459, 259-460 (1994)……………………………………….….pg.9

# Index of Statutes

15 U.S.C. 15…………………………………………………………..……………… pg.38,39

1788 N. Y. Laws, ch. 31………………………………………………………….……pg.9

18 U.S.C. (a)(2)(C)……………………………………………………………… pg.34

18 U.S.C. (a)(2)(D)............................................................................... pg.34

18 U.S.C. 3553(a)(2)(B)........................................................................ pg.34

18 U.S.C.S. § 3583(d)(2)..................................................................... pg.34,35

Fed.R.Civ.P. 15(a)............................................................................. pg.28

Fed.R.Civ.P. 15(a) ...........................................................................pg.40

Federal Rule of Evidence 201 ............................................................. pg.36

Prison Litigation Reform Act 28 § 1915..................................................pg.1

Texas Administration Code Texas Commission of Jail Standards 283.1(3)(D).............. pg.10

Texas Commission of Jail Standards Texas Admin. Code 283.1(4) ............................. pg.5

Texas Health and Safety Code 841.002(2)....................................................... pg.7

Texas Health and Safety Code 841.062 ....................................................... pg.9

## **Table Of Appendix**

Exhibit A Affidavit Concerning Welsh Contact With His Mother For Bail

Exhibit B Trial Transcripts Volume 2

Exhibit C Transcripts Volume 7

Exhibit D Affidavit Concerning the Admonishment To Forego Counsel

Exhibit E Affidavit Concerning The Lamb County Book Policy

Now comes Lonnie Kade Welsh, plaintiff appearing pro se, whose pleadings are to be held to a "less stringent standards than formal pleadings by lawyer." Haines v. Kerner, 404 U.S. 519, 520. Welsh humbly objects to the Honorable Magistrate Judge Bryant's report and recommendation under:

## I. Standard of Review

Though Welsh brings several claims against Lamb County during the time Welsh was detained in the Lamb County Detention Center Welsh cannot be considered a prisoner for the purpose of review as Welsh proceeds in forma pauperis under the Prison Litigation Reform Act 28 § 1915. The review § 1915(e)(2)(B) the Fifth Circuit in Westfall v. Luna, 903 F.3d 534, 542 (5th. Cir. 2018). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Courts may dismiss when the action on appeal fails to "state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). They may also dismiss claims that are "clearly baseless," including "claims describing fantastic or delusional scenarios." Neitzke v. Williams, 490 U.S. 319, 327-328, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989), see also Denton v. Hernandez, 504 U.S. 25, 33, 112 S. Ct. 1728, 118 L. Ed. 2d 340 (1992) (dismissal "is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them").

A claim is frivolous if it lacks "an arguable basis in law or fact." Brewster v. Dretke, 587 F.3d 764, 767 (5th Cir. 2009) (per curiam). A claim lacks an arguable basis in law "if it is based on an indisputably meritless legal theory," and a claim lacks an arguable basis in fact if "the facts alleged are fantastic or delusional scenarios or the legal theory upon which a complaint relies is indisputably meritless." Samford v. Dretke 562 F.3d 674, 678( CA5 2009) (quoting Harris v. Hegmann, 198 F.3d 153, 156 (5th Cir. 1999)).

1

## II Objection To The Report and Recommendations

## 1. Welsh Objects to the Dismissal of Substantive Right Count V

### A. Welsh Objects To The Injuries Being De Minimis

The Honorable Judge Bryant dismissed Welsh's claim for Substantive Due Process Conditions of Confinement on pg. 24-26. The magistrate dismissed Welsh's claims being de minimis with no Constitutional value. The seems not to be a question if Welsh suffered punishment at the hands of Defendants Diaz and Maddox but that it didn't rise to the level of Constitutional protection. Using the holding from the Fifth Circuit in Hamilton v. Lyons, 74 F.3d 99, 102 (CA5 1996) and Bell v. Wolfish, 441 U.S. 520,539, N21.

Though at first glance the Hamilton case seems analogous holding that "Hamilton alleges that he was denied visitation, telephone access, recreation, mail, legal materials, sheets, and showers for a three-day period." Hamilton Supra at 106. Where the dichotomy lies with Hamilton is because it is unclear as to if the court applied a totality of the living conditions or if Hamilton plead any mental and emotional injuries. And how those condition affect the Substantive analysis when combined with the mental and emotional injuries. The magistrate claimed that Welsh did not claimed any injuries on pg. 25 N.19 that "Welsh does not claim any specific harm with respect to the reported deprivation." See Questionnaire 18-19. But the magistrate did not read the complaint liberally as he is required nor does it seem that he accepted anything Welsh said as true.

Because Welsh claimed on pg. 18-19 "It provide a degree of mental torture when you add up the totality of the circumstances." For every restrictive punishment. Moreover, Welsh further stated specifically that the injuries caused sever "mental sickness of depression, anxiety, and sleepless nights due to worry, with the added physical illness causing pain by headaches and nausea produced by the mental burden the aforementioned mental sickness to the plaintiffs constitution." Finally the Magistrate did not even ask about how sleeping on the cell concrete floor while he was injured with internal bleeding harmed him as he clearly plead in the complaint. See Amended Complaint pg. 5-6 #7. See Alberti v. Klevenhagen 790 F.2d 1220 (CA5 1986) "The court held that the totality of the conditions at the jails failed contemporary standards of decency."

2

Welsh claims that he was "was forced to eat foodloaf, denied a sleeping mattress, proper bedding material being allowed on one blanket toothbrush and toothpaste and toothbrush, legal property and other personal property, phone, and recreation stationary." Moreover, the defendants made Welsh drink from the toilet for substance and to satisfy his thirst. See Exhibit C Transcripts Volume 7 pg. 10. But, Welsh clearly claimed injuries being mentally and emotionally through the totality of confinement. "The district court stated that, with respect to causation, it is "[understood] Plaintiffs' argument as saying that each policy and practice does not, on its own, have to result in a constitutional violation." It pointed to this court's opinion in Alberti v. Klevenhagen for the proposition that, '[i]n determining the constitutional question, we need not separately weigh each of the challenged institutional practices and conditions, for we instead look to 'the totality of conditions.'" M.D. v. Abbott 907 F.3d 237, 254 (CA5 2018) (quoting) Alberti v. Klevenhagen 790 F.2d 1220, 1224 (5th Cir. 1986) (quoting Ruiz v. Estelle, 679 F.2d 1115, 1139 (5th Cir.) (Ruiz VII), modified on other grounds, 688 F.2d 266 (5th Cir.1982);

This is the appropriate standard, "[Welsh] contends that the 'totality of conditions' of his confinement also establish an Eighth Amendment violation. Ruiz is correct that conditions of confinement 'in combination' may establish an Eighth Amendment violation, 'but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need," such as exercise, warmth, or hygiene.'" Gates v. Cook, 376 F.3d 323, 333 (5th Cir. 2004) (emphasis added). Thus, the magistrate judge also erred insofar as dismissing [Welsh's] 'totality of the conditions' claim as it relates to" the physical deprivation of liberty and the mental and emotional torture Diaz and Maddox forced upon Welsh. Ruiz V. Leblanc 643 Fed. Appx. 358,363 N.9 (CA5 2016).

First it must be considered that Welsh was injured from the use of force and the punitive detention for three days being by retribution for that force. "Retribution and deterrence are not legitimate nonpunitive governmental objectives." Bell 441 U.S. at 539 N.20. Therefore the, " fact finder will need to determine, on all the evidence relating to beatings, removal of all clothing and other indignities, if established, whether the officers' conduct satisfied reasonable safety and security concerns or, rather, was exercised maliciously and sadistically. Because the 'excessive force' and 'conditions-of-confinement' claims in this case are so analytically and factually intertwined, the plaintiff's charges require consideration of the evidence relating to both claims as a continuous course of conduct." Wilkins v. Moore 40 F.3d 954, 958 (CA8 1994). See also Jackson v. Phelps, 575 Fed. Appx. 79, 84 (3d Cir. 2014) "Even assuming that the restraints were rationally related to protecting institutional security, and Jackson's behavior was "erratic," a reasonable jury could conclude that, under a totality of the circumstances, both actions were disproportionately severe such as to amount to punishment." See

3

Wolfish, 441 U.S. at 539 n.20 ("Retribution and deterrence are not legitimate nonpunitive governmental objectives.") 575 Fed. Appx. 79, 84.

Therefore the injury requirement for the conditions of confinement must take in the use of force. But the injury requirement also raises above the de minimis threshold because of the psychological and mental affects upon Welsh. "It is not hard to imagine inflictions of psychological harm-without corresponding physical harm-that might prove to be cruel and unusual punishment." Hudson, v. McMillian 503 U.S. 1,16 (Blackmun, J., concurring in the judgment) (citation omitted). Justice Blackmun stated he was "unaware of any precedent of [the Supreme] Court to the effect that psychological pain is not cognizable for constitutional purposes. If anything, our precedent is to the contrary." Id. See also "There is torture of mind as well as body; the will is as much affected by fear as by force. And there comes a point where this Court should not be ignorant as judges of what we know as men." Watts v Indiana, 338 US 49,52. Or stated another way "No doubt there would remain the need to give protection against torture, physical or mental." Palko v. Connecticut 302 U.S. 319,326.

Of course the circuit courts agree on this point. "Moreover, he later unambiguously stated: 'As far as being in solitary confinement or administrative confinement . . . I'm sure I was depressed from it.' This clearly poses the factual question whether plaintiff 'suffered any pain, misery, anguish or similar harm, whether capable of estimation or not.'" Chandler v. Baird 926 F.2d 1057, 1066 (CA11 1991)(quoting) Cowans v. Wyrick, 862 F.2d 697, 700 (8th Cir. 1988). "In short, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." Brown v. Lynch, 524 F. App'x 69, 79 (5th Cir. 2013) (quoting Ikerd v. Blair, 101 F.3d 430, 434-35 (5th Cir. 1996)); See also Delaney v. DeTella, 256 F.3d 679, 685 (7th Cir. 2001) (permitting prisoner's allegations of mental and physical injuries resulting from the denial of "out-of-cell exercise opportunities" for six months, and rejecting the defendants' argument that 'only a showing of physical injury can satisfy an Eighth Amendment claim'"); Benefield v. McDowall, 241 F.3d 1267, 1272 (10th Cir. 2001) (affirming claim based upon prisoner's allegation that a guard had labeled him a "snitch" even though the prisoner had not alleged a physical injury); Jordan v. Gardner, 986 F.2d 1521, 1525 (9th Cir. 1993) (en banc) (holding that cross-gender clothed body searches constitute an "infliction of pain" because the searches created "a high probability of great harm, including severe psychological injury and emotional pain and suffering" (emphasis added; internal quotation marks omitted)). Cortez v. McCauley, 478 F.3d 1108, 1129 (10th Cir. 2007)"actual injury that is not de minimis, be it physical or emotional." ; Hobbs v. Lockhart, 46 F.3d 864, 869 (8th Cir. 1995) "inmate's emotional distress was sufficiently serious to support Eighth Amendment failure-to-protect claim."

4

The Supreme Court established the standard for substantive due process claims raised by pretrial detainees in Bell. Bell teaches that "a [pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Bell supra at 535; see also McMillian v. Johnson, 88 F.3d 1554, 1564 (11th Cir.), amended on other grounds on reh'g by 101 F.3d 1363 (11th Cir. 1996). Substantive due process violation under the Fourteenth Amendment of the U.S. Constitution has two elements: (1) the government's conduct implicates a constitutionally protected right and (2) this conduct is not rationally related to a legitimate governmental interest. See, e.g., Simi Inv. Co. v. Harris County, 236 F.3d 240, 249-51 (5th Cir. 2000).

"[W]hether a condition of pretrial detention amounts to punishment [ for a substantive due process analysis] turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose." Magluta v. Samples, 375 F.3d 1269, 1273 (11th Cir. 2004) (citing Bell, 441 U.S. at 538, 99 S. Ct. at 1873). "[A]n expressed intent to punish on the part of detention facility officials" is sufficient, but not necessary, to establish unconstitutional pretrial punishment. Bell, 441 U.S. at 538, 99 S. Ct. at 1873-74; see also McMillian, 88 F.3d at 1564. Because, "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related  to a legitimate governmental objective or that it is excessive in relation to that purpose." Kingsley v. Hendrickson, 192 L. Ed. 2d 416,427 (emphasis added); Bell supra 441 U.S., at 541-543, Cf. Block v. Rutherford, 468 U.S. 576, 585-586.

## B. The Defendants Violated Welsh's Liberty Interest Created By State Law

Even if the Federal Judges has water down the meaning of the constitution to be of little value. Welsh has a state created liberty interest that is suppose to be protected by the due process clause in not being denied a bed, hygiene, clothing, or to be feed via food loaf. These restrictions being  in direct violation of Texas Commission of Jail Standards Texas Admin. Code 283.1(4).

Here the State uses state uses language of a mandatory character, such as "shall," "will," or "must." Hewitt v. Helms, 459 U.S. 460, 471. So when the state uses language under in  Texas Admin. Code 283.1(4) holding "The following sanctions are prohibited:

(A)  deviation from normal feeding procedures;

(B)  corporal punishment;

(C)  administration of any form of disciplinary action or supervision by inmates;

(D)  deprivation of clothing or bedding; inmates who destroy bedding or clothing may be deprived of such items. This shall be reviewed and documented every twenty-four hours;

(E)  use of a violent cell;

(F)  deprivation of items necessary to maintain an acceptable level of personal hygiene;

(G)  deprivation of correspondence privileges when the offense is unrelated to a violation of the institutional rules and regulations regarding correspondence. In no case shall privileged correspondence be suspended; and

(H)  deprivation of physical recreation or physical exercise.

Because Welsh claims the depravation of feeding, hygiene, recreation, clothing, and bedding and those actions to be prohibited to the Defendants under State law the use of the "per legem terrae" requirement of due process is violated. The defendants acted arbitrary and capaciously and even though it would seem there is nothing written to protect Welsh's rights according to Judge Bryant under United States Constitutional Law, "For purposes of determining actual rights and obligations, however, questions of state law cannot be avoided.  Within our federal system the substantive rights provided by the Federal Constitution define only a minimum.  State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution.  If so, the broader state protections would define the actual substantive rights possessed by a person living within that State." Mills v. Rogers, 457 U.S. 291,300 (citing) Greenholtz v Nebraska Penal Inmates, 442 US 1, 7, 12,; Oregon v Hass, 420 US 714, 719; see also Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489 (1977).

## C.. If The Claim Is De Minimis It Still Cannot Be Dismissed

Here, there is no dispute between Welsh and Judge Bryant to the facts that Welsh was punished.  Diaz and Maddox abused their authority and punished Welsh. Therefore they violated the constitution. In Lewis v. Woods, 848 F.2d 649, 651 (5th Cir. 1988). A violation of constitutional rights is never de minimis, a phrase meaning so small or trifling that the law takes no account of it. As the Supreme Court and this circuit have emphasized, a party who proves a violation of his constitutional rights is entitled to nominal damages even when there is no actual injury. Memphis Community School Dist. v. Stachura, 477 U.S. 299, 106 S. Ct. 2537, 2544 n. 11; Carey v. Piphus, 435 U.S. 247, 266; Mann v. Smith, 796 F.2d 79, 86 (5th Cir. 1986); Ryland v. Shapiro, 708 F.2d 967, 976 (5th Cir. 1983).

6

## 2. Welsh Objects To His Punishment R & R pg. 26-30.

### A. Welsh Objects To Being Punished For Acts Outside His Control Count VI #19

The Defendants Lamb County by policy practice and custom by its policy makers Maddox, Thompson, and Diaz and individual Maddox, Thompson, and Diaz did violate plaintiff Substantive Due Process Rights under the United States Constitutional Fourteenth Amendment as named defendants acts punished or disciplined plaintiff for acts outside is control.

Even though Judge Bryant cited case law that Jail officials can punish Welsh. That is not the issues. " But assuming, for purposes of argument only, that the basic prohibition is constitutional, it does not follow that there is no constitutional  limit to the means which may be used to enforce it." Oyama v. California, 332 U.S. 633,646-647.

The State of Texas as declared Welsh to be mentally ill. But not just ill but seriously ill that he cannot be held morally to blame for his acts of sexual violence. See Kansas v. Crane 534 U.S. 407,413. Specifically, the State of Texas has determined that Welsh lacks free will to control his sexual impulses. As this court should take judicial notice that Welsh is a Sexually Violent Predator under Texas Health and Safety Code 841. The State who used its powers to define a medical condition has held that Welsh has a volitional capacity disorder known as a behavioral abnormality. See Texas Health and Safety Code 841.002(2). So it must not be discounted that when Welsh used the words "you look sexy using force" towards a female officer this is apart of his mental derangement. The Magistrate never addressed Welsh's mental illness when he wrote his report and recommendations about Welsh's punishment on page 26-28.

History and ethics are on Welsh's side. Blackstone would determine the "deficiency in will, excuses from the guilt of crimes, arises also from a defective or vitiated understanding, viz., in an idiot or a lunatic. For the rule of law as to the latter, which may easily be adapted also to the former, is, that "furious furore solum punitur." (A madman is punished by his madness alone). 4 William Blackstone Commentaries on the Laws of England 24(1769).He wrote further that 'lunatics are not chargeable for their own acts, if committed when under these incapacities." 4 William Blackstone Commentaries on the Laws of England 24. Even Sir Edmond Coke explained that a commission of a criminal offense by "the act and wrong of a mad man shall not be imputed to him." 2 Institutes of the Laws of England § 405 p. 247b (1628) (Coke).

The act to punish Welsh "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Patterson v. New York 432 U.S. 197,202. As it was said, "To

7

be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the "crime" of having a common cold. Robinson v. California 370 U.S. 660, 667.

Blackstone characterized the volitional question as the ultimate issue for culpability, "all the several pleas and excuses, which protect the committer of a forbidden act from the punishment which is otherwise annexed thereto, may be reduced to this single consideration, the want or defect of will." 4 Blackstone 20. He further expressed that the cognitive disorder has a role to play in the volitional impairment, " where there is a defect of understanding . . . there is no discernment, there is no choice; and where there is no choice, there can be no act of the will." Id at 20. These facts of comparison of the volition and cognitive disorder connection was not lost upon the esteem Justices when the Fifth Circuit sitting en banc declared, "Most psychotic persons who fail a volitional test would also fail a cognitive test, thus rendering the volitional test superfluous for them." United States v. Lyons, 731 F.2d 243,249(5th Cir. 1984)(en banc).

Other Courts have decided it to be wrong to punish the mentally ill for acts that are a product of the inmates mental illness."[B]eing treated with punitive measures by the custody staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses" violated seriously mentally ill prisoners' Eighth Amendment rights." Coleman v. Wilson, 912 F. Supp. 1282, 1320 (E.D. Cal. 1995); See also Braggs v. Dunn, 257 F. Supp. 3d 1171, 1232 (M.D. Ala. 2017) "ADOC has an unacceptable practice of disciplining mentally ill prisoners for behavior that stems from their mental illnesses and doing} so without adequate regard for the disciplinary sanctions' impact on mental health."; Hanks v. Hill 373 F. Supp. 3d 1230;1232(D. Minn. 2017); Cameron v. Tomes783 F. Supp. 1511,1524-1525 (D. mass 1992) aff'd as modified 990 f.2d 14 21 (1st Cir. 1993); Ruiz v. Estell 37 F. Supp 2d 855,915( S.D. Tex 1999);, rev'd and remanded on other grounds 243 F.3d 941( CA5 2001), adhered to on remand 154 F. Supp 2d 975, 984-986(S.D. Tex. 2001); Langley v. Coughlin 715 F. Supp 854,868(SDNY 1988); Inmates of Occoquan v. Barry 717 F. Supp 854,868(D.DC 1989); Madrid v. Gomez 889 f. Supp 1146, 1265-1266 (N.D. Cal 1995).

It would seem that the likely interpretation of behavioral abnormality and for the purpose of this discussion would show the prospect that a congenital mental condition that distorts

8

volition is not conjecture because the colloquialism must turn on the finding of beyond a reasonable doubt such an extremely high burden the state undertook to judge the facts of the behavioral abnormality. The term applied and understood that a volitional capacity is an intense abnormality to be the impetus, to be the determining factor to chose to engage in the act of sexual violence is cast with the consideration that free will is struggle for Welsh and a losing one at that. See generally Moore, "Ethics" (1963); Gustatson, Voluntary and Involuntary 24 Phi. L. & Phenomenological Res. 493, 498-501. See also Texas Health and Safety Code 841.062 ( finding Welsh volitional impairment beyond a reasonable doubt).

In the history of our nation this is established that a "non compos mentis" is not to be held morally to blame. This is an expression held by all 9 members of the Supreme Court in the 2019 decision of Kahler v. Kansas 206 L. Ed. 2d 312. Even though the esteem Justices came to different conclusions about the standards of moral accountability the opinion and the descent leaves little doubt that historically individuals how are in the throws of a mental disorder cannot be held to account for their actions. As the only qualifier would be the States choice for definitions. "There is remarkable agreement that in general, the legal system must not impose punishment unless the defendant is blameworthy or beans moral responsibility for [his] act." Wright, The Progressive Logic of Criminal Responsibility and the Circumstances of the Most Deprived, 43 Cath. Univ. L. Rev. 459, 259-460 (1994). And the idea of madness affecting those with the "Behavioral Abnormality" is explicitly clear by four Supreme Court Justice. "The law traditionally has considered this kind of abnormality akin to insanity for purposes of confinement.  See, e.g., Minnesota ex rel. Pearson v Probate Court of Ramsey Cty., 309 US 270, 274, (upholding against a due process challenge the civil confinement of a dangerous person where the danger flowed from an " 'utter lack of power to control . . . sexual impulses' ") (quoting State ex rel. Pearson v Probate Court of Ramsey Cty, 205 Minn. 545, 555, 287 N. W. 297, 302 (1939)); 1788 N. Y. Laws, ch. 31 (permitting confinement of those who are "furiously mad"); In re Oakes, 8 Law Rep. 122, 125 (Mass. 1845) (Shaw, C. J.); A. Deutsch, The Mentally Ill in America 419-420 (1949) (tracing history of commitment of furiously mad people in 18th and 19th centuries)." Kansas v. Hendricks 521 U.S.346,375-376 (dissenting opinion).

In law, no less than in morals, the idea of human action lies at the heart of the ascription of responsibility. It is the minds volition that cause acts. The State defenses to excuses criminal

9

consequences derive from the idea that certain mental diseases, defects and abnormalities can interfere with a persons acting self to render him blameless. The defenses of insanity, mens rea, and voluntary action have more in common than they do in disagreement. Given all of this the "Behavioral Abnormality" falls into those ideologies that must be considered one of the designations that preclude criminal responsibility because the Constitution compels the results to separate the typical from the atypical criminal. See Hendricks supra at 357-358 and Crane supra at 413. Therefore, Welsh cannot be punished for calling a sexy women sexy because he cannot suffer moral condemnation for acts beyond his control.  It is the interest being deep rooted in history and social conscience that vindicated by the Due Process Clause as a Substantive Right in the historical sense that  "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" Zinermon v. Burch, 494 U.S. 113,125 (quoting) Daniels v Williams, 474 US, 327, 331.

## B. Welsh had a State Created Liberty and Property Interest In Count VII #20

The Jail officials did not have to implement a system to reduce and mitigate the disciplinary when imposing disciplinary under Texas Administration Code Texas Commission of Jail Standards 283.1(3)(D) stating, "provisions may be included for inmates to waive the right to a disciplinary hearing provided proper notification is given prior to the signing of the waiver." But when they chose to create the waiver the administration code carried mandatory language, "The waiver shall include the appropriate identification of charges, the allowable sanctions, and the sanctions offered by the waiver. A waiver shall not include the loss of good time as a sanction."

The Defendants did not have to change Welsh's disciplinary verdict under the heading of sexual siltation to disrespect. But when they did so, this implemented a corresponding obligation under the statute that "The waiver shall include the appropriate identification of charges, the allowable sanctions, and the sanctions offered by the waiver. A waiver shall not include the loss of good time as a sanction." Therefore, when the Defendants changed the disciplinary title the original waiver did not have the appropriate information to inform Welsh of what he was accepting or rejecting and he then has the State Created right that should have been enforced. "Indeed, any other conclusion would allow the State to destroy at will virtually any state-created property interest. The Court has considered and rejected such an approach:  'While the legislature may elect not to confer a property interest, ... it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.

10

... [T]he adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms.'" Logan v.Zimmerman Brush Co. 455 U.S. 422,432 quoting Vitek v Jones, 445 U.S. 480, 490-491, n 6, and quoting Arnett v Kennedy, 416 U.S.134,167.

It was defendants duty under the Constitution "to implement procedural safeguards" when thay changed the disciplinary. Zinermon v. Burch, 494 U.S. 113,138. The Supreme Court has "pointed out that 'minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.'" Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532,541(citation omitted). When determining the Procedural Due Process Clause "a State may confer procedural protections of liberty interests that extend beyond those minimally required by the Constitution of the United States. If a State does so, the minimal requirements of the Federal Constitution would not be controlling, and would not need to be identified in order to determine the legal rights and duties of persons within that State." Mills v. Rogers, 457 U.S. 291,300

## C. Welsh Cannot Suffer Punishment by Retribution Even If He Had Control

The courts have allowed the States to implement a system of punishment by retribution and deterrence absent a criminal conviction calling the acts disciplinary. When the Magistrate cites to different opinions none of then controlling it is essentially "the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends. If I may pursue that metaphor:" Judge Brant has cited to numerous opinions that are not well reasoned or explanatory of how an individual who cannot be punished at all, can be punished by retribution and deterrence. He has, "selected few of whom-[his] "friends"-the Court has introduced to us in support of its result. But there are many other faces in the crowd, most of which, I think, are set against today's result." Conroy v. Aniskoff 507 US 511, 519 ( J. Scalia Desenting) (emphasis added).

"Behavior correction and preservation of order are purposes ordinarily associated with punishment." Ingraham v. Wright, 430 U.S. 651, 687-688( J. White, Brennan, Marshall, and Stevens.) Now it is understood that , "Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility

11

so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." Bell supra at 536-537.

Now Welsh was conceivably punished because he told a female officer she looks sexy. Administration imposed sanction for retribution and deterrence purposes. The County may have a goal to maintain a pristine work environment where their employees feeling are protected. But "Retribution and deterrence are not legitimate nonpunitive governmental objectives." Bell supra at 539, N.20. Now, the Judge may say this has to be a mistake by the then Justice Rehnquist. A simple word slippage that we can ignore. But what does the court say when its repeated by a majority of justices, "Furthermore, 'retribution and deterrence are not legitimate nonpunitive governmental objectives." United States v Halper, 490 US 435,448 (citation omitted). It is because this is an older principle of liberty and freedom. It is a shame that the court destroyed the presumption of innocence with the Bell holding.Because that presumption had carried further in the culture and psyche of Americans than the court will ever know.

The court needs to explain where in Constitutional doctrine they arrive at the premise that Welsh can be punished, "For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Bell supra at 535. It seems a far cry from the premise that, "most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all" let alone by means of retribution. Kingsley v. Hendrickson, 192 L. Ed. 2d 416,428.

In this instance Judge Brant says an "expressed intent to punish on the part of detention facility officials" is expectable though the holding tells you just the opposite. Bell supra at 565. Bell instructs us to turn to the Seven Kennedy Factors expressed in Kennedy v Mendoza-Martinez, 372 US 144. These factors are:

The punitive nature of the sanction here is evident under the tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character, even though in other cases this problem has been extremely difficult and elusive of solution. Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions.

Kennedy v Mendoza-Martinez, supra, at 168-169. So the relevant enquiry is does the Kennedy factors expose the Defendants to liability for punishing Welsh. Lets take them one at a time:

12

1. The sanctions imposed caused an affirmative disability and restraint by imposing solitary confinement and impoverishing Welsh's right to communicate and associate by the telephone and preventing him the ability from acquiring property.

2. The sanctions absolutely carry the historic meaning of punishment. The defendants implemented a "continuum of possible punishments ranging from solitary confinement" Griffin v. Wisconsin 483 U.S. 868,874. Of Course the denial of the right to acquire property or the diminished First Amendment rights to access the phone was considered by Kennedy v Mendoza-Martinez when it determined what is the meaning of historic punishment. Id at 168, N.23. Here the court Cited Cummings v Missouri (US) 4 Wall 277, 320, 321. Punishment is not limited "'to punish one is to deprive him of life, liberty or property, and that to take from him anything less than these is no punishment at all.' The learned counsel does not use these terms-life, liberty, and property-as comprehending every right known to the law. He does not include under liberty freedom from outrage on the feelings as well as restraints on the person. He does not include under property those estates which one may acquire in professions, though they are often the source of the highest emoluments and honors. The deprivation of any rights, civil or political, previously enjoyed, may be punishment; the circumstances attending and the causes of the deprivation determining this fact." Id at 320.And it is further understood, "The theory upon which our political institutions rest is, that all men have certain inalienable rights-that among these are life, liberty and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions, are alike open to everyone, and that in the protection of all these rights all are equal before the law. Id at 321-322.

3. A scienter is definitely required. You have to impose some sort of intent and knowingly break the rules to be punished. And it has to be an act of free-will.

4. I think we have settled the fact that the defendants purpose was for retribution and deterrence.

5. The behavior was not a crime. This lies in favor of the defendants.

6. They call it disciplinary which is an act for "The infliction of punishment" meaning it "is a deliberate act intended to chastise or deter. This is what the word means today; it is what it meant in the eighteenth century ...." Wilson v. Seiter 501 U.S. 294,300 (citing) Duckworth v

13

Franzen, 780 F.2d 645, 652 (CA7 1985). So it is the purpose to punish. Though the Defendants may have some other corresponding goal the main goal is punishment.

7. The defendants did not have to apply all the other sanctions to get their point across therefore they could have achieved their goal of safety by the placement in solitary confinement alone. Moreover, the fact if Welsh would have agreed to half the restriction via the waived rights to a hearing shows that half the restriction satisfied the Defendants institutional needs.

Finally I will point out that the reason to discipline Welsh was because he spoke words. I did not cause an act that would place the security of the institution and the public in danger. Welsh did not insight others to violence. Did not provoke or threaten with any words to place the jailers in fear of violence. In short there was no clear and present danger. Sure the words where provocative but such words should be expected by the ambience of such a facility here the Defendants should be made to show that Welsh's speech, where only one other guard was in hearing, was of such a nature that it would lead to the breakdown of the safety and security of the institution. " It is the business of prison officials, of course, to maintain order within their institutions.  But this fact does not support a claim that every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security.  Routine and automatic arguments to this effect have been made before and have been rejected by this Court." Cleavinger v. Saxner, 474 U.S. 193,207 (citing) See Johnson v Avery, 393 US 483, 486-487,; Lee v Washington, 390 US 333, 334; Ex parte Hull, 312 US 546. But more importantly a lesson all courts need to learn, "The Constitution is not a document `prescribing limits, and declaring that those limits may be passed at pleasure.'" United States v. Stevens 176 L Ed 2d 435,445 (quoting) Marbury v. Madison, 1 Cranch 137, 178

### 3. Welsh's Objects To The Dismissal of Claim Count VIII  Right to Make Bail

The Magistrate dismissed Welsh's right to make bail on pages 30-32. Stating that because I had access to the mail to write an attorney or family members that Welsh failed to state a claim. The magistrates reasoning and the cases he cites to are nonsensical. First, he cites to Simpson v. Gallant 223 F. Supp 2d 286 ( D. Me. Sept 25, 20002) that Welsh's rights falls into the province of "post-arrest procedural guarantees such as bail." Id at 295. He ultimately dismiss the case that

14

Welsh had access to the mail for legal and personal and cites that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." Bell supra 441 U.S. at 539.

But the Magistrate provides no reasoning why the jail has a legitimate objective to keep Welsh within its confines. Moreover, Bell punishment analysis does not provide for if Welsh had a reasonable alternative to exercise his rights. Bell holding say's " without more" well the denial of bond is "more" and fails into the other rubric, "Conversely, loading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution.  But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish." Bell supra at 539 N. 20. And that Welsh can "prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." Kingsley Supra 192 L Ed 2d at 427.

First I will point out that Welsh had no attorney to write. Further, he never asked the question if writing to my family to procure bail was legitimate alternative that could succeed in establishing to bonding process. It was not. "The more difficult problem, however, is that of framing the questions to insure that responses are given and are also of some use. Thus, the form should be simple enough for the average prisoner to understand the questions. The form should be concise and pertinent to a claim asserted under the Civil Rights Act." Watson v. Ault, 525 F.2d 886, 892 (5th Cir. 1976). See Exhibit A Affidavit Concerning Welsh Contact With His Mother For Bail. Nor does the magistrate establish the connection that even prolonging the right to bail by seeking it via the mail system is reasonable to the jail objectives. Which seems the only objective was to insure their disciplinary "punishment" was fully achieved.

Welsh clearly established the reasoning of why he wanted bond. Not only do I have a right not to sit needlessly in solitary confinement looking at the four walls because the defendants wanted to visit a punitive system of "retribution and deterrence" but, Welsh had the "traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction." Stack v. Boyle, 342 U.S.

15

1, 4. Welsh clearly pointed out that he wanted to return to the Texas Civil Commitment Center due in the most part because of the superior law library services. The defendants nor the magistrate have authority to determine where Welsh will spend his time awaiting trial. See Report and recommendations pg. 31, "he would not have been released into the free world but instead would have returned to civil commitment." See Stacks supra at 7-8 "The practice of admission to bail, as it has evolved in Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is found convenient to give them a trial.  On the contrary, the spirit of the procedure is to enable them to stay out of jail until a trial has found them guilty. Without this conditional privilege, even those wrongly accused are punished by a period of imprisonment while awaiting trial and are handicapped in consulting counsel, searching for evidence and witnesses, and preparing a defense."

It is an abuse of power to maintain confinement in the County Jail for purposes of fulfilling the institutions disciplinary plan. "The touchstone of due process is protection of the individual against arbitrary action of Government.: Wolf v. McDonnell 418 U.S. 539,558 (citing) Dent v West Virginia, 129 US 114, 123. The Defendants must be made to answer why and how the postponement of the right to bail served a legitimate non-punitive objective. "Prohibition against improper use of the 'formal restraints imposed by the criminal process' lies at the heart of the liberty interests protected by the Fourteenth Amendment due process clause." Jones v. City of Jackson, 203 F.3d 875, 880 (5th Cir. 2000), (quoting ) Board of Regents v. Roth, 408 U.S. 564, 575.

## 4. Welsh Objects to the Dismissal Access To The Courts I & II.

### A. Failure To Provide Access To The Court Due To Self Representation

Initially and grudgingly so, Welsh admits that under Fifth circuit precedent Degrate v. Godwin 84 F.3d 768 (CA5 1996) Judge Bryant makes a good point. I would only say that my case may be inapposite to the Degrate case. Let me explain. . . .

Welsh did not make a knowingly and intelligent choice to dismiss counsel. This is not said lightly, but I present proof. That (1) the choice was made with the understanding I would

have access to law library services and (2) that attorney Jim Saw was suppose to be retained as stand-by counsel. See Exhibit B Trial Transcripts Volume 2 pg.24  and Exhibit C Volume 7 pg.23-24.

I did not waive the assistance of counsel but was under the understanding that Shaw was appointed to answer legal questions. At some point and early without any notice the trial court of the 154th Judicial District removed Shaw. Mr. Shaw asked the court directly " Your Honor, I would, I guess, I need to ask the Court what capacity that I would be representing him or not representing him or be involved in the case?" To this question the court answered, " I will continue you as stand-by counsel to answer any legal questions that he might have. That will be the—I mean, all you will be subjected to in this case." See Exhibit B Volume 2 pg. 24.

The holding in Degrate makes clear, "prisoner who knowingly and voluntarily waives appointed representation by counsel in a criminal proceeding is not entitled to access to a law library" 84 F.3d at 769. Here, Welsh never "having rejected the assistance of court-appointed counsel" waived his rights to direct representation not assistance by Mr. Shaw to as the 154th District court put it "answer any legal question he might have." When Welsh realized that neither Mr. Shaw or a law library was provided for access to the courts Welsh filed for continuance. See Exhibit C Volume 7 pg. 23-24 sating, "Furthermore, if the Court will recall, I initially asked for Mr. Shaw to sit here with me as standby counsel. How that ended up changing I don't know and it's horrible." Mr. Shaw informed Welsh that he was under the presumption that he was suppose to be stand-by counsel and didn't understand why that changed. Mr. Shaw is a key witness to what happened. If need be I will provide the entire trial transcript to show that never was I told that Mr. Shaw would not be my stand-by counsel. See Exhibit D Affidavit Concerning the Admonishment To Forego Counsel.

It has been said, In Simmons v. United States, 390 U.S. 377,398 to be " intolerable that one constitutional right should have to be surrendered in order to assert another." In order to represent myself I also had to give-up legal research and assistance of counsel. I know it is not fashionable to make an ineffective assistance of counsel claim when one represents himself by the defendants interfered with my right to make myself effective. The Second circuit has held in Benjamin v. Fraser 264 f.3d 175(CA2 2001)at 185-188 seems to be more  analogous to Welsh's cause than the Fifth Circuits  Degrate v. Godwin, Welsh will present the opinion in its entirety:

17

The Department contends that Lewis's standing requirement of "actual injury" applies not just to law libraries and legal services, but to all access-to-the-courts and right-to-counsel claims. It argues, "Interference with attorney visits does not rise to the level of a constitutional violation unless the inmate is completely denied access to courts or legal counsel, or a policy exists that creates a substantial interference with attorney-client communication that has an identifiable detrimental effect."

We disagree. The Court in Lewis gave no indication that it intended to overrule Procunier. Procunier (relating to an inmate's ability to seek and receive the assistance of an attorney) is closer than Lewis (dealing with the state's obligation to provide legal services and a law library to convicted prisoners) to our case. More importantly, Lewis is inapplicable to Sixth Amendment claims of pretrial detainees.

Lewis's reasoning is premised on the distinction between the standing required to assert direct constitutional rights versus the standing required to assert claims that are derivative of those rights. Because law libraries and legal assistance programs do not represent constitutional rights in and of themselves, but only the means to ensure "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts," prisoners must demonstrate "actual injury" in order to have standing. Lewis v. Casey, 518 U.S. 343, 351 (internal quotations omitted). In the absence of actual or imminent harm, "the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches," id. a 349, requires the judicial branch to leave to the political branches the choice among "alternative means to achieve . . . . meaningful access to the courts," id. at 351. By contrast, where the right at issue is provided directly by the Constitution or federal law, a prisoner has standing to assert that right even if the denial of that right has not produced an "actual injury."

The right of the accused "in all criminal prosecutions . . . to have the Assistance of Counsel for his defence" is a direct right, grounded squarely in the text of the Constitution. U.S. Const. amend. VI. While a prisoner complaining of poor law libraries does not have standing unless he can demonstrate that a direct right - namely his right of access to the courts - has been impaired, in the context of the right to counsel, unreasonable interference with the accused person's ability to consult counsel is itself an impairment of the right. As the Supreme Court has recognized, "to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." Maine v. Moulton, 474 U.S. 159, 170, 88 L. Ed. 2d 481, 106 S. Ct. 477 (1985). See also Wolfish v. Levi, 573 F.2d 118, 133 (2d Cir. 1978) ("One of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979); Johnson-El v. Schoemehl, 878 F.2d 1043, 1051 (8th Cir. 1989) (when pretrial detainees' interest in effective communication with attorneys is "inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised"). While certain restrictions on a detainee's right to counsel may be justified by the constraints of institutional management, this does not affect the detainee's standing to challenge those restrictions. In other words, the standing question raised by Lewis - whether a person's interests have been harmed in a way that creates a justiciable controversy - must be distinguished from the subsequent question of justification - whether such an impairment is necessitated by a legitimate government interest.

18

The Department is correct that the right to counsel and the right of access to the courts are interrelated, since the provision of counsel can be a means of accessing the courts. However, the two rights are not the same. The access claims at issue in Lewis concerned the ability of convicted prisoners "to attack their sentences, directly or collaterally, and . . . to challenge the conditions of their confinement." 518 U.S. at 355. By contrast, here we are concerned with the Sixth Amendment right of a pretrial detainee, in a case brought against him by the state, to utilize counsel in his defense. It is not clear to us what "actual injury" would even mean as applied to a pretrial{2001 U.S. App. LEXIS 27} detainee's right to counsel. Lewis describes "actual injury" as a showing that a "non-frivolous legal claim had been frustrated or was being impeded" due to the action of prison officials. Lewis, 518 U.S. at 353. The reason pretrial detainees need access to the courts and counsel is not to present claims to the courts, but to defend against the charges brought against them. See Murray v. Giarratano, 492 U.S. 1, 7, 106 L. Ed. 2d 1, 109 S. Ct. 2765 (1989) (contrasting "trial stage of a criminal proceeding, where the State by presenting witnesses and arguing to a jury attempts to strip from the defendant the presumption of innocence and convict him of a crime," with the post-conviction stage "where the defendant needs an attorney not as a shield to protect him against being haled into court by the State and stripped of his presumption of innocence, but rather as a sword to upset the prior determination of guilt" (internal quotation marks omitted)).

In considering burdens on the Sixth Amendment right to counsel, we have not previously required that an incarcerated plaintiff demonstrate "actual injury" in order to have standing. See Perry v. Leeke, 488 U.S. 272, 278-80, 102 L. Ed. 2d 624, 109 S. Ct. 594 (1989 (stating that denial of access to counsel for consultation "is not subject to [] prejudice analysis"); Wolfish, 573 F.2d at 133 (remedial order affirmed where "attorney visits were made in the general visiting rooms during visiting hours thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality"); Covino v. Vermont Dep't of Corr., 933 F.2d 128, 130 (2d Cir. 1991) (remand to determine whether detainee's transfer to a more distant jail impaired his Sixth Amendment right to counsel); cf. Smith v. Coughlin, 748 F.2d 783, 789 (2d Cir. 1984) (ban on visits by paralegal personnel to convicted inmate violated the Sixth Amendment; although inmate could not prove compensable injury, he was entitled to nominal damages); see also Schoemehl, 878 F.2d at 1052 (restrictions on telephone access to attorneys by pretrial detainees were "inadequately justified"); Cobb v. Aytch, 643 F.2d 946, 959-60 (upholding injunctive relief against pretrial transfer of detainees to distant {264 F.3d 187} facilities since such transfers caused "substantial interference with the right to effective assistance of counsel").

Having determined that Lewis is inapplicable and that both the due process right of access to the courts and the Sixth Amendment right to counsel are implicated, we apply the standards set out in Procunier v. Martinez, 416 U.S. 396, 419 ("unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts"), and Bell, 441 U.S. at 547 (when an institutional restriction on pretrial detainees infringes a specific constitutional guarantee [i.e., the Sixth Amendment], "the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security").

Based on the above premise Welsh objects to the Magistrates Report and Recommendations

19

**B. Welsh Objects to The Magistrates Findings of Facts To Injury Access To The Courts**

Judge Bryant miss read Welsh's questionnaire and the complaint. On pg. 10-14. First, Judge Bryant makes the comment when he states that the Judge dismissed Welsh's claims because he "failed to comply with a Court order, not because he lacked case authority." Then he further considers the case history of 5:17-CV-083 in n. 6 on appeal. But the Honorable Judge Bryant misses the point.

In the questionnaire Welsh states: "I also could not challenge the case on appeal because I no longer had the Federal Rules of Appellate Procedure to understand how to do it. I also did not have any case authorities that I could cite to even if I did appeal. It would have been the same results as before because I could not preserve the issues without authorities to cite to." See Questionnaire pg 5.

The Magistrate took this to mean the first appeal citing n. 6. But reading it liberally it is clear Welsh is speaking of being frustrated in appealing the final order to dismiss the case against Correct Care Solutions the District Judge filed on 6-11-18. Welsh is clear indicating that he was frustrated from filing an appeal from the final order and suffered injury at the result.

Moreover, the Magistrate completely over looks the other injuries Welsh expressed in the Complaint itself. If the court will take its attention to the live pleadings pg. 4 "Plaintiff also wish to conduct research on the none frivolous Civil actions of Habeas Corpus for his Civil Detention in 15-01-659-cv, for his prior criminal charges under A06-490; B1002; and 2010CR12730. Plaintiff who did eventually file three writs was impeded from pursuing these claims while in Lamb County Jail."

Finally the magistrate does not truly consider anything that had been expressed. Yea he gave Welsh the ability to Amend 5:18-CV-20 and gave me a Spears hearing, but he does not even note that I didn't have access to the law library when he so benevolently gave the ability to amend the complaint. Or how he ambushed Welsh with a motion to dismiss denying leave to plead Welsh's best case because he gave the leave to amend earlier when Welsh did not have access to a law library. How can he figure this does not frustrates the claim. Nor, does he account for the fact that I could not amend 5:17-CV-083 to conform to the courts order because I was left ignorant of the law without the law library and the authorities needed to purpose a amended complaint in conformity with the law and the courts order. Yes, the court waited very patently for me to Amend the complaint that cannot be refuted. But what can be refuted is that I could have done it according to the courts order without the guiding light of the law library resources and the authorities within the law that the resources would provide.

20

In Ryland v. Shapiro, 708 F.2d 967, the Fifth Circuit thoroughly discussed the denial access and the harm imposed and the strength of the right Welsh repeats that here:

The right of access to the courts is basic to our system of government, and it is well established today that it is one of the fundamental rights protected by the Constitution. In Chambers v. Baltimore & Ohio Railroad, 207 U.S. 142, the Supreme Court characterized this right of access in the following terms:

The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship, and must be allowed by each state to the citizens of all other states to the precise extent that it is allowed to its own citizens. Equality of treatment in this respect is not left to depend upon comity between the states, but is granted and protected by the Federal Constitution.207 U.S. at 148, (citations omitted). It is clear that the Court viewed the right of access to the courts as one of the privileges and immunities accorded citizens under article 4 of the Constitution and the fourteenth amendment.

In California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, the Supreme Court found in the first amendment a second constitutional basis for this right of access: "Certainly the right to petition extends to all departments of Government. The right of access to the courts is indeed but one aspect of the right of petition." Id. 92 S. Ct. at 612.

This court recognized the first amendment right of access to the courts in Wilson v. Thompson, 593 F.2d 1375 (5th Cir.1979), where we stated: "It is by now well established that access to the courts is protected by the First Amendment right to petition for redress of grievances." Id. at 1387. See also NAACP v. Button, 371 U.S. 415, 83 S. Ct. 328, 336, 9 L. Ed. 2d 405 (1963); Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358, 1363 (5th Cir.1983).

A number of other courts have also recognized that this right of access is encompassed by the first amendment right to petition. See McCray v. Maryland, 456 F.2d 1, 6 (4th Cir.1972); Harris v. Pate, 440 F.2d 315, 317 (7th Cir.1971); Pizzolato v. Perez, 524 F. Supp. 914, 921 (E.D.La.1981); Crews v. Petrosky, 509 F. Supp. 1199, 1204 n. 10 (W.D.Pa.1981).

A third constitutional basis for the right of access to the courts is found in the due process clause. In Wolff v. McDonnell, 418 U.S. 539, the Supreme Court defined the right of access in a civil rights action under section 1983 in the following terms:

The right of access to the courts, upon which Avery [[Johnson v. Avery, 393 U.S. 483, 89 S. Ct. 747, 21 L. Ed. 2d 718 (1969)] was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. It is futile to contend that the Civil Rights Act of 1871 has less importance in our constitutional scheme than does the Great Writ. Id. 94 S. Ct. at 2986. See also Mitchum v. Purvis, 650 F.2d 647, 648 (5th Cir.1981); Rudolph v. Locke,

21

594 F.2d 1076, 1078 (5th Cir.1979). The due process clause has also been construed to allow prisoners meaningful access to the courts. See Bounds v. Smith, 430 U.S. 817; Boddie v. Connecticut, 401 U.S. 371.

A mere formal right of access to the courts does not pass constitutional muster. Courts have required that the access be "adequate, effective, and meaningful." Bounds v. Smith, 97 S. Ct. at 1495; see also Rudolph v. Locke, 594 F.2d at 1078. Interference with the right of access to the courts gives rise to a claim for relief under section 1983. Sigafus v. Brown, 416 F.2d 105 (7th Cir.1969) (destruction by jail guards of legal papers necessary for appeal supports claim for damages under § 1983); McCray v. Maryland, 456 F.2d 1, 6(CA4 1972), ("Of what avail is it to the individual to arm him with a panoply of constitutional rights if, when he seeks to vindicate them, the courtroom can be hermetically sealed against him by a functionary who, by refusal or neglect, impedes the filing of his papers?"); Crews v. Petrosky, 509 F. Supp 1199, 1204(W.D. Penn. 1981), ("An allegation that a clerk of state court has negligently delayed the filing of a petition for appeal, and that the delay has interfered with an individual's right of access to the courts, may state a cause of action under 42 U.S.C. § 1983.") (emphasis added).  See also Harris v. Pate, 440 F.2d 315, 317 (7th Cir.1971) (prison authorities may not place burdens on right of access to courts); Corby v. Conboy, 457 F.2d 251, 253 (2d Cir.1972).

In conclusion, it is clear that, under our Constitution, the right of access to the courts is guaranteed and protected from unlawful interference and deprivations by the state, and only compelling state interests will justify such intrusions.

Denial-of-access claims take one of two forms: forward-looking claims alleging "that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," and backward-looking claims alleging that an official action has "caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." Christopher v. Harbury, 536 U.S. 403, 413-14, (citations omitted) . By the above premise and the applicable case law Welsh clearly states a non-frivolous legal claim for access to the courts.

## 5. Welsh Objects To The Dismissal Fourth Amendment Claim Count IV

Welsh objects to Magistrate Bryant's dismissal of his Fourth Amendment claim of the seizure of his personal papers. See R & R pg21-22.  Magistrate Bryant states that the Fourth Amendment as to prisoners does not apply. But he uses the wrong standard conflating rights to privacy of prisoners with the rights to privacy of pre-trial detainee's. He claims that Welsh is making a privacy claim but in truth Welsh is making a personal security claim. "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government, without regard to

whether the government actor is investigating crime or performing another function." City of Ontario v. Quon, 177 L. Ed. 2d 216,225.

The source of Welsh's right is the Fourth Amendment to be secure in his papers and effects. "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." Graham v. Connor, 490 U.S. 386, 395; See also Castellano v. Fragozo, 352 F.3d 939,953-954(CA5 2003)(en banc) " Such claims of lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983."

First, Judge Bryant cites Hudson v. Palmer 468 U.S. 517. But Hudson dealt with prisoners not pretrial detainees. Next, the Magistrate miss read Gross v. Normand 576 F. App'x 318, 320(CA5 2014) there the court dismissed the Fourth Amendment complaint under the Parratt/Hudson doctrine that the State of Louisianan provided adequate post deprivation remedy, not as he contends rejecting the plaintiff's Fourth Amendment claim.. And the other case the magistrate inapposite to Welsh dealing with convicted prisoners. See Rickerson v. Rust Civil Action No. 5:17-CV-172, 2019 WL 8500865, at *9(E.D. Tex. Nov. 13, 2019).

The true Constitutional Doctrine is that for Welsh to prove a claim under the Fourth Amendment is exceedingly difficult. But all Constitutional claims are difficult to put forth under the dogma of todays court but that fails to mean that it does not exist. The United States Supreme Court has never over turned Weeks v. U.S. "The protection of the Fourth Amendment reaches all alike whether accused of a crime or not; and the duty of giving it force and effect is obligatory on all entrusted with the enforcement of Federal laws." 232 U.S.383,384. What was done to Weeks by, "declaring his right to be secure against such search and seizures is of no value, and … might as well be stricken from the constitution." id at 393.See also Albright v. Oliver, 510 U.S. 266, 273(quoting) Graham v. Connor 490 U.S. 386,395. "It cannot be presumed that any clause in the constitution is intended to without effect." Marbury v. Madison supra 174.

As there is no dichotomy between search and seizure the statndard for a pretrial detainee to make a Fourth Amendment claim is stated in Mabry v. Lee 849 F3d 232, 237-238 (CA5 2017), citing to Florence v. Board of Chosen Freeholders 132 S. Ct. 1510 the court held:

Although stressing the importance of deference to correctional officials, the Court suggested that substantial evidence could demonstrate that a correctional strip search policy is an exaggerated response to security concerns when, compared to the facts presented in Florence, the need for such a policy is lower, the justification weaker, the

23

intrusiveness higher, or an alternative, less invasive policy more feasible. Justice Kennedy's majority opinion clarified that "[t]his case does not require the Court to rule on the types of searches that would be reasonable in instance where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees. . . . The accommodations provided in these situations may diminish the need to conduct some aspects of the searches at issue." Id. at 1522-23. Similarly, Chief Justice Roberts stressed: "it is important for me that the Court does not foreclose the possibility of an exception to the rule it announces." Id. at 1523. Justice Alito highlighted that "the Court does not hold that it is always reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population. Most of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate. . . . For these persons, admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible." Id. at 1524 (Alito, J., concurring). Despite this cautionary language, the Court in Florence nonetheless made clear that the evidentiary burden rests with the plaintiff when challenging a correctional search policy. Without substantial evidence to the contrary, courts should defer to the reasonableness determinations of correctional officials.

Therefore, as the Fifth Circuit and the Supreme Court makes clear it is not the claim of the Fourth Amendment inapplicable to pretrial detainees that is at issue but the reasonableness of the violation of the Fourth Amendment at issue. Here Welsh contends that it was unreasonable to seize his property because the defendants had no legitimate security concerning Welsh's legal work . The defendants did not wish to search it or temporarily seize the property to inspect it for contraband but for the purpose of behavioral control for Welsh causing a disturbance. The defendants claim that Welsh made some kind of head movement to initiate the seizure and the magistrate will contend that the video shows Welsh stepping towards the officer. But, the magistrate does not contend that Welsh made some kind of head movement nor does he contend that Welsh presented a threat to the security of the institution by maintaining possession of his papers. See Magistrate's Report and recommendation pg.16 and pg.16,N.13. For these reasons Welsh objects to the magistrates findings.

## 6. A Right To Order Books Welsh Objects to the Dismissal Cause XII

On page 35-36 the Magistrate claimed I did not provide adequate facts to support a claim of the denial of book purchases but for some unknown reason the magistrate wants to read the complaint as an access to the courts claim. The Magistrate contends that because Welsh plead details of why he needed the dictionary that has some relation to my legal work fails to mean that it is solely an access to the courts claim. Thou, it may have relation to Welsh's ability to access the court Welsh clearly makes out the injury

24

as a restriction of speech. See Questionnaire at 34 "So that limited my ability to function in the way I intended to convey my expression and ideas in the law."

I don't know what standard the Honorable Judge used in construing the brief but the Supreme Court in United States v. James Daniel will hold "We have rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another. As explained in 'Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather, we examine each constitutional provision in turn.'" 510 U.S. 43, 49-50; (Quoting) Soldal v Cook County, 506 US 56, 70.

Here the magistrate would dismiss the claim that I made base on expression of ideas and rights to publication and input his own claim of access to the court. Then to add insult to injury he dismiss my free expression and publication claim because I failed to plead his access to the court claim. I respectfully ask for the court to not input the Magistrate's reasoning because it is clearly flawed. If I could have made an access to the court claim I would have, I doubt the court can accuse me of not possessing any legal acumen. But moreover, the claim is more about my ability to express myself than it is being denied access. The denial of the dictionary does not deny me access to the court. In no way did it prevent me from filing a non-frivolous legal claim. What it did was stunt my ideas and expression as I claimed.

Next, the magistrate dismissed the claim that I was vague in my statement because I didn't use the word "all" in front of books. When I claimed the Jail denied me the right to order books as I stated in the questionnaire "I had requested several books." See Questionnaire pg. 34. First, the standard is not if I had access to other books or couldn't order any other book the standard is does the prohibition on the books I wanted have a reasonable relation to a non-punitive governmental objective and if it does have a reasonable relation can the government objective be meet in another least harsh method and still achieve its goals see. Bell 441 U.S. at 539, N.20.

First, I like to point out that Bell would suggest that the rational relationship standard only applies to pre-trial detainees claims of punishment not the violation of other rights fundamental to our Constitutional heritage. Specifically Bell supra at 534 says this about the subject, "Instead, what is at issue when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged, is the detainee's right to be free from punishment," and then "under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." Id at 536-537. Moreover, Bell standard for

25

implementing a restriction by rational relationship was, "influenced in our decision by the fact that the rule's impact on pretrial detainees is limited to a maximum period of approximately 60 days. In sum, considering all the circumstances, we view the rule, as we now find it, to be a 'reasonable 'time, place and manner' regulation[n that is] necessary to further significant governmental interests ...." Bell supra 441 U.S. at 552(citations omitted); Grayned v City of Rockford, 408 US 104, 115.

Even giving the long time use of the rational relationship standard for restrictions lasting longer than 60 days the Lamb County Jail Policy fails that test. See DeMarco v. Davis, 914 F.3d 383,389 (CA5 2019), "A plaintiff bears the burden of proving that a prison policy, as applied, is not reasonably related to legitimate penological objectives. Moreover, prison officials are entitled to 'substantial deference' in the exercise of their professional judgment. See Overton, 539 U.S. at 132 (citations omitted). Nevertheless, the government 'must do more . . . than merely show 'a formalistic logical connection between [its policy] and a penological objective.'" (quoting) Prison Legal News, 683 F.3d, 201, 215(CA5 2012) (quoting Beard v. Banks, 548 U.S. 521, 535, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006)). Though a plaintiff shoulders the ultimate burden of persuasion, the government must identify "'a reasonable relation,' in light of the 'importance of the rights [here] at issue.'"(citing Prison Legal News, 683 F.3d at 215 (quoting Beard, 548 U.S. at 535); see also Mayfield v. Texas Dep't Of Criminal Justice, 529 F.3d 599, 612 (5th Cir. 2008) (reversing the district court's grant of summary judgment in favor of the TDCJ because "none of the penological interests provided by the TDCJ necessarily support[ed] limiting access to rune literature in the prison library"); Thompson v. Solomon, 995 F.2d 221, 1993 WL 209926, at *2 (5th Cir. 1993) (per curiam) (concluding that the state's "cursory response . . . provide[d] an insufficient factual basis" to dismiss plaintiff's free-exercise claim); Rudolph v. Locke, 594 F.2d 1076, 1077 (5th Cir. 1979) (per curiam) (holding that the state's "bare assertion" that its regulation was an appropriate means of maintaining security was "not enough" to deny relief on plaintiff's First Amendment claims).

Specifically with the claim for the Dictionary "The American people have always regarded education and acquisition of knowledge as matters of supreme importance, which should be diligently promoted. The Ordinance of 1787 declares: 'Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.'" Meyer v. Nebraska, 262 U.S. 390,400 . Because the very, "heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. '[T]he freedom to speak one's mind is not only an aspect of individual liberty-and thus a good unto itself-but also is essential to the common quest for truth and the vitality of society as a whole.'" Hustler Magazine, Inc. v. Falwell, 485 U.S. 46,50-51(quoting), Bose Corp. v Consumers Union of United States, Inc., 466 US 485, 503-504. The magistrate also accuses Welsh of lying about no dictionary

26

being in the Lamb County Jail Library. First, I recommend the Magistrate go down there and inspect the library for a dictionary before I'm accused of misrepresenting the facts. Second, giving validity of the authenticated records the magistrate assumes that no other prisoner can go and take the dictionary out of the library.

Finally, the Magistrate never asked if the regulation restricted the ability to order all books which it most certainly did. See Exhibit E. Therefore the questionnaire was not specific enough with the question. See Watson v. Ault, 525 F.2d 886, 892 (5th Cir. 1976), "The more difficult problem, however, is that of framing the questions to insure that responses are given and are also of some use."

## 7. Objection To Facts About The Use Of Force Count III

Welsh objects to certain findings of facts concerning the use of force:

1. Welsh objects to the Magistrates findings that Welsh's lunging his head at officer Weston The Magistrates pg. 16 N.13 clearly indicates that Welsh moves towards officer Weston but does not indicate that Welsh is making a head lung motion towards Weston.

2. Welsh Objects to the Magistrates finding that Force was needed when all the officers had to do was take his property and leave. The failing to obey orders was over with. They had what they wanted. They just had to lock the door behind them. As the magistrate observed "Welsh scoots himself to the back wall of the cell near the toilet." Any force after that is objectively unreasonable. What is the need for force? Where is the seriousness of the security threat? Welsh is already in segregation what else to they want. . . ow. . . that's right. . . they wanted to punish me.

3. The Magistrates findings that Welsh must obey lawful orders is substantiated by only citing to prison cases. As a prisoner the 13th Amendment does not apply. As a detainee I have the right to refuse any order that violates my rights. As Kingsley states ", pretrial detainees (unlike convicted prisoners) cannot be punished at all" id at 428.Therefore the court must look at the objective need for the force and not simply because Welsh refused orders. Because disobeying an unlawful order does not require force because its unlawfulness in itself makes it objectively unreasonable. See Storey v. Taylor, 696 F.3d 987, 993 n.6 (10th Cir. 2012); accord Romero v. Story, 672 F.3d

27

880, 889 (10th Cir. 2012); See also Schmidt v. United States, 145 Ct.Cl. 632 (1959) (stating that an unlawful order "did not have to be obeyed" and that "a refusal to obey it was not insubordination"); United States. v. Jones, 26 F. Cas. 653, 657, F. Cas. No. 15494 (C.C. Pa. 1813) ("Disobedience of an unlawful order, must not of course be punishable."); United States v. Bright, 24 F. Cas. 1232, 1238, F. Cas. No. 14647 (C.C. Pa. 1809) (recognizing that certain orders "were unlawful and void"); United States v. Johnson 476 F2d 1251, 1256 (CA5 1973) "Thus, since Johnson cannot be punished unless he failed to obey a lawful order of the Board, the lawfulness of the order is necessarily an element of the crime charged"; Estep v. United States 327 U.S. 114,120-121 .

## 8. Welsh Objects Diaz Is Liable For The Force Used Count III

The Magistrate dismissed the claim against Diaz unreasonably. Welsh plead that Diaz ordered "objectively unreasonable force against the plaintiff to violate plaintiff personal security and right to possession while using force while plaintiff sat on the ground  that caused plaintiff physical injury in the form of internal bleeding where plaintiff was then  taken to the hospital as he was urinating blood." See Amended Complaint # 7. Therefore, Diaz is Liable for the force used by Martinez. See  Turner v. Driver 848 f.3d 678, 696(2017);(quoting) Mesa v. Prejean, 543 F.3d 264, 274 (5th Cir. 2008), "Personal involvement of supervising personnel generally includes giving a 'command, signal, or any other form of direction to the officer that prompted' the detention or arrest." See also Doe v. Rains Cty. Indep. Sch. Dist., 66 F.3d 1402, 1406 (5th Cir. 1995), "concomitant right to exercise control over [the constitutional violator]." (emphasis added).

## 9. Welsh Moves The Court To Amend The Use Of Force Claim III

Welsh mistakenly named Officer Dennis Duran and in fact Officer Logan Knox was the officer that used unreasonable force along with Officer Martinez. Under Fed.R.Civ.P. 15(a), permission to amend "shall be freely given when justice so requires." Although our review is limited to determining whether the trial court's decision is an abuse of discretion, the policy of liberal amendment directs that "unless there is a

28

substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 598 (5th Cir.1981).

## 10. Welsh Objects To The Dismissal Of Count IX and X

It seems the Magistrate uses the same standard to dismiss Welsh's claims against the excessive phone rates and commissary. He holds that Welsh does not have the right to be comfortable in the county jail. See Report and Recommendation pg. 32-34. Judge Brant cites to a few non-binding case laws that supports this idea. He also cited to binding case for prisoners in Texas Department Of Corrections from 1976. See Hill v. Estelle, 537 F.2d 214,215(CA5 1976). This case would hold the use of the phone is govern by legitimate security interest. Though informative the case is inapposite to Welsh, one class can be punish the other cannot.

## A. The Bell Standard and The Right To Live Comfortably

In 4 William Blackstone Laws on the Commentaries of England *300 "Upon the whole, if the offense be bailable, or the party cannot find bail, he is to be committed to the county goal by the mittimus of justice . . . ; But the imprisonment, as has been said, is only for safe custody, and not for punishment; therefore in his dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity; and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only. . ." As the Supreme court has recently said when assessing if a law violated historical standards " in assessing that practice, we look primarily to eminent common-law authorities (Blackstone, Coke, Hale, and the like), as well as to early English and American judicial decisions." Kahler v. Kansas 206 L. Ed. 2d 312,321.

The simple truth is Bell v. Wolfish accorded this though through out the opinion. I believe I have cited the same note half a dozen times but it still needs to be said Bell supra at 539 N.20 reads: "This is not to say that the officials of a detention facility can justify punishment. They cannot. It is simply to say that in the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective. See Kennedy v Mendoza-Martinez, 372 US, at 168, 9 L Ed 2d 644, 83 S Ct 554; Flemming v Nestor, 363 US, at 617, 4 L Ed 2d 1435, 80 S Ct 1367. Retribution and deterrence are not legitimate nonpunitive governmental objectives. Kennedy v Mendoza-Martinez, supra, at 168, 9 L Ed 2d

644, 83 S Ct 554.  Conversely, loading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution.  But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish."

Nothing in Bell is to the contrary the cited portion of Bell of the cases the Honorable Judge Bryant cites does not lend support to his conclusions. As that portion reads: "Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility.  And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" Bell 441 U.S. at 537. This just places a restraint upon the natural right of locomotion, "'consist[ed] in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint." 1 Blackstone * 130.

Further, Bell would speak further about punishment "Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." Id at 539. This and Bell supra at 539 N. 20, "many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish." Is consistent with the English common law as Blackstone said, "many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish." Id at 300.

The Court also has to understand the reasoning that inspired the Bell standard and the facts that inspired that reasoning. The Supreme Court considered the incidents of confinement as applied to pretrial detainees that retrained the detainee from exercising his rights or for alternative means to pursue those rights the " conclusion in this regard is further buttressed by the detainees' length of stay at the MCC. Nearly all of the detainees are released within 60 days." Bell 441 U.S. at 543. Because the Court didn't believe the restrictions, "maximum period of 60 days violates the Constitution." Ibid. Because the Supreme Court was "influenced in our decision by the fact that the rule's impact on pretrial detainees is limited to a maximum period of approximately 60 days." Bell supra 60 L Ed 2d 447, 458.

It simple as the holding in Bell clearly expressed, "in any event, were of only limited duration so far as the pretrial detainees were concerned." Bell supra 60 L Ed 2d at 458. When examining the opinions handed down by the Supreme Court , "It is the holdings of our cases, rather than their dicta, that we must attend" Kokkonen v. Guardian Life Ins. Co. 511 U.S. 37,56. As this court has illuminated "We are bound

30

by the statutory construction put forward in [Bell]." Tran v. Mukasey, 515 F.3d 478,484 (CA5 2008)(citing) Rivers v. Roadway Express, Inc., 511 U.S. 298,312 ("It is [the Supreme Court's] responsibility to say what a statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law "). Therefore, it is the holding that bounds the court and the reasoning that such conditions of confinement are to be implemented. "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bond." Seminole Tribe of Florida v. Florida 517 U.S. 44,67.

The question is does the burdening for six months Welsh's rights to communicate in his chosen manner with his family  turn upon if Welsh had a reasonable alternatives or if it was a complete band because, "It is of no moment that the [regulation] does not impose a complete prohibition.  The distinction between laws burdening and laws banning speech is but a matter of degree." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803,812 . The Court accorded this in Sorrell v. IMS Health, Inc., 180 L Ed 2d 544,556 where the Court  recognized that the ``distinction between laws [ or regulations] burdening and laws [or regulations] banning speech is but a matter of degree'." Even more persuasive is Bells holding "the content of the expression, there are alternative means of obtaining reading material, and the rule's impact on pretrial detainees is limited to a maximum period of approximately 60 days." Bell supra60 L Ed 2d at 457.

The Fifth Circuit spoke upon the limitation upon the State in  Ryland v. Shapiro, 708 F.2d 967, 971(5th Cir. 1983). "That state agents may simultaneously violate both substantive and procedural rights was made clear by the now retired Justice Stewart, sitting by designation:

A single act of depriving a citizen of his right to correspond may simultaneously constitute a violation of substantive constitutional rights and of the right to procedural due process.  Because the right to correspond is protected by the First and Fourteenth Amendments, the result of depriving a citizen of this right will violate those substantive guarantees unless the action is justified by sufficiently compelling countervailing state interests.  At the same time, because the interest in corresponding is a "liberty" interest within the meaning of the Fourteenth Amendment, the manner of depriving a citizen of this right could violate the procedural norms embodied in the Due Process Clause. See, e.g., Procunier  v. Martinez, 416 U.S. 396, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1973) (analyzing restrictions on a prisoner's correspondence rights as a violation of both substantive constitutional rights and the right to procedural due process). Owen v. Lash, 682 F.2d 648, 652 n. 4 (7th Cir.1982) (emphasis in original).  Although Justice Stewart was speaking of the right to correspond, we will show below that the right of access to the courts, like the right to correspond, is also protected by the first amendment.

This is the historical strength of the First Amendment, in Fifth Circuit is "of course, '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" Google v. Hood III

31

Google, Inc. v. Hood, 822 F.3d 212,227 (5th Cir. 2016), (quoting) Elrod v. Burns, 427 U.S. 347, 373; See also Palmer v. Waxahachie Indep. Sch. Dist., 579 F.3d 502, 506 (5th Cir. 2009). And "At the same time, however, we have held that the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.' " Agency for International Development v. Alliance for Open Society International, Inc. (AID), , 186 L. Ed. 2d 398, 408 (citations omitted).

## B. The Defendants Extorted Welsh's Needs

What ever can be said, it cannot be misunderstood that the Defendants are using its position placing Welsh into bondage and arbitrarily using that power to extort Welsh for extra money. Blackstone described extortion as "an abuse of public justice, which consists in an officer's unlawfully taking, by colour of his office, from any man, any money or thing of value, that is not due to him, or more than is due, or before it is due." 4 W. Blackstone, Commentaries *141 (emphasis added).

With the use of their power confining Welsh in its detention center the defendants actions must be considered , "more odious than robbery; for robbery is apparent, and hath the face of a crime, but extortion puts on the visure of virtue" 3 Edward Coke, Institutes on the Laws of England *542. But odious behavior Judge Bryant would say is lawful though Welsh believes the Fourteenth Amendment Due Process Clause protects him from the arbitrary actions of government. "The touchstone of due process is protection of the individual against arbitrary action of Government.: Wolf v. McDonnell 418 U.S. 539,558 (citing), Dent v West Virginia, 129 US 114, 123. And his plea is to that of the true sovereign the United States Constitution , where it is said, "That extortion in a large sense signifies any oppression under colour of right; but that in a strict sense, it signifies the taking of money by any officer, by colour of his office, either where none at all is due, or not so much is due, or where it is not yet due." 1 W. Hawkins, Pleas of the Crown 316 (6th ed 1787).

It is the same as bribing the Jail officials to exercise the rights to communicate in the means desired by Welsh. "At common law, extortion was an offense committed by a public official who took "by colour of his office" money that was not due to him for the performance of his official duties. A demand, or request, by the public official was not an element of the offense. Extortion by the public official was the rough equivalent of what we would now describe as 'taking a bribe.' It is clear that petitioner committed that offense." Evans v. United States 504 U.S. 255, 260-261. The Magistrate says I don't have the right to live as comfortable as possible absent any legitimate security concerns of the Defendant or the need to insure I go to trial, but I insist, I do. I turn back to the holding in Bell where the Court expressed the give and take " if a particular condition or restriction is reasonably related to a

32

legitimate nonpunitive governmental objective, it does not, without more, amount to 'punishment,' but, conversely, if a condition or restriction is arbitrary or purposeless, a court may permissibly infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. " Bell supra 60 L Ed 2d at 457

It does not matter if this is a regulatory taking, tax, penalty, fine or like Welsh stated above extortion it is protected by the Substantive rights founded in the Due Process Clause. The defendants "may not, under the guise of the police power impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities." Village of Euclid v. Ambler Realty Co 278 U.S. 116, 121 . Such regulation that have no relation to the safety and security of the public or the institution "can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." Id. At 395.

Considering the "condition of the imposition is the commission of a crime. This, together with the amount of the tax, is again significant of penal and prohibitory intent rather than the gathering of revenue. Where, in addition to the normal and ordinary tax fixed by law, an additional sum is to be collected by reason of conduct of the taxpayer violative of the law, and this additional sum is grossly disproportionate to the amount of the normal tax, the conclusion must be that the purpose is to impose a penalty as a deterrent and punishment of unlawful conduct." United States v. Constantine, 296 U.S. 287, 295.

The Supreme Court has noted, that "there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment." Dep't of Revenue of Montana v. Kurth Ranch, 511 U.S. 767,779 (citing Bailey v. Drexel Furniture Co., 259 U.S. 20, 38. But there is also the, "term 'penalty' involves the idea of punishment for the infraction of the law, and is commonly used as including any extraordinary liability to which the law subjects a wrongdoer in favor of the person wronged, not limited to the damages suffered." O'Sullivan v. Felix, 233 U.S. 318, 324 (citing) United States v. Chouteau, 102 U. S. 603, 611, 26 L. ed. 246, 249; Huntington v. Attrill, 146 U. S. 666, 667.

If this is some kind of fine to use the phone and to bu goods the Supreme Court speaks of that as well, "Directly at issue here is the phrase 'nor excessive fines imposed," which ``limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.' " When considering its relevancy the , "Magna Carta required that economic sanctions `be proportioned to the wrong' and `not be so large as to deprive [an offender] of his livelihood.'" As our history dictates, "protection against excessive fines has been a constant shield throughout Anglo-American history:

33

Exorbitant tolls undermine other constitutional liberties. Excessive fines can be used, for example, to retaliate against or chill the speech of political enemies, as the Stuarts' critics learned several centuries ago." Therefore given the historical and logical consideration that "Protection against excessive punitive economic sanctions secured by the Clause is, to repeat, both `fundamental to our scheme of ordered liberty' and `deeply rooted in this Nation's history and tradition." Timbs v. Indiana, 203 L. Ed. 2d 11,16-19 (citations omitted) .

The Court must strike down the conditions of confinement if they be as said a means to extort persons to hear the sound of their families voice, regulation or a tax to be able to have the ability to improve your standard of living, a fine to exercise your liberties or a combination of the aforementioned the defendants impose as unconstitutional condition of confinement. "In light of that understanding, the process for evaluating a regulation's constitutionality involves an examination of the 'justice and fairness' of the governmental action.  That inquiry, by its nature, does not lend itself to any set formula, and the determination whether 'justice and fairness' require that economic injuries caused by public action [must] be compensated by the government, rather than remain disproportionately concentrated on a few persons, is essentially ad hoc and fact intensive." . Enters. v. Apfel, 524 U.S. 498,523 (citations omitted); See also Harmelin v. Michigan, 501 U.S. 957, 979, n. 9, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (opinion of Scalia, J.) (``it makes sense to scrutinize governmental action more closely when the State stands to benefit"); 4 W. Blackstone, Commentaries on the Laws of England 372 (1769) (``[N]o man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear . . . .").

## C. How The Federal Government Punishes Is Instructive

How the United States punishes its criminals is informative on how Welsh conditions of confinement should be considered punishment with respect to the commissary and phone rates. In 18 U.S.C.S. § 3583(d)(2) "involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D)." This is enlightening when considering the burdens imposed to the right to speak to his family on the phone or to acquire property. Would the court consider the phone rate of $1.00 a minute a "greater deprivation of liberty than is reasonably necessary' or would the court consider the price fixing of 3,4,5 and more times retail value of goods involves "greater deprivation of liberty than is reasonably necessary." The court should remember that Bell v. Wolfish involved a federal detention center and the court pain snakingly tried to make clear that Welsh cannot be

34

punished at all. The Fifth Circuit has used the 18 U.S.C.S. § 3583(d)(2) model for supervised release to guide the deprivation of rights for prisoners under the Texas parole system. See Johnson v. Owens, 612 Fed. Appx. 707(5th Cir. 2015).

Here the court reasoned that, "Prisoners' First Amendment rights may be restricted in ways "reasonably related to legitimate penological interests." Stauffer v. Gearhart, 741 F.3d 574, 584 (5th Cir. 2014). The First Amendment rights of probationers can also be constitutionally restricted if "reasonably necessary" for purposes such as protecting the public and discouraging recidivism. United States v. Locke, 482 F.3d 764, 768 (5th Cir. 2007). Parole is on the "'continuum' of state-imposed punishments," falling between imprisonment and probation, Samson v. California, 547 U.S. 843, 850, and is comparable to supervised release in the federal system. See id. at 850, 854-55 (citing supervised release cases interchangeably with parole cases for the proposition that parole is intermediate to imprisonment and probation); Doe v. Harris, 772 F.3d 563, 571 (9th Cir. 2014) (treating parole and federal supervised release."

The Fifth Circuit further reasoned, "The Constitution protects parolees' First Amendment rights as long as infringement is not reasonably related to achieving state goals like protecting the public." Id 713. Then finally, "Simply stating that these restrictions relate to Texas's protection and reintegration goals does not make it so, in the absence of logical or factual connections. Otherwise every conceivable deprivation of rights would be constitutionally permissible." Id at 714.

This reasoning falls in line with Bell 441 U.S. at 539, N.20. The defendants must show that the deprivation upon Welsh's rights is legitimate with the goals of the detention center for safety and security and bring Welsh to trial as is no greater than is reasonably necessary.

## 11. The Magistrate Did Not Dismiss Count XII Welsh Objects To Its Dismissal

Welsh's rights under the Fourteenth amendment Privileges and Immunities Clause was violated. This count describes an "irreparable injury as named defendants abridge plaintiff privileges of citizenship absent a conviction under the law. This produced sever depression, with the loss of consortium, with the affirmative restraint by denying privileges in the pursuit of happiness by restricting the ability to acquire property, and disabling plaintiff of his rights and privileges of citizenship of association and communication with family and friends and the privilege to acquire property punished by the denial of liberty by segregation; loss of phone, loss of first amendment rights by loss of access to information by

35

the television and , loss of the right to acquire property." See Amend Complaint pg. 22 #25; see also id at #8 and 9.

The Fourteenth Amendment, which provides, inter alia: ``No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." The Supreme Court concluded that the Privileges or Immunities Clause protects only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws." Slaughter-House Cases, 16 Wall. 36, 79.

Recently Justice Thomas revisited the idea of the Privilege & Immunities Clause in the Fourteenth Amendment of course he started with history, "When describing those `fundamental' rights, Justice Washington thought it `would perhaps be more tedious than difficult to enumerate' them all, but suggested that they could `be all comprehended under' a broad list of `general heads,' such as `[p]rotection by the government,' `the enjoyment of life and liberty, with the right  to acquire and possess property of every kind,' `the benefit of the writ of habeas corpus,' and the right of access to ``the courts of the state,' among others." McDonald v. City of Chicago 177 L Ed 2d 894,947-948(quoting) Corfield v. Coryell,, 6 F. Cas. 546, 551-552 (No. 3,230) (CC ED Pa. 1825).

Justice Washington's complete list was as follows:

``Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental: to which may be added, the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised." 6 Fed. Cas., at 551-552.

It seems that we have forgotten as a nation what the spirt of the great charter was meant to protect. I say it was meant to protect and forbade any abridgement because these rights are fundamental in their character and the Defendants must have pursued a least restrictive means as even Bell dictates in its language

36

"employed to achieve objectives that could be accomplished in so many alternative and less harsh methods," Bell supra 441 U.S. at 539, N.20  to:

1. My First Amendment Rights at all times

2. My property rights to acquire property

3. My right not to be punished

Here is an old lesson from my favorite Justice, "The protection guaranteed by the Amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone - the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the 4th Amendment." Olmstead v. United States, 277 U.S. 438,478 (J. Brandeis, dissenting)

## 12.  Welsh Request The Court To Consider the Attachments

Welsh request the court to consider the following:

(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201. See Norris v. Hurst Trust, 500 F.3d 454, 461 n. 9 (5th Cir. 2007); R2 Invs. LDC v. Phillips, 401 F.3d 638, 640 n. 2 (5th Cir. 2005). When a defendant attaches documents to its motion that are referenced in the complaint and are central to the plaintiff's claims, however, the court can also properly consider those documents. Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 288 (5th Cir. 2004); In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007). "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 499 (5th Cir. 2000).

37

## 13. Welsh Request Opportunity To Amend To Plead His Best Case.

Welsh requested leave to plea a violation of 15 U.S.C. 15 that gives him a cause of action based on the anti-trust law of the United States for Counts IX and X. The Magistrate denied this in so doing he did not even give a glance at the anti-trust laws and dismiss the amendment based upon the constitutional issues presented. Well my momma always told me there is more than one way to skin a cat and that cat does not have to be skinned only by the constitution but by the laws of the United States.

Moreover he purposely mischaracterizes the entire amendment making it sound as Welsh plead things that was never plead. He claims that on ECF No. 21, at 3-6 on pg. 2 of his order signed on September the 2nd, that Welsh blames Securus Tech for the commissary rate and the right to order books from an outside vendor at the jail. See I d. I don't know if the honorable Judge is over worked or some other reason is at work but this is not plead in the complaint, nor can it even reasonably be construed in that manner.

Finally, Judge Bryant refused to allow Welsh to add another claim of privacy because he asserts Welsh has no privacy while in the county jail. But this is far from the truth as mentioned above Welsh does enjoy privacy, albeit, limited but the measures cannot be excessive when reasonable alternatives can be achieved. Again I return to the Bell holding:

(d) Assuming that a pretrial detainee retains a diminished expectation of privacy after commitment to a custodial facility, the room-search rule does not violate the Fourth Amendment but simply facilitates the safe and effective performance of the searches and thus does not render the searches "unreasonable" within the meaning of that Amendment.

(e) Similarly, assuming that pretrial detainees retain some Fourth Amendment rights upon commitment to a corrections facility, the body-cavity searches do not violate that Amendment. Balancing the significant and legitimate security interests of the institution against the inmates' privacy interests, such searches can be conducted on less than probable cause and are not unreasonable.

(f) None of the security restrictions and practices described above constitute "punishment" in violation of the rights of pretrial detainees under the Due Process Clause of the Fifth Amendment. These restrictions and practices were reasonable responses by MCC officials to legitimate security concerns, and, in any event, were of only limited duration so far as the pretrial detainees were concerned.

Bell supra 60 L Ed 2d at 457-458.See also Kelly v. Foti, 77 F.3d 819, 821 (5th Cir. 1996) ("Jail officials may strip search a person arrested for a minor offense and detained pending the posting of bond only if they possess a reasonable suspicion that he is hiding weapons or contraband."); Stewart v. Lubbock Cnty.,

38

Tex., 767 F.2d 153, 156-57 (5th Cir. 1985) ("Because Lubbock County's strip search policy was applied to minor offenders awaiting bond when no reasonable suspicion existed that they as a category of offenders or individually might possess weapons or contraband, under the balancing test of Wolfish we find such searches unreasonable and the policy to be in violation of the Fourth Amendment.").See also Jimenez v. Wood County, 660 F.3d 841,848 (CA5 2011) (en banc)(hold that reasonable suspicion instruction to the jury is not plain error when determining the legality of a county jail strip search.)

Welsh request leave to Amend:

1. The Denial of Books Count XI so the magistrate will understand that Welsh was completely denied ALL books and to make sure it is understood as a denial of expression, speech, and knowledge if the court overrules the objection.

2. The right to add Officer Logan Knox in the Use of Force Count III

3. If the court overrules Welsh's objection to Diaz given the Order to use force Welsh request leave to amend to add a claim against Misty Diaz for failure to Control Officer Martinez  Use of Force Count III

4. If the Court overrules the objections on the right to make bail  Count VIII Welsh request leave to Amend to better state the claim.

5. If the court does not sustain Welsh's objection to the Substantive Due Process Claim mental and emotional injury requirement holding that Welsh did not plead injury with enough specificity Welsh request leave to re-plea Count V.

6. If The Court overrules Welsh's objects concerning the access to the courts count II Welsh request leave to amend to better state the facts.

7. If the court refuses the Constitutional Claims concerning the over priced phone rates and commissary items in Count IX and X then Welsh request leave to amend to the 15 U.S.C. 15 anti-trust claims.

9. Welsh request leave to amend the complaint to make the 15 U.S.C. 15 anti-trust claims claim  Count IX and X #22-23 and facts of the complaint #11-12

10  Welsh request leave to amend the complaint to make a punishment claim of  Count IX and X #22-23 and facts of the complaint #11-12

39

11. Welsh request leave to add the complaint against unreasonable infringement of his privacy as described in ECF No. 21.

12. Welsh request the Court to direct him in any other deficiencies given leave to amend under the courts guidance.

Under Fed.R.Civ.P. 15(a), permission to amend "shall be freely given when justice so requires." Although our review is limited to determining whether the trial court's decision is an abuse of discretion, the policy of liberal amendment directs that "unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." Dussouy v. Gulf Coast Investment Corp., 660 F.2d 594, 598 (5th Cir.1981). The most common factors justifying such a denial are undue delay, bad faith, repeated failure to amend, and unfair prejudice to the opposing party. E.g., Union Planters National Leasing, Inc. v. Woods, 687 F.2d 117 (5th Cir.1982); Dussouy, 660 F.2d at 598; See also Brown v. Taylor, 911 F.3d 235, 246 (5th Cir. 2018), "A district court must provide a '"substantial reason' to deny a party's request for leave to amend," such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment." N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.898 F.3d 461,477(CA5 2018) (quoting) Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n, 751 F.3d 368, 378 (5th Cir. 2014)). A district court's failure to provide an adequate explanation justifies a reversal. N. Cypress supra at 478."

# III Prayer

Wherefore premise considered, Welsh humble prays the Honorable District Judge sustains Welsh's objection to the Honorable Magistrate Judge Bryant's Report and Recommendations. In the alternative Welsh humble prats the court grant Welsh's request for leave to amend the complaint and all other relief entitled too.

Respectfully Submitted,

## Table Of Appendix

Exhibit A Affidavit Concerning Welsh Contact With His Mother For Bail

Exhibit B Trial Transcripts Volume 2

Exhibit C Transcripts Volume 7

Exhibit D Affidavit Concerning the Admonishment To Forego Counsel

Exhibit E Affidavit Concerning The Lamb County Book Policy

Case 5:20-cv-00024-H   Document 25   Filed 09/15/20   Page 56 of 159   PageID 845

**Exhibit A Affidavit Concerning Welsh Contact With His Mother For Bail**

42

I Lonnie Kade Welsh do hereby under the penalty of perjury swear that the following is true and correct:

I Lonnie Kade Welsh had attempted to contact his mother Lonnell Hanks by mail to arrange bond. I asked her to find a bondsmen in Lubbock or Littlefield that would bond me out. My mother did receive the letter but she informed me that by then it was to late. She told me that if I would have called her then she would have keep the money to bond me out.

Singed under the penalty of perjury on _____/ /_____ day of _A̲u̲g̲_____, 2020.

Lonnie Kade Welsh

**Exhibit B Trial Transcripts Volume 2**

1

REPORTER'S RECORD
VOLUME 2 OF 14 VOLUMES

APPEALS COURT CASE NUMBER 07-18-00227-CR
TRIAL COURT CAUSE NO.  DCR-5715-17

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
8/15/2018 2:28:27 PM
VIVIAN LONG
CLERK

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | LAMB COUNTY, TEXAS |
| | ) | |
| LONNIE KADE WELSH | ) | 154TH JUDICIAL DISTRICT |

-------------------------------
PRETRIAL HEARING
March 8, 2018
-------------------------------

On the 8th day of March, 2018, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Felix Klein, Judge presiding, held in Littlefield, Lamb County, Texas;

Proceedings reported by machine shorthand.

2

A P P E A R A N C E S

FOR THE STATE:

    Scott A. Say
    DISTRICT ATTORNEY
    100 6th Drive, Room 111
    Littlefield, Texas 79339

    Rickie Redman
    ASSISTANT DISTRICT ATTORNEY
    100 6th Drive, Room 111
    Littlefield, Texas 79339

FOR THE DEFENDANT:

    Jim Shaw
    LAW OFFICE OF JIM SHAW
    3307 82nd Street, Suite K
    Lubbock, Texas 79423

3

I N D E X

VOLUME 2

PRETRIAL HEARING

MARCH 8, 2018                                          PAGE VOL

Appearances..................................... 2    2

Call of the case.............................. 4    2

Discussion if prior finding of competency to.. 4    2
  stand trial

Court finds Defendant competent to stand...... 9    2
  trial

Defendant's Motion to Waive Counsel and....... 9    2
  Represent Himself

Court's ruling on Motion to Waive Counsel..... 23   2
  and Represent Himself

Clarification of appointed counsel's.......... 24   2
  capacity

Court withdraws ruling allowing Defendant..... 26   2
  to represent himself

Court adjourned at 4:03 p.m................... 27   2

Court Reporter's Certificate.................. 28   2

4

PROCEEDINGS

THE COURT:  This is Cause Number 5715, the State of Texas versus Lonnie Kade Welsh.  We're here today for pretrial matters.

Initially, first I need to take up, Mr. Welsh has filed a motion seeking self-representation.  Mr. Welsh, you pleaded and signed this Motion For Self-Representation?

MR. WELSH:  I did, Your Honor.

THE COURT:  Okay.  Now there -- I noticed that one question is not answered that says:  Has any court ever found that you are not competent to stand trial?  Is that -- Has one or hasn't?

MR. WELSH:  Well, Your Honor, I'm currently civilly committed.  Underneath the terms of the behavioral abnormality, I have volition with emotional control issues.  And that's defined by law, I just found out, beyond reasonable doubt --

THE COURT:  Okay.  But that has nothing to do with competency.

MR. WELSH:  Well, okay.  I mean -- I can't stand trial for a lot of different things in the State of Texas, Your Honor.  That's why they have you civilly committed.

MS. REDMAN:  Uh-uh.

Rogers, Harvey & Crutcher   (806) 744-7754

5

THE COURT: Okay. Have you been found competent or incompetent?

MR. WELSH: Like I said, Judge, the law is ambiguous, Your Honor.

THE COURT: Well, the law is not ambiguous at all as to whether you are competent or not competent.

MR. WELSH: Well --

THE COURT: Has any -- Okay. Has any court ever determined that you were not competent?

MR. WELSH: Your Honor, I am civilly committed in the State of Texas --

THE COURT: Okay.

MR. WELSH: -- by the law, so whatever the law sees that as. If we look at every commitment of -- It says that I do not have contact with reality and that's what the highest court of the land says here in the State of Texas.

If we look at the other case from the United States Supreme Court, I'm not supposed to be considered as a typical criminal, a typical moral recidivist. I'm the amoral recidivist. So -- And they say that I'm similarly situated with those other civil committed individuals. So.

THE COURT: Mr. Shaw, do you have any

6

reason to believe that Mr. Welsh is not competent?

MR. SHAW: Well, just based upon what he is presenting to the Court in that the civil commitment has, as far as he's concerned, has to do with behavior as opposed to the competency, that it has to do with the understanding mentally as to how he functions. My interactions with him, I have no question that he understands what he's been charged with and the procedures that the Court would be following.

THE COURT: Okay.

MS. REDMAN: My only request, Judge, would be for the Court to make an inquiry under 46B.003 as to first, whether Mr. Welsh has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.

THE COURT: Okay.

MS. REDMAN: And second, whether he has a rational as well as factual understanding of the proceedings against him. Mr. Welsh and I have engaged in a lengthy discourse in the past about whether his beliefs and my beliefs about what competency is actually questioning and I believe the Court's previous questions today to Mr. Welsh kind of hit on my point, which is that the behavior abnormality which was found beyond a reasonable doubt that he possesses has nothing to do

7

with his competency to stand trial.

THE COURT:  Mr. Welsh, you understand what you are charged with?

MR. WELSH:  Judge, the only thing I have to say to Ms. Redman --

THE COURT:  Okay.  Okay.  What I want you to do is answer my questions.

MR. WELSH:  Okay.  Yes, sir.

THE COURT:  Do you understand?

MR. WELSH:  Yes, sir, I do.

THE COURT:  Okay.  And what are you charged with?

MR. WELSH:  I'm charged with tampering with evidence, Your Honor, 37.09(d)(1).

THE COURT:  Okay.  And so what do you understand that to be?  What are the allegations against you?

MR. WELSH:  Is that, okay, during a pending and in-progress investigation I tampered with evidence, namely my body they said.

THE COURT:  Okay.  And how does it allege that you tampered with your body?

MR. WELSH:  They say I physically struck myself.

THE COURT:  Okay.  And so Mr. Shaw was

8

appointed to represent you; is that correct?

MR. WELSH:  Yes, sir.

THE COURT:  Okay.  And you've had discussions with Mr. Shaw?

MR. WELSH:  Yes, sir.

THE COURT:  Okay.  And have you understood the information that he provided to you?

MR. WELSH:  Yes, sir, Your Honor.

THE COURT:  Okay.  So you think that you were able to consult with him and understand what he was telling you?

MR. WELSH:  Yes, Your Honor.

THE COURT:  Okay.  And so -- And again, I am going to ask you one time:  Has any court ever determined that you are not competent?  And by that, if a court has determined that you were not competent you would not be able to go to trial until you -- as long as you were incompetent.

MR. WELSH:  Correct.

THE COURT:  Has any court ever said that you are not competent to the -- so that you were not able to go to trial?

MR. WELSH:  Again, Your Honor, I would have to say that the terms of my behavior --

THE COURT:  Okay.

9

MR. WELSH:  -- abnormality does state that I am incompetent to testify.  They have me civilly committed.

THE COURT:  Okay.  All right.  Has any -- Have you ever -- Has any court ever denied taking you to trial?

MR. WELSH:  Since I have been civilly committed, Your Honor?

THE COURT:  At any time in your life?

MR. WELSH:  No, sir.

THE COURT:  Okay.  So, there's not been any criminal case or anything where a court found that you were incompetent and that you could not proceed to trial because of that?

MR. WELSH:  That's correct.

THE COURT:  Okay.  So I'm going to check no on that point.  And based on your responses as well as the responses of Mr. Shaw, the Court finds that you are competent and so --

MR. WELSH:  Thank you, Your Honor.

THE COURT:  -- anyway.

Now, a number of things I need to go over with you.  First off, you understand that you're asking the Court to waive your right to counsel so that you can represent yourself; is that correct?

10

MR. WELSH:  That's correct, Your Honor.

THE COURT:  Okay.  That you are required by law to have -- That I am required by law to ask a series of questions and inform you of several reasons why I believe it would be a mistake for you to proceed without assistance of an attorney and I believe it would be a mistake for you to proceed without assistance of an attorney.  And if you have any questions, you let me know.  You understand that?

MR. WELSH:  Yes, Your Honor.

THE COURT:  Okay.  Now, you are under indictment for tampering with evidence and what degree of felony do you understand that to be?

MR. WELSH:  It's a third degree felony, Your Honor.

THE COURT:  All right.  You understand the range of punishment for a third degree felony?

MR. WELSH:  I do.

THE COURT:  Okay.  And what is that range of punishment?

THE WITNESS:  It's two to ten, Your Honor, not counting enhancements.

THE COURT:  Okay.  And is there any fine potential there?

MR. WELSH:  That's something I didn't

Rogers, Harvey & Crutcher   (806) 744-7754

11

worry myself about, Your Honor.  It's really the jail time.

THE COURT:  Okay.  So you're -- There, in addition to the two to ten, there is a possible fine in any amount not to exceed $10,000.

MR. WELSH:  Okay.

THE COURT:  Okay?  If you do not have the ability or means to hire an attorney to represent you, you have the right to have the Court appoint an attorney to represent you.  Do you understand that?

MR. WELSH:  I do.

THE COURT:  And in this case Mr. Shaw has been appointed to represent you; is that correct?

MR. WELSH:  Yes, sir.

THE COURT:  Okay.  You understand that there are many dangers and risks associated with self-representation?

MR. WELSH:  I do.

THE COURT:  Okay.  Based on the nature of this case and the consequences you face if convicted, it is my opinion that representing yourself would be a mistake for several reasons, including the amount of discovery involved in this case is substantial and, depending on the type of evidence in your case, you might have a limited right of access to view it in

12

preparation for your trial.  Do you understand that?

MR. WELSH:  I would have to say what kind of terms are those under, Your Honor?  What kind of discovery would prevent me from being able to view?

THE COURT:  Okay.  There are some Rules under the Code of Criminal Procedure that would require some redaction or something in certain cases.

MR. WELSH:  Okay.

THE COURT:  Okay?  Have you talked to Mr. Shaw about that?

MR. WELSH:  Briefly, Your Honor.  My answer to that would be that the simple taking out the sensitive information would be -- would be -- that's your decision, of course, you know.  And that is what I discussed with him.

THE COURT:  Okay.  So you understand there may be some redacted information?

MR. WELSH:  Correct.

THE COURT:  Okay.  And you still want to proceed?

MR. WELSH:  Correct.

THE COURT:  Okay.

MS. REDMAN:  Judge, may I interject?

THE COURT:  Certainly.

MS. REDMAN:  39.14, sub-section (d) also

Rogers, Harvey & Crutcher    (806) 744-7754

13

says that in the case of a pro se defendant, if the Court does order us to produce and permit the inspection of any document, item, or information, he would only be allowed to view it.  He's not -- We are not required to allow electronic duplication.

THE COURT:  Okay.

MS. REDMAN:  And I just want to make sure he's clear on that.

MR. WELSH:  Your Honor, I am and I would have to say that denies me my Sixth Amendment right to effective assistance of counsel.  I mean, I have the right to defend myself to my best possible means within my own --

THE COURT:  That does not prevent you from seeing and viewing the evidence.  It just means that they're not going to be any electronic.

MR. WELSH:  Okay.  So we're talking I can get hard copies and things of that nature?

THE COURT:  No.

MR. WELSH:  So --

THE COURT:  -- you all the discovery.

MR. WELSH:  So I'm -- And so it does limigate [sic] my ability to defend myself, Your Honor.

THE COURT:  Well, that is something you take up with the Appellate Court.  The Rules are what

14

the Rules are.  It's not going to deny you access to any information.  It just denies or limits how that evidence can be given to you.  You'll have ample opportunity to review it and recall it and prepare for your trial.

MR. WELSH:  Okay.  So the question I would have, Your Honor, is what is my limitations then?

THE COURT:  Well you're not going to get -- They're not going to produce it electronically or anything for you.  They will permit you to view it and --

MR. WELSH:  For how long?

THE COURT: -- videos or anything, you'll be permitted to view those videos and all in preparation for your case, but there are some limitations that you have to understand 39.14 put on the production of discovery.

MR. WELSH:  Well, Your Honor, again I would have to say it denies my Sixth Amendment right to effective assistance of counsel if I cannot view the things and go over and hash out and deliberate, you know, within my own reasoning to, you know, proceed on what I would wish to go direction on trial and without any kind of -- I mean, you just going to let me do it for 30 minutes, 20 minutes, an hour?  I mean, I think there should be some hard ground rules set.

15

THE COURT:  Well, you'll be given the opportunity to view all the evidence.  So, that's all I can tell you at this point.

MR. WELSH:  Then I would have to say that my choice is being taken away from me, Your Honor, to defend myself.  And I guess it is up to the Appellate Court at this point.

Because if I'm not able to have the full discovery that any other attorney would, then my options are limited.  And so now I would have to -- I would have to take a reconsideration if I do want to represent myself.  Because now I am kind of between a rock and a hard place, Your Honor.  Will I have enough time?  Will everything be provided to me where I can kind of sit down and go over it, rehash it?  If I need to go back to it, can I go back to it, you know?  I mean, you're asking me to recall something.  You're not asking me to, you know, where I can just go back to my files and look it up, oh yeah, I do remember that.  You're asking me to have instant recall on an amount of information that I'm going to have to --

I mean, the discovery in this case is going to be significant, Your Honor, because there's more than just what's going on.  And the way they approached it as trying to quantify an expert, you know,

16

I'm going to the discovery to be able to impeach that expert. I'm also going to have to have discovery to be able to impeach the different witnesses that they are calling on this. And just to be able to rely on my recall alone significantly disabilitates [sic] my ability to defend myself.

THE COURT: All that I can tell you is, 39.14 --

MR. WELSH: I understand.

THE COURT: -- puts some limitations on the discovery that you can get. If you felt like that is inadequate, then it would be your responsibility, if you're representing yourself, to make the appropriate motions or arguments before the Court, but those limitations exist --

MR. WELSH: Uh-huh.

THE COURT: -- and that you have to understand they do exist. And so anyway, if you're representing yourself, that's one of the points that you're going to have to contend with.

MS. REDMAN: If I may?

THE COURT: Certainly.

MS. REDMAN: It's not anything that either one of us have control over. It's what the Code of Criminal Procedure says.

17

MR. WELSH:  I can --

MS. REDMAN:  Well, I don't want it to hurt anything, but in times --

MR. WELSH:  People don't --

MS. REDMAN:  Well, in the times past what we've done, the last person who we had who was incarcerated, the reason why he told me that is because --

THE REPORTER:  Can you speak up, Rickie?

MS. REDMAN:  Yes, I'm sorry.  It's one of the risks that you assume if you choose to go forward without counsel.  So, that's why he has to admonish you, because that's what the case law says.

Now obviously, our goal is to see that justice is done and so if you are choosing to represent yourself, what we've done in the past is, we do all the redactions that 39.14 requires of all the name, address, phone number, everything in 39.14, we provide it in a binder to the sheriff's office.

MR. WELSH:  Uh-huh.

MS. REDMAN:  It is up to the sheriff's office in terms of scheduling what times you're allowed to view and access that information.  You won't have in that binder the discs.  We are not required to make electronics copies of the discs or the videos.

18

And so I know from reading your discovery motions, that's going to be one of your primary concerns and so that's why the Court is informing that you have to take that into consideration when you make a decision about proceeding pro se. It is the state of the law and so it is what it is. We do everything that we can to try to give you access to it. You can make notes or write down questions or anything like that, but in terms of the discs, that's where you're really going to have most of -- most of your difficulty.

THE COURT: You'll have the opportunity to view those.

MS. REDMAN: Right. Right. I just can't guarantee when or for how long.

THE WITNESS: Yes, Your Honor, I would have to say that it would be in my best interest if the Court appoints Mr. Shaw as a stand-by counsel then to help me with the case as far as controlling the evidence and assisting in information of that nature and the electronic records and that way I can view them and deliberate with him on that.

THE COURT: Okay. Now, if I appoint him as stand-by counsel, he will be there to answer any legal questions or anything. It's not his -- part of his job to direct your case, direct discovery, anything

19

like that.  He's just there strictly to answer any legal questions that you might have.

MR. WELSH:  I do understand that, Your Honor, and it seems to me that -- I mean, I want to take my life in my own hands so -- and that's why I'm at it. And so it would be, you know, a good role for him to go and at this point to be a stand-by counsel as far as the discovery and things of that nature.

THE COURT:  Okay.  Anyway, you understand your trial, you were indicted on -- in January of this year.  Your trial is set for 4-3 of '18 and based on the upcoming settings in your case, should you choose to represent yourself, you may not have adequate amount of time to review all the discovery and prepare for trial. You understand that risk?

MR. WELSH:  Yes, Your Honor.  And I would have to say that, you know, the expediated [sic] -- I haven't had any discovery yet and we are still doing the -- You know, we're still getting all the discovery in so I don't know if that actually would be -- I would be ready for this stage of trial on that date.

MS. REDMAN:  There's nothing in the Rule prevents him from making a subsequent Motion for Continuance.

THE COURT:  Correct.

20

Okay.  A licensed attorney has specific training in the laws for your case; you understand that?

MR. WELSH:  I do.

THE COURT:  Even though you have no legal training or experience, you will be subjected to the same rules and laws that apply to any attorney that appears in this court.

MR. WELSH:  Yes, sir.

THE COURT:  Okay.  When you appear before the Court you will be treated no differently from an attorney and you will be expected to conduct yourself in a professional capacity, just as an attorney would.

MR. WELSH:  Yes, sir.

THE COURT:  If an attorney represented you, that person would have a better understanding of the Rules of procedure and evidence, the Penal Code, the Code of Criminal Procedure, the Constitution, and other laws or rules.  You understand that?

MR. WELSH:  Yes, sir.

THE COURT:  In order to properly preserve error in your case you have to follow certain legal rules, which you might not know.

THE REPORTER:  Just a minute, Judge.

THE COURT:  You'll need to take the child out of the courtroom, please.

Rogers, Harvey & Crutcher    (806) 744-7754

This could negatively affect your case were you ever to pursue an appeal if you were convicted. Do you understand that?

MR. WELSH:  Yes, sir.

THE COURT:  The Court is personally aware of several occasions when defendants who represented themselves received long sentences and later regretted representing themselves.  Do you understand that?

MR. WELSH:  I do.

THE COURT:  Self-representation could result in a conviction.

MR. WELSH:  Yes, sir.

THE COURT:  If you are incarcerated at any point from now until the beginning of the trial, your ability to adequately prepare for your trial could be significantly hindered.  You understand that?

MR. WELSH:  I do, Your Honor.

THE COURT:  If you choose to represent yourself then you are not entitled to have stand-by counsel appointed to assist you.  You understand that you are not entitled to that?

MR. WELSH:  I do understand that, yes, Your Honor.

THE COURT:  If you choose to represent yourself and the Court begins trial, then you will not

22

be permitted to stop the proceedings to ask for appointment of counsel at that time.

MR. WELSH:  Yes, sir.

THE COURT:  As I previously stated, I want you to understand that I believe it's a mistake for you to represent yourself.

MR. WELSH:  I do understand that.

THE COURT:  Do you feel like you understand all the risks associated with representing yourself?

MR. WELSH:  I do, Your Honor.

THE COURT:  Has anyone forced you or threatened you or promised you favorable treatment by this Court or any other body in exchange for your waiver of counsel?

MR. WELSH:  No, Your Honor.

THE COURT:  Are you choosing to represent yourself and forego appointment of counsel because it is what you and you alone are choosing to do?

MR. WELSH:  I am, Your Honor.

THE COURT:  Do you believe that you can become familiar with and understand the Code of Criminal Procedure, the Penal Code, or any other rules of evidence or any other codes that might affect your case?

MR. WELSH:  I believe I can, Your Honor.

23

THE COURT:  Do you believe that you can become familiar with and understand the rules of evidence and criminal procedure?

MR. WELSH:  Yes, Your Honor.

THE COURT:  Do you believe you can become familiar with and understand the laws which might govern your conduct, the presentation, or objections to evidence presented in this case?

MR. WELSH:  Yes, Your Honor.

THE COURT:  Mr. Welsh, is it your intent to wish to continue to represent yourself?

MR. WELSH:  Yes, Your Honor.

THE COURT:  All right, Mr. Welsh, then the Court will allow you to represent yourself before this Court.

MR. WELSH:  Thank you, Your Honor.

THE COURT:  Okay.  I do want you to know I think this is a very grave mistake on your part.

MR. WELSH:  Thank you.

THE COURT:  Okay.

MR. WELSH:  Your Honor.

THE COURT:  Yes, sir.

MR. WELSH:  Ask if you would, during the pretrial can I get at least one of these handcuffs off?

THE COURT:  Okay.  Which is your dominant

24

hand?

MR. WELSH:  My right hand, sir.

THE COURT:  Okay.  It will be removed. Because he can -- that's not locked, he can spin that. If you'll lock it to the belt.  Okay.

And I have a number of motions.

MR. SHAW:  Your Honor, I would, I guess, I need to ask the Court what capacity that I would be representing him or not representing him or be involved in the case?

THE COURT:  I will continue you as stand-by counsel to answer any legal questions that he might have.  That will be the -- I mean, all you will be subjected to in this case.

MR. SHAW:  And as far as the discovery that I have, am I still able to share that discovery with him?

MS. REDMAN:  My opinion would be no, Judge.  39.14 only makes provision for the attorney for the defendant or the pro se defendant.

THE COURT:  You'll be subject to the pro se limitations on discovery.

MR. SHAW:  And as far as his access to the videos, then I would not be able to show him the videos?

25

THE COURT: As he is representing himself, that's going to be his obligation.

MR. SHAW: So what access then do we have to the videos?

THE COURT: You'll have to make arrangements with the Sheriff's Office and the State's counsel to get those.

MR. SHAW: Okay, Your Honor.

MR. WELSH: So I'm underneath a complete understanding here. The Sheriff's Office will have a copy of the videos for me to be able to view at their chosen time; correct?

THE COURT: I'm not sure what the State's procedure and the jail's procedure is on that, but they will be made available for you to view.

MR. WELSH: Isn't that the point of having the stand-by counsel in the first place, that he has authority --

THE COURT: No, stand-by counsel's role is to answer any legal questions that you have and that's the limitation on it.

MR. WELSH: Again, Your Honor, I would have to say that my Sixth Amendment right to be able to defend myself adequately is being impaired right now. And again, I would have to say, I don't know if I'm

26

making an informed decision when it comes to the role of an attorney because I don't know for sure if I'm going to have adequate access.  I'm not -- I don't know -- I don't know anything right now.  The ambiguity of it all is quite distressing because --

THE COURT:  Do you want some additional time to consider whether or not you want to represent yourself.

MR. WELSH:  I think that I would need it. Yes, Your Honor.

MR. SHAW:  Your Honor, my suggestion would be to allow the request to stay in place and to see exactly what kind of access is provided to him.  If it looks like in the future that that's not going to be adequate, then at that point would allow him to withdraw his request.

THE COURT:  Okay.  At this point in time, the ruling that you represent yourself, I'm going to withdraw my ruling on that.  I will allow you -- We will set a date, sometime in the future before trial, for you to re-urge that.  And given that ruling, I will reset the pretrial matters as well; okay?  At this point in time Mr. Shaw will still be your attorney representing you and he can go over the discovery and what have you in this case.  But we will reset at some point in time

27

in the future, a date to come back in on the pretrial matters as well as to consider your motion to represent yourself.

MR. WELSH:  Okay, Your Honor.

THE COURT:  All right.  If there's nothing further then we will be in recess.

(Court recessed at 4:03 p.m.)

28

REPORTER'S CERTIFICATE

THE STATE OF TEXAS    )
COUNTY OF LAMB        )

I, Charles Walker, Certified Court Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 11th day of August, 2018.

/s/ Charles Walker
_____
Charles Walker, Texas CSR 185
Expiration Date:  12/31/2018
ROGERS, HARVEY & CRUTCHER
Firm Registration No. 168
709 Broadway
Lubbock, Texas 79401
PHONE 806-744-7754
FAX 806-744-7965

Rogers, Harvey & Crutcher    (806) 744-7754

**Exhibit C Transcripts Volume 7**

1

REPORTER'S RECORD
VOLUME 7 OF 14 VOLUMES

APPEALS COURT CASE NUMBER 07-18-00327

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
8/15/2018 2:28:27 PM
VIVIAN LONG
CLERK

TRIAL COURT CAUSE NO. DCR-5715-16

THE STATE OF TEXAS          ) IN THE DISTRICT COURT
                            )
VS.                         ) LAMB COUNTY, TEXAS
                            )
LONNIE KADE WELSH           ) 154TH JUDICIAL DISTRICT

------------------------------
PRETRIAL HEARING
May 14, 2018
------------------------------

On the 14th day of May, 2018, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Felix Klein, Judge presiding, held in Littlefield, Lamb County, Texas;

Proceedings reported by machine shorthand.

2

A P P E A R A N C E S

FOR THE STATE:

     Scott A. Say
     DISTRICT ATTORNEY
     100 6th Drive, Room 111
     Littlefield, Texas 79339

     Rickie Redman
     ASSISTANT DISTRICT ATTORNEY
     100 6th Drive, Room 111
     Littlefield, Texas 79339


FOR THE DEFENDANT:

     Lonnie Kade Welsh
     PRO SE
     Lamb County Jail
     1200 East Waylon Jennings Boulevard
     Littlefield, Texas 79339-4250


FOR CORRECT CARE RECOVERY SOLUTIONS & EMPLOYEES:

     Stefani Williams
     LEWIS BRISBOIS
     5100 Ross Avenue
     Dallas, Texas 75201

3

INDEX

MAY 14, 2018                                              PAGEVOL.

Appearances.....................................   2      7

Call of the case...............................   5      7

Issues raised by the Defendant.................   6      7

State's argument...............................  17      7

Defendant's argument...........................  23      7

State's argument...............................  24      7

Defendant's argument...........................  24      7

State's argument...............................  25      7

Court's ruling on Motion for Continuance.....    26      7

Argument Between Defendant and State over....   29      7
    Defendant's questioning of Court's Finding
    of Facts

Court asks for clarification from Defendant..  33      7

Defendant argues list of experts.............  33      7

Court continues previous ruling..............  33      7

Defendant continues arguing issues...........  34      7

Court announces previous ruling on expert....  36      7
    witness

Defendant Bench files Motion to Take.........  36      7
    Judicial Notice

State's response to above Motion for.........  36      7
    Judicial Notice

Court takes the Motion under advisement......  39      7

Court admonishes the Defendant...............  39      7

Further discussion of subpoenas..............  40      7

4

PAGEVOL.

Defendant's two Notices and discussion of....    42    7
   testimony transcript

Court's ruling on testimony transcript.......    46    7

Defendant objects to Court not allowing......    46    7
   Suppression Hearing

Court's response..............................    47    7

Defendant's argument..........................    48    7

State's objection.............................    49    7

Defendant's response..........................    50    7

CCRS Motions to Quash Subpoenas for..........    51    7
   Christopher Wood

Court's ruling on logbook....................    55    7

CCRS Motion to Quash Subpoena for Medical....    57    7
   Records

Court's ruling on medical records............    58    7

CCRS Motion to Quash Subpoena for John.......    59    7
   Wellman

Court's ruling on above Motion...............    60    7

CCRS Motion to Quash Subpoena for James/Jeff.    61    7
   Kirkland

Court's ruling on above Motion...............    63    7

Discussion of subpoenas for nine (9).........    63    7
   residents of the facility

Court adjourned at 12:08 p.m.................    65    7

Reporter's Certificate.......................    66    7

5

PROCEEDINGS

THE COURT:  This is Cause Number 5715, the State of Texas versus Lonnie Welsh.  I'm going to call this Pretrial Number 5.  And so Mr. Welch, let's see, I understand you filed some more pretrial matters on Friday afternoon?

MS. REDMAN:  There were also some filed earlier last week.  I think they actually were file marked on Friday around 2:00 o'clock, but we received them Wednesday or Thursday, I believe.

THE COURT:  Okay.  All right.  And so.

MS. REDMAN:  They should be in front of all those subpoenas, Judge.

THE COURT:  Oh, okay.

MS. REDMAN:  Because the subpoenas didn't come in until around 4:00 or so.

THE COURT:  All right.  And I was out of town and I have not had an opportunity to look at -- So what was your first?

MS. REDMAN:  It was the Motion for Continuance Based on New Evidence.

THE COURT:  Okay.  And I understand that you do not wish to continue your case?

MR. WELSH:  Well, Your Honor, that's yet to still be decided.

6

THE COURT: Okay.

MR. WELSH: Let's take it, I guess, step by step, would be the best way. Because I have a lot of objections to some of these things that are going on, based on my constitutional rights.

So as far as the continuance goes, I have had an opportunity to review the disc that Ms. Redman sent over. They won't let me copy nothing for the book so I'm not able to actually use that in trial.

As far as some of these other things go, Your Honor, I have to object to not being able to go to the law library based off my Sixth Amendment right to effective assistance of counsel and the minimum of due process. I mean, to be able to prepare a defense I need access to the law.

THE COURT: Okay. Now just for clarification, you have been allowed to go to Lubbock County so far as they would accept you. I think you created issues over there and I don't know if they've allowed us to take you back over there, but they have a law library that you'd had access to. Additionally, you have had Code of Criminal Procedure and other things and the jail has copied off cases or anything that you requested of them to print out for you.

MR. WELSH: I know.

7

MR. SAY:  And I also add that he's also had his mother looking up case law for him too, Judge.

THE COURT:  Okay.  All right.

MR. WELSH:  Well, that being said, having a third party run around who has no concept of what the law is, trying to find you specific things in the law, it's not my access to the Court.  It's their access.

Furthermore, the jail told me that they wouldn't print off the cases that I wanted.  She said I had to be very specific and when I'm trying to get into more detail, especially when it comes to way I want my jury instructions to go and I'm asking her for certain things, she's not able to get those things which I could get on AlexisNexis [sic] when it comes to two witnesses or the one witness being collaborated.

Furthermore, when I -- I mean, it's just a simple fact that Lubbock had allowed me only two hours and it was the issue that they put me in --

THE COURT:  Now, listen.  Just a second. You said two hours --

MR. WELSH:  Well you said I could raise issues.

THE COURT:  You said that the Lubbock allowed you two hours per week.

MR. WELSH:  Only two hours.

Rogers, Harvey & Crutcher  (806) 744-7754

8

THE COURT: I understand. The way they'd indicated --

MR. WELSH: Not two hours per week, two hours for the entire time I have been allowed access to law library for this case was for two hours. By the time I was representing myself I was been allowed only two hours.

THE COURT: Okay. All right. That's -- Go ahead.

MR. WELSH: Okay. Now the issue that was created was the fact that they had seg'd me up without due process. I have a right to have a hearing based off any segregation to by the Constitution. Now if the Constitution waved in their face and they have a problem with that, that is not my fault. Tell them to obey the law of the land and we wouldn't have a problem.

Furthermore, there's other places that have a law library. So just Lubbock alone and the reliance on Lubbock alone fails to be a legitimate excuse, Your Honor.

THE COURT: Okay. Anything else on your --

MR. WELSH: Do you sustain or do you override the objection, Your Honor?

THE COURT: That's -- Well, giving you

9

first opportunity to make your arguments and I'm hearing responses --

MR. WELSH:  Okay.

THE COURT:  -- that the State might want to make.

MR. WELSH:  Okay.  Well that's as far as the law library goes.

But second of all, the State has refused to provide videos of the aftermath of a jail incident from 1-26-17 to 1-28-17, even though this Court just ordered on Tuesday to provide any videos that I require based on the evidence, but based off the event.

I mean, if they plan on introducing this evidence, like I said, under 107, it completes the narrative.  It completes the entire story.  It ain't just oh, well this is what our view of what happened and this we're going to segregate it off.  We're not going to allow Mr. Welsh to propose everything else, but that that happened in the consensual event.  It happened sequentially, everything.

And they violated the law.  They violated the Texas Administration Code, 283.1, which is Jail Commission Standards on disciplinary.  And it shows how they violated the law.  It shows that they deviated from the feeding practices, that they deny me my bedding,

10

that they also deny me my property, all these things that they're not allowed to do. They denied me proper clothes and they denied me proper hygiene during that time. The video will also show that, Your Honor, I had to drink out of the toilet because they wouldn't bring me water. So, that being said, I think it's very important to show the Machiavellian attempts of the jail and the State to prevent me from the proper Brady discovery that that's what that is.

MR. SAY: Not which is relevant.

MR. WELSH: If -- I mean, if you're going to use it in a trial against me it is relevant.

THE COURT: Okay.

MR. WELSH: Okay? Okay. The Court denying of all mitigating evidence in possession of CCRS and TCCO because the State has given notice of their intention to use bad acts that had -- that was within the possession of these agencies. The State has given me notice and I had tried, both through a Brady discovery and by subpoena, to get these items, but yet the Court says that it's not Brady and I don't have the right to gain evidence through subpoena. And but yet the State has the right to bring these issues up once again. They have a right to flaunt my bad acts without any mitigating evidence that can be obtained through

11

these agencies.

THE COURT:  Okay.

MR. WELSH:  Okay?  The State's refused to provide prior criminal history of the witnesses the State will call through the course of this trial.  The Court ordered, because there was an argument, that I have the right to impeach them based off the Texas Rules of Evidence 609.  And I agreed that, you know, before using them I would approach the Bench, but the State has not provided these items.  And the State has been clear that they plan on calling several witnesses who obviously have criminal records.

Let's see, what else I have here?  The Court ordered that the State does not have to provide through Brady the employment records of TDCJ for Lesley Dinwiddie or Dustin Tijerina.  Yet the State has given notice of intent of bringing bad acts of the Defendant's, based off that institutional record.

Now, it seems to me to fail fundamental fairness if the State is able to go to TDCJ and get these bad acts, but yet I'm not allowed to impeach the witnesses that they plan on calling.  I mean, to me, Your Honor, it seems that, especially since the Assistant Attorney General argued that one agency of the State of Texas was based off of Brady and that I have to

12

go through them, through the discovery and through Brady in order to get this evidence. It would naturally follow that the TDCJ is also the same state agency that the State has evidence that could be mitigating to my defense.

THE COURT: Anything further?

MR. WELSH: Oh, yes, sir. The Court has refused to issue the subpoenas for the Defendant's medical records that I put in several weeks --

THE COURT: When you say Defendant's, that's your medical records?

MR. WELSH: Yes, Your Honor. I subpoenaed the medical records from Christopher Woods, as the Court ordered, because even though 39.14 of the Texas Criminal Code says that if an agency is contracted with the State, that I'm able get that evidence through discovery, you told me no. You told me I have to get it by other means. And the other means is through the power of the writ of the subpoena, Your Honor. And that being said, I subpoenaed the medical records, but yet the Court had -- your clerks, and I guess you haven't approved it, has not provided that.

Now also, I subpoenaed my disciplinary --

THE COURT: Now wait just a minute.

MR. WELSH: They didn't issue the

Rogers, Harvey & Crutcher   (806) 744-7754

13

subpoena.

THE COURT:  You're saying I didn't approve what?

MR. WELSH:  I don't know what what.  I don't know how this works.  All I know is that when I put in a subpoena, it naturally goes that the Court issues the subpoena, the Clerk issues it.

THE COURT:  The Clerk issues that.

MR. WELSH:  Okay.

THE COURT:  I don't ever see your subpoenas.

MR. WELSH:  Well, your Clerks, Your Honor, have refused to issue the subpoena.  Not only that, I have also put in a subpoena for the disciplinary record based off of the events on 11-13-18.  Now these disciplinary records go to show -- I mean, I don't want -- I have to give up my whole case in order to get evidence.  I mean, this is the opposition here, Your Honor.  But if the Court can't see that the disciplinary records from 11-13 is relevant, then I will make the further argument.  But I would like it just to stand on that.

THE COURT:  Okay.  I don't -- Let's see, I'm not --

MR. WELSH:  This incident happened on

14

11-13-18.

THE COURT:  Okay.

MR. WELSH:  I don't want to have to give up my whole case --

MS. REDMAN:  November hasn't happened yet.

MR. WELSH:  Huh?

MS. REDMAN:  It was 11-13 of '17.

MR. WELSH:  '17, yeah, I'm sorry.  I misspoke.  11-17 -- I mean, 11-13 of '17.

THE COURT:  Uh-huh.

MR. WELSH:  And I'm asking for CCRS to provide the disciplinary from that event.

THE COURT:  Okay, just a second.  Rickie.

MS. REDMAN:  That's what's absolutely in that orange folder, Judge.  It's asinine for him to come here and say he doesn't have the records when every single person who was involved in writing up a disciplinary report about what he did in the hallway that day and in that intake cell is contained in that folder.  I provided every single one of those statements to him, even for witnesses that we're not going to call. We gave him the complete record of everything that CCRS documented that day.

MR. WELSH:  Okay, Your Honor.  Ms.

15

Redman's insipid argument fails. Because what we're looking for here, because I have to, I have to now expose my case, is how did I use the manufacture of evidence to end an investigation maybe CCRS was conducting at the time, Ms. Redman? And so this would show that I used this based off the disciplinary. Well based off my written, my verbal statements that they take down and I sign off, off of a disciplinary procedure. And we're talking about the disciplinary from the 13th or even afterwards.

But because well part of the case that I now have to give up is how did I ever use any manufacture of evidence in an investigation at CCRS? We've already -- Even though the CCRS is a private company that has no legal ties, just like Mr. Hester testified to, but it still would behoove me to be able to show I never used any kind of manufactured evidence, Your Honor.

THE COURT: Okay.

MR. WELSH: All right. And let's just keep going because we ain't done yet.

THE COURT: Okay.

MR. WELSH: I have to object that the Clerks refused to re-subpoena any out-of-town witnesses. This -- This doesn't prejudice me because they came

16

anyway, but the simple fact of the matter is, they almost didn't even get to come off, to get off -- sorry, to get off to be able to come here.

Furthermore, I got subpoenaed a Doctor Douglas Russell out of Lubbock and I haven't got that back. I haven't also gotten back two other subpoenas for residents that are out there at CCRS who will provide testimony against --

THE COURT: Okay. Let me get one point clear.

MR. WELSH: Yes, sir.

THE COURT: These are the subpoenas that you sent to the Clerk's office Friday afternoon?

MR. WELSH: No. I sent them way before Friday afternoon, Your Honor.

THE COURT: Okay.

MR. WELSH: I -- I mean, I kind of just basically letter bombed them because they wouldn't ever issue the subpoenas. So I thinking well maybe they got lost, maybe something happened, maybe, you know, maybe I'm not being clear enough to say that I have a right by the 6th Amendment, this many, to these subpoenas. I mean, I don't know. I don't know. Do I have this right or not?

MS. REDMAN: I'm kind of failing to

17

understand the purpose of his argument aside from it being a stall tactic this morning because Chris Weston did go and deliver over 20 subpoenas out to the facility on Friday afternoon, close to 5:00 o'clock. So I don't know what he's talking about.

MR. WELSH: Okay. Well, I haven't got nothing back so maybe -- Then maybe I --

THE WITNESS: So is your argument you don't have a return for the subpoenas or --

MR. WELSH: I don't have no idea. I have no idea if these witnesses are available or not.

THE COURT: Okay.

MR. WELSH: Furthermore, I have to object that I have not been provided the jury pool.

MS. REDMAN: Neither have we.

THE COURT: Yeah.

MR. WELSH: Okay. Well no, I'm just making sure. I'm going to make sure everything is fair. I mean, I'm being denied evidence left and right and everybody is just whoo. I believe that's it.

MS. REDMAN: May I respond?

THE COURT: Uh-huh.

MS. REDMAN: All right. First, he claims that he's not had enough time in the law library. I'd like to remind the Court that for most of the pendency

18

of this case Mr. Welch had the benefit of a court-appointed attorney and it wasn't until a couple of months ago that he decided to fire that attorney. I will also remind the Court that Mr. Welch chose, deliberately chose, not to avail himself of standby counsel. I'll ask the Court to take notice of all of the motions and briefs and addendums to motions that Mr. Welsh has filed citing to case law, lots of different case law. The Court will also recall that he received an order from the Court to be able to gain access to the same accordion file that now sits on counsel table with him, what he claimed was necessary so that he could have access to the legal research that he had done in this case.

So again, now we're in the eleventh hour saying I need more time in the law library, but I think he's failed to demonstrate what specifically he's been deprived of. Because he's been doing legal research and engaging in these activities the whole pendency of the case and certainly in the last couple of months since he's represented himself.

Second, he claims that I violated the Court's order regarding the jail videos from January 26th of this year. He made a couple of sternly worded demands of Ms. Diaz last week to communicate to

19

me that I was in violation of the Court's order, but I think the Court will recall what you ordered me to do. I've already provided him with what I intend to use in the punishment phase of the trial, are we to get there and if Mr. Say and I choose to put on that bad act that he engaged in on the 26th of January of this year. That's what I'm required to provide to him, what evidence do I have that I'm potentially going to use against him. And I did that weeks ago.

The Court didn't order me to do anything except make an inquiry with Ms. Diaz as to whether any other videos of that incidence existed. When I inquired with her she said no, there are not any other videos.

I have watched the video, as I'm sure Mr. Welsh has, and it covers not only the actual incident of bad acts conducted by Mr. Welsh, but then a significant period of time after that. I don't know what else is to be gained regardless, even if assuming that I'm supposed to provide something that does not exist or has not been preserved, except to prove his point, which is however long he stayed in ad seg, however long he was denied access to the dayroom, things that the Jail Commission has already addressed with the Sheriff's Office, things that are not relevant for this Court to consider, in my opinion.

20

He says that I haven't turned over mitigating evidence and primarily what he argued was, I'm guessing, things that would be contained in the TCCO file. I've reviewed 1800 pages of this man's TCCO file and found absolutely nothing that mitigates any kind of punishment he might receive in this case or I would have provided it to him.  I don't know specifically what is mitigating that I need to provide.  He directly references documents that CCRS would have and possibly that TCCO would have, but everything that I have would be inculpatory evidence, things that make him come across as someone who regularly violates the rules and bucks authority.  There's nothing that I have that mitigates anything that he has done or did in this case.

The Court did order me to provide CCH summaries on all of the witnesses that the State intends to call, but if the Court will remember, I don't have to provide those to Mr. Welsh until I actually am calling the witness because the State has discretion over which witnesses it can call.  I'm not going to give him access to otherwise confidential information if that person is never going to take the stand.  I absolutely have those prepared and will give them to him whenever he is allowed to have access to them, which is when the witness is testifying, Judge.

I am not in possession of any TDCJ employment records.  He's been waxing poetic about this one for a few weeks too.  What I have that I have access to again are inculpating punishment evidence type documents that show that while he was in TDCJ, again, he's developed a pattern of violating the rules of TDCJ, assaulting staff, threatening staff, things that I put on my 404(b) notice.  I don't have access to TDCJ employment records in some way that sets me apart and enhances my ability to get those records different from Mr. Welsh.  As the Court has -- We've already discussed this.  He has the same right to subpoena those records as I do.  Otherwise, I don't have access to them.  That means it's not Brady.  If he has equal access to me, it's not Brady evidence.

In terms of the subpoenas and that sort of thing, obviously I don't have a say so in any of that.  Like I told the Court earlier when I interjected, it is my understanding that several subpoenas were issued like near 5:00 o'clock on Friday afternoon.  So I don't know and I obviously don't have any dog in the fight in terms of which subpoenas are served or what happens to any of those.

I will note, though, that Christopher Woods is not the custodian of medical records at CCRS.

22

Christopher Woods is the Director of Security.  So I'm not real sure if that has anything to do with why he has not come and produced medical records for Mr. Welsh, but I do, it's my very basic understanding, that he would have to subpoena the correct person, like if he subpoenaed Mr. Say for his medical records.

Further, we've already put on the record that we have also not had access to the jury pool list by the Court's decision.  I have no idea who's going to show up this afternoon.

I think that is all, Judge.

I think also I'll just remind the Court that when the Court communicated with Mr. Welsh last week, Mr. Welsh said at that time that he did not intend to pursue the Motion for Continuance.

And I'll remind the Court too of the admonishments that you gave Mr. Welsh when he initially proposed the idea or furthered the argument that he should be allowed to represent himself, which was, you will be limited to the amount of preparation that you have, specifically because you're incarcerated in this case and that is something that you need to consider because you will be required to go to trial.

And I think if the Court will look and recall, we've continued the trial twice now, with no

23

objection from the State. We are ready. We need to go to trial this afternoon.

MR. WELSH: Okay, Your Honor.

First of all, the argument over the videos, Your Honor, was because, first of all, I asked the State to provide me with the mitigating evidence from that. If they wish to put on as bad acts in the punishment phase, then like you say, if we get there, then I have a right to mitigate those bad acts.

Furthermore, it goes to saying with the other bad acts the State brought up, because I asked specifically for the grievances filed with TCCO and Correct Care Recovery Solutions and I was told this ain't Brady, you have to subpoena them. But then this lady here comes up and says well, sir -- and this goes for the medical records too -- we're not going to allow Brian Thomas to be subpoenaed, who is the Director, who is in charge of everything, who has access to the medical, who has access to the grievances, but the Court had put a bar on me from subpoenaing him. And so I turned once again to the discovery of 39.14, which it states if the agency is contracted with the State it's discoverable; okay?

Furthermore, if the Court will recall, I initially asked for Mr. Shaw to sit here with me as

24

standby counsel. How that ended up changing I don't know and it's horrible --

MS. REDMAN: That is entirely false.

MR. WELSH: If the Court will go back and look at my motion, that's the way the motion reads.

Furthermore, I've had to piecemeal my motions with what I do have in my possession. But does that make for effective counsel? Absolutely not. You tell me because I have a few little tidbits of information and I'm able to try to piecemeal it together and copple [sic] and --

MS. REDMAN: Which was part of the risk that you warned him of when he decided to go out on this adventure on his own, Judge, and now that he's made the bed, he has to sleep in it, period.

MR. WELSH: Your Honor, the access to the law library is a constitutional right. The effective assistance of counsel is a constitutional right. Due process is a constitutional right. I asked the Court even last week to put on just so I can get two to four more hours into the law library, just continue it one more week so I could get the information I need. This isn't new. I have been constantly bringing this up. This ain't just some surprise I'm jumping on to the prosecution or to the Court. This is a tired old rag

25

that I keep bringing out that I just keep getting ignored, that I have no constitutional rights because I want to represent myself. I still have the right to effective assistance of counsel, even though I'm representing myself.

I believe that's about it.

THE COURT: Okay.

MS. REDMAN: I'll just ask the Court to recall, we have had five Pretrial Hearings now and never once has Mr. Welsh said Judge, I really need Mr. Shaw or any other attorney to be back on my case to assist me with legal research. And I think the Court will recall in one of those very first one or two pretrial hearings there was a conversation had with this man about the fact that if Mr. Shaw were allowed to remain on the case as standby counsel, that he could assist with legal research. But the problem here is, now that we sit at the eleventh hour when we're starting trial this afternoon and he perceives apparently, allegedly perceives that he has not had enough time, now he wants to say, well I was never given access. At the time his hubris prevented him from being able to accept the help offered by the Court and we should not have to continue the trial again because now he's decided that even though weeks and weeks ago the Court offered that

26

assistance to him, that now he wants it.  The Court warned him against this very thing weeks ago, Judge, and he can't benefit from it now.

THE COURT:  The Motion for Continuance is denied.  Do you have another motion?

MR. WELSH:  I just want to re-interject that I wouldn't need a standby counsel if the Court would provide me with the access to the law library so.

Yes, Your Honor, let's go over to -- I'd like to discuss your Finding of Facts here, Your Honor, on defense experts.

THE COURT:  Uh-huh.

MR. WELSH:  First of all, I want to make sure I'm under the understanding that the Court finds me capable of standing trial in the State of Texas based off of both incompetency and insanity; is that correct?

THE COURT:  You have the Findings of Fact so.

MR. WELSH:  Okay.  I mean, I'm able to stand trial.  Okay.  Let's continue.

The security expert, the Court said that the State has not designated an expert based off the technical?

MS. REDMAN:  Which paragraph are you referring to?

27

MR. WELSH:  We'll go on to the second paragraph here, Ms. Redman, right here.

MS. REDMAN:  Right, 1, 2, 3 or 4?

MR. WELSH:  Oh, I'm looking for the first one, right in order, ma'am.

MS. REDMAN:  Okay.

MR. WELSH:  The Court finds the State has not designated an expert to provide any kind of technical testimony because the Court -- I -- Ms. Redman has designated Christopher Woods to provide technical testimony based off of the residential treatment facility.

THE COURT:  Uh-huh.

MR. WELSH:  Okay.  And I would say that the, you know, based off too, that it becomes an important concept in this case.

And as far as a private investigator goes, Your Honor, the Court says I subpoenaed over 60 individuals.  Most of those though are duplicates because of the reset of the trial.  And I wanted to make sure that my witnesses were called and, you know, and some of the ball has been dropped when it comes to my out-of-town witnesses so I constantly wanted to make sure.  So it wasn't actually 60.

Furthermore, the State had designated

28

several witness that they chose to call. The majority of those were, to reiterate, to make sure that the witnesses the State wished to call were subpoenaed, that they were coming. Because I'm not going to prepare my case off of somebody who's not going to be here.

Second of all, Your Honor, the majority of those subpoenas for evidence that the Court has denied. The Court has denied the SMU logbook that I'm both mitigating and factual, with the mitigating based off of if it's -- goes to punishment and if factual evidence based off of one, it goes to defensive theory that I can never know an investigation is pending if they don't ever let me use the phone to call the police, and being denied to call the police.

But furthermore, you know, it goes to direct evidence. I mean, with Ms. Redman's claim that I could just question them. I could just question them. She's telling me that I'm not allowed to rely on evidence, I'm just allowed to go with less verbally spat back and forth and we'll see who comes out the better, because I'm not going to allow you to any evidence.

Third, the witnesses I have subpoenaed that I have known to for my cases so, are of the sort of a caliber of individuals that do not rank high in society's view. And the ones that I do wish to subpoena

29

that I don't have actual knowledge where they're at and I asked for the private investigator to get, the Court is denying me that right to be able to find these individuals, to be able to call them as witnesses to be able to provide their testimony to my case.

THE COURT:  Okay.  Anything further?

MR. WELSH:  That's about it.

MS. REDMAN:  I'm a little confused about how to respond because he started out by complaining about the Court's Findings of Fact in the order that was entered on April 24th, but I'll do the best I can.  And I'm more than sure that Mr. Welsh will remind me if I've screwed something up.

In terms of the finding that the Court made, security expert finding Number 1, I would agree with the Court's finding that none of the State's experts were designated to offer scientific or otherwise very technical or complicated testimony.  If the Court will look back on the filing the State made, the designation of expert witnesses on March the 2nd of this year, the one that Mr. Welsh refers to, Mr. Woods was designated and given a summary of anticipated testimony to include how security staff are trained and what behaviors qualify as behavioral threats, facility responses to security threats, and security measures at

30

the Texas Civil Commitment Center.  My position still remains that none of that requires any particularized technical or scientific expertise.

Second, to respond to Mr. Welsh's claim that he -- I guess his complaint is that he still believes that he needs a private investigator.  The State is still of the opinion that Mr Welsh has done a pretty significant job, I think because he referred to it earlier as letter bombing the Clerk's office.  He has issued now probably close to a hundred subpoenas and I'm still not sure.  He keeps making allegations against the District Clerk's office, but apparently Mr. Welsh has not examined the shuck to confirm which subpoenas were served and which were not.  As I communicated to the Court, I am aware that over 27 subpoenas were served Friday afternoon.  Again, whether he's serving the proper people or not, that's between him and whoever he's serving.  I don't know.

I do know that at every turn when the Court has asked me to do further investigation or to provide further discovery to Mr. Welsh, I have done that.  I have saved all of the e-mail responses that I got from CCRS and the Police Department.  I've always been very open about what I have and what I don't have. I've attempted to get everything that the Court has

ordered me to get and I have provided Mr. Welsh with things that I don't think I even necessarily am required under 39.14 to provide. I would remind the Court that 39.14 does not say what Mr. Welsh says that it says. He wants to twist the wording and the verbiage to match his arguments.

MR. WELSH: You're going to take away --

MS. REDMAN: The law -- Excuse me, I'm going to make my argument now.

MR. WELSH: Yeah, well you interrupted me a second ago so.

MS. REDMAN: Well, welcome to the party. So he claims that the State should be in possession of all these different types of documents, but I have given an open file disclosure to Mr. Welsh that says exactly what is in my file. Every single time I have obtained additional discovery, including as late as Friday, I have updated his folder and provided him with an updated 39.14 disclosure. I think that it's -- It is insidious of him to suggest that I have done anything in this case except to comply with the Court's orders. I take great offense to that. The Court knows how I operate and Mr. Welsh certainly does in this case as well.

MR. WELSH: Your Honor, maybe there's some confusion about what the Court actually ordered

32

last week, based off the jail videos. And I guess the best way would be just to clear them up. And I'm not asking for a continuance based on that. I believe Ms. Redman can provide them before the punishment phase, before she actually goes to utilize them.

Furthermore, Ms. Redman misstates what she has here as designated expert because she says a residential treatment facility. There's more than one residential treatment facility in the State of Texas. There is more than one way to advocate the treatment facility. And furthermore I would have to say that -- Well, excuse me, to use force at a residential treatment facility.

Furthermore, I have to say that I have an equal protection right when the TCCO refuses to promulgate something in Texas Administration Code, that I have the right to the people who are similarly situated to myself, by the law, to the laws that govern their treatment. And that being said, TCOO has provided a very short list on the use of force. And when it comes to a residential treatment facility, the Texas State and Health and Human Services has provided a significant amount of -- about -- how I would say this? They have provided -- They have implemented things into the Texas Registry to be accepted into the Texas

33

Administration Code to promulgate it into law, to make the operation of a treatment facility, residential or otherwise, to be ran to accordance to the letter of the law.

And I would have to say that the State, I'm not misquoting, if an agency is contracted with the State of Texas, it is discoverable. It's plain English. I mean, I have it right here.

THE COURT: Okay. Let's go back to the start of this because we've gone enough different directions I'm not certain. What exactly is your --

MR. WELSH: I just ran through the whole list on the experts. We could take them from the top if you want.

Ms. Redman has designated Christopher Woods as an expert in the residential treatment facility and use of force.

THE COURT: Okay. So what is your motion?

MR. WELSH: My motion is to -- I object to the Court not providing me with an expert to rebut Christopher Woods.

THE COURT: Okay. The Court has previously ruled on that and I continue with that ruling.

34

MR. WELSH:  Make sure the objection is in the record.

Second of all, Your Honor, when we're talking about the people I wanted to subpoena, the Court is limiting my case.  The State would love to put me in a little box and to put me in a little box and how I, I wish to argue my case and to have it just the way they want it, just their own perfect little --

MS. REDMAN:  It's called the Rules of Evidence, Judge.

MR. WELSH:  And the Rules of Evidence says I'm allowed to present -- The Rules of Evidence and the Constitution allows me to bring these things up -- 404, it clearly states that I'm able to bring up prior bad acts, that if she's a he's a bad actor, even though she fails to say that I'm not yet proven guilty, but I'm the bad actor, but that doesn't mean that the people they call haven't done bad acts as well, and bad acts in this case and bad acts that has a history, background information that show why they did what they did the day they did it.  And a continuance of the building of a, it's a crescendo effect.  It escalated to the fact that what happened on that day, why they would say they did what they did, and what I did.  And it all, it all goes to the same picture, Your Honor.  It all goes to 107,

35

because they're going to put in that little bitty box.

But we talked about 107. We have prior discussions, conversations, we have prior acts. But, you know, when if I elicted [sic] testimony from them, hey, did this happen? He said oh, no. You know, I have a right to impeach him. I have a right to impeach him by 107. These are the rules of evidence.

I mean, the Court don't think I don't understand this stuff, but I think I understand it quite well. I mean, I object not to be able to subpoena these witnesses.

MS. REDMAN: No one has done anything to bar him from subpoenaing witnesses.

MR. WELSH: Your Honor, I'm stuck in a five by nine cell, 24 hours a day. I have no way to get this. It is beyond my means to provide me effective assistance of counsel to be able to find these individuals. I asked the Court many months ago. I put in -- I mean, I object. I make sure you say that my Sixth Amendment right to effective assistance of counsel, it does to have the expert, to also have the expert to provide the layout of the security and different things of that nature. Where is this cell, where is that, how is your view coming in when you see these things? These are all very relevant things, Your

36

Honor.  Because what this man has accused me of, as he's walking up, in a side view right there where you can only see the wall, he happened to see me hit myself.  I mean, are you, are you serious?  And I would like an expert to say what can you see when you're walking up, what do those cameras see?  Well, I mean, but that ended up to be a mute point because all these cameras disappeared all of a sudden.  But that being said, I think an expert is relevant in the case.

An expert also relevant in the case to help me find my witness I need.

THE COURT:  Okay.  I've already ruled on expert witnesses.

MR. WELSH:  I understand.  I object.

THE COURT:  Okay.  Is there anything further?

MR. WELSH:  Yes, Your Honor, I have this motion.  I can bring it to the Bench?

THE COURT:  Go ahead.

MR. WELSH:  I provided Mrs. Redman with one.

THE COURT:  Okay.  As far as the taking judicial notice of Administrative Codes or Health and Safety Codes, got no problem with West versus Thanch?

MS. REDMAN:  I just want to reflect an

opportunity to be heard under 2019(d) before the Court does takes judicial notice of any of the facts contained in any of those statutory provisions. My concern is obviously I, the State would never argue that these statutory provisions don't exist. I do take issue with their relevance or application to this proceeding and I would ask that the Court clarify with Mr. Welsh what his intent is if the Court does take judicial notice of these facts, because my concern is, is that 201(f) provides that potentially here we're getting into an issue where the jury would have to be instructed on things of which the Court has taken judicial notice. And so, like I said, I don't argue the existence of this case and I don't argue the existence of the statutory provisions, but I would argue the relevance and specifically under the 400s, what these facts, if taken judicial notice, what they, what their capability is of confusing the issues before the jury, misleading the jury, and that sort of thing. That's the only thing I'd like the Court to go into.

THE COURT: All right. Well that's -- I mean, I don't think the fact that I take judicial notice of something indicates that that's admissible or relevant evidence.

MS. REDMAN: The only reason I bring that

38

up, Judge, is 201(f) specifically says in a criminal case the Court must instruct the jury that it may or may not accept the noticed fact as conclusive. So, my problem is, is that this motion just lists out several lengthy, what I know to be very lengthy Administrative Code and Health and Safety Code sections and chapters and articles. It doesn't ask the Court to take specific notice of any particular fact. And of course, the Court is well aware and there's a long progeny of case law, sometimes the Court will take notice of the fact that, you know, Waylon and Phelps, that that intersection exists in Lamb County, Texas. That's a fact that you can take judicial notice of. Or that something is a particular type of water or not. And so, that's typically what the use of 201 would be, is for the Court to take judicial notice of a fact that cannot be disputed by any of the parties in the case. And so that's my concern. Because if the Court grants his request to take judicial notice of these facts or the existence of this case, then I believe, under my reading of 201(f), then he can ask that an instruction be given to the jury that they first of all, be informed that the Court has taken judicial notice of a fact or multiple facts --

THE COURT: Okay.

39

MS. REDMAN:  -- which he hasn't specified and then the Court would have to give them that instruction under (f).

THE COURT:  Okay.  So I will take this under advisement and approach the Court any time you want me to take notice of and I will determine that at that time.

And let me tell you, Mr. Welsh, we've had this discussion numerous times.

MR. WELSH:  Uh-huh.

THE COURT:  It's not a 1983 case or anything else and there are other cases that you need in different venues or different causes of action that you won't do it.  We're not litigating a civil case.

MR. WELSH:  I understand.

THE COURT:  We are litigating the facts specific to this case and any relevant defenses that you might have to anything here.  And, you know, we have not cut you off of any subpoenas.  You've issued every subpoena you wanted to.  We haven't rejected them or anything else to say no, you can't have this or you can't subpoena that.  There have been some motions to quash some of your subpoenas.  Some of it's been granted, some of it's been denied.

But, you know, we are going to try a

40

criminal case here.  And to the extent that any defenses or anything mitigates or is relevant in any way to the proceedings before this Court, you'll be allowed to go there.  I'm not cutting you off.  I'm not trying to restrict you from any proper defense and such, but there are a lot of things that might be relevant in a different cause of action which have no relevance to these proceedings and we are not going to try a civil case in this court on a 1983 incident or anything else. We are trying a criminal case this time and that's what evidence will be presented to the jury.

MR. WELSH:  Okay, Your Honor, I am well aware of the fundamental differences between criminal and civil law.  The relevancy, though, is that it's background, Your Honor.  Am I being falsely accused? These things lead up, you know.  Because they may have relevance in a 1983 that I am going to pursue, I mean, it is what it is.  The fact that they do have relevancy in this case is a whole different issue.  Because we can't have the whole picture just based on what's out here.  Well why did you do this, why did you say that, why are you lying?  Well, why are you lying is a very, very important fact and that fact, it goes to a lot of the evidence that I'm requesting.

Furthermore, when you say I don't know --

Rogers, Harvey & Crutcher    (806) 744-7754

Ms. Redman said that I didn't subpoena the right person when I asked for the medical records so I don't know if they got subpoenaed or not, but I was barred from subpoenaing the right person.

THE COURT: Now wait. You're saying you were barred from subpoenaing -- No, you were not barred from subpoenaing anyone. Now whether you subpoenaed the right person or not, that's your decision as to who's subpoenaed and what to subpoena them for. If you subpoena the wrong person, that's your problem. That's part of the self-representation --

MR. WELSH: All right -- anybody --

THE COURT: -- admonishments that we went over with you; okay? So, to the extent if you issued a subpoena, the Clerk issued a subpoena to that person for whatever purpose that you sent them to -- sent them for and then we will deal with that. No one has cut you off or told you that you can't subpoena anybody or that you can't subpoena any type of records. You have had full ability to subpoena anyone for anything. And then, like I say, we've had a few motions to quash, I think we may have some more this morning, but there's been no one that's tried to impede in any way what you could subpoena, who you could subpoena --

MR. WELSH: This Court's exact words

42

verbatim was that not to subpoena Brian Thomas, that Christopher Woods is local here and subpoena him.

THE COURT:  I don't believe I ever directed you who to subpoena.  Now, I may have quashed a subpoena based on evidence presented, but I did not restrict or direct you to subpoena one person over another in any way.  Those are your calls.  If there's a motion to quash I will deal with that.  But you're the one that made the decisions on who to subpoena, what to subpoena them for, and I didn't have any input or didn't attempt to impact or direct you to subpoena anything in any way.  So, I just want to make that clear.  So is there anything else that we have?

MS. REDMAN:  He still has a couple of notices.  There's a Notice of Objection to Court Failing to Order Evidentiary Hearing on Selective Enforcement and Prosecution.  And then there's also a Motion to Compel the Court to Order Indigent Copies of Transcripts of the Hearing on the Motion to Suppress Oral Statements.  And those should be in the shuck because those are the ones I got served with -- Well, I saw file marked copies around 2:00 p.m. Friday afternoon.

THE COURT:  Okay.

MR. WELSH:  If the Court will recall the last time we were here, Ms. Redman said she planned on

43

providing me with a copy of --

MS. REDMAN:  Never said that.

THE COURT:  Of what?

MR. WELSH:  I mean, this stuff is on the record so we're going to find out here.

THE COURT:  All right.  She --

MS. REDMAN:  I don't have possession of a transcript to be able to provide it to him.

THE COURT:  Okay.  Let me --

MS. REDMAN:  How would I --

THE COURT:  I didn't hear what he was saying that you didn't.

MR. WELSH:  Well, Your Honor, I believe maybe I was confused, but she said that she planned on providing me with a copy.

MS. REDMAN:  No.

THE COURT:  Okay.

MS. REDMAN:  The only thing I have a transcript of is the conversation that he had with Chief Hester on the --

MR. WELSH:  But the Court then ordered her to give me all the videos.  I mean, maybe I was confused on that as well.  Maybe I got them switched or something.

THE COURT:  Well --

44

MS. REDMAN:  No.  I think he's just hearing what he wants to hear.

MR. WELSH:  Right.

MS. REDMAN:  The Court is aware that I don't have possession of any transcripts.

MR. WELSH:  And now I'm hearing voices.

MS. REDMAN:  And Mr. -- I didn't say that.  You're hearing what you want to hear.  Mr. Walker would be the person who's in possession of those transcripts and as the Court is well aware, if he were to provide a copy to me he would be directed to also provide a copy to Mr. Welsh.  I don't have a copy of that transcript.  I don't need a copy of it.  I do recall that he asked the Court to get transcripts to him, but I never volunteered to ask Mr. Walker to produce those because I don't need them.

THE COURT:  Okay.

MR. WELSH:  I do need them, Your Honor, before Mr. Hester testifies.

THE COURT:  That's -- Exactly what in the testimony are you needing from Hester?

MR. WELSH:  There's two things, both -- Your Honor, first, can I ask one of the relevant witnesses who just entered the room to be excused?

THE COURT:  If you'll step out.

45

MR. WELSH:  Sorry --

MS. REDMAN:  On what grounds?

THE COURT:  That's all right --

MS. REDMAN:  It's a public hearing.

THE COURT:  -- I'm going to ask him to step out.

MS. REDMAN:  Okay.

MR. WELSH:  Well because --

MS. REDMAN:  Your Honor, I'll be outside for a second and I'm --

THE COURT:  Okay.  All right.  Go ahead.

MR. WELSH:  Yes, Your Honor.  There's two issues.  There's conflicting statements that go for what Christopher Woods had said and what Chief Hester had said.  Now I want to make sure his testimony --

THE COURT:  If you will --

MR. WELSH:  -- is consistent.  Also, Your Honor.

THE COURT:  Okay.  Here, I'm telling you what you're going to have to do.

MR. WELSH:  Okay.

THE COURT:  You're going to have tell me what specifically you're looking for in those transcripts and then I will have the clerk look that up.  At this date and time, there is no way I'm going to get

Rogers, Harvey & Crutcher   (806) 744-7754

46

transcriptions from previous matters. But, if you have a specific point, you tell me what you're looking --, what the witness was, when the date that it occurred, and what you believe that they said, I will have the clerk look for that. Okay?

MR. WELSH: Okay.

THE COURT: But you're going to have to put that in writing and then I'll have the clerk look it up; okay?

MR. WELSH: Okay. I can do it. I'll bring it up when we start here later?

THE COURT: That'll be fine.

MR. WELSH: Okay.

Now as far as -- Well, I wish to object to the Court never allowing me to have suppression hearing on the selective prosecution and selective enforcement of the law. It is by my understanding that just requesting it alone is not enough. I have to get the Court's absolute ruling on it and I read. It's -- We can provide me with a hearing or do you overrule my objection?

THE COURT: Well, we are proceeding on the case that is before the Court --

MR. WELSH: I have asked way before this, Your Honor, and --

47

THE COURT: Okay.

MR. WELSH: -- the fact of the matter is, the selective prosecution is relevant. I mean, why is the State prosecuting me and not the people who assaulted me, the people who repeatedly assaulted me?

THE COURT: Okay.

MR. WELSH: I could provide evidence that the Police Department don't even pick up the phone. Oh, yeah, oh, you're --

THE COURT: Mr. Welsh, what I'm dealing with is the case that was filed --

MR. WELSH: I understand it.

THE COURT: -- before a Grand Jury, the Grand Jury returned a bill of indictment.

MR. WELSH: Right.

THE COURT: And that's the case we're going on. If there are other cases that should be presented to a Grand Jury then I suggest you present them to the Grand Jury and go on. But I can only deal with the cases that are before this Court and whether you think there ought to be other cases filed that haven't been or not, that's not what --

MR. WELSH: No, Your Honor, what I'm saying is --

THE COURT: -- we're in before this Court

48

today.

MR. WELSH: -- based off of my class, the prosecution is selectively prosecuting me based on my class, because I am a class of a sexually violent predator and the prosecution is selectively prosecuting me and not providing me equal protection of the law. And that is relevant. It is not put -- I mean, it is a grounds to prevent the prosecution from doing what they're doing.

THE COURT: Okay.

MR. WELSH: And I asked for a hearing months ago. I have asked for a hearing just a couple of weeks ago and I'm asking for it now.

THE COURT: Okay.

MS. REDMAN: May I just ask on what grounds you believe you have standing to make this sort of challenge because you don't cite to any statutory authority and you don't cite to any Texas authority in your motion?

MR. WELSH: I cite Supreme Court case law.

MS. REDMAN: Right.

MR. WELSH: Which is the supreme law of the land, which the Court has to take an oath to uphold. So I don't --

49

MS. REDMAN: But my question is --

THE COURT: Okay.

MR. WELSH: I don't have to cite Texas state law.

MS. REDMAN: But my question --

MR. WELSH: You know, I will sit down, I put my objection.

THE COURT: Go ahead.

MS. REDMAN: My objection is that his motion relies solely on his opinion that he is being selectively prosecuted, but he states no authority which specifically says, when a defendant feels that he's being selectively prosecuted or that a violation of the protection clause under this particular authority or statute or provision of the Constitution, he may make an objection on which the Court needs to consider giving him a hearing. And that's all I'm asking. I've never had anyone accuse me of selectively prosecuting them. I think the Court is well aware, if you look at the Court's docket, we have a number of tampering with or fabricating physical evidence cases pending before the Court and so I'm just curious as to if I am required to defend our decision to prosecute his case, what ground is it, what authority is it that gives him the right to make the complaint to the Court that I guess that he

50

says the Court then has to consider having a hearing? That's all I want to know.

THE COURT:  Do you have a response?

MR. WELSH:  Yes, Your Honor.  In my original motion I had, my original Motion to Quash, if I'm saying it correctly, quash.  I had -- My tongue gets tied sometimes.  On my original motion I did site the authority, which is the 14th Amendment, equal protection.  I did cite the authority of I believe it's Armstrong versus United States, which governs these kind of things the that Supreme Court held and many more. The State is not allowed to rest the fact they they're, they didn't selectively prosecute.  That they didn't, you know, purposely select me for prosecution over, you know, say the assault case or anything else.  They purposely selectively prosecuted me based off of my class.

MR. SAY:  You're the one who chose to have us prosecute you.

MR. WELSH:  I may be -- You are selectively prosecuting.  You're not prosecuting anybody else based on any -- And you could say oh, we got these and this --

MS. REDMAN:  But that's the truth.

MR. WELSH:   -- and this is your go-to

51

crime.  Now what --

MS. REDMAN:  No one else punched themselves in the face in his cell at the protective Civil Commitment Center.

MR. WELSH:  Welsh didn't punch himself in the face either.

MS. REDMAN:  Yeah, he did.

MR. WELSH:  Well Welsh is going to prove he didn't, how about that?

MR. SAY:  Are we done, Judge?

THE COURT:  We're done.

MR. WELSH:  Huh?  I mean, I -- The law is relevant, the law is right, and the law is on my side. Thank you, Judge.

(A break was taken from 11:47 to 11:53 a.m.)

THE COURT:  Again, this is Cause Number 5715.  The Defendant is present in the courtroom as is Stefani Williams for Correct Care Solutions and employees of that.  Mr. Welsh is present in the courtroom.  None of the attorneys for the State of Texas in this case are present.  This is a Motion to Quash some of the subpoenas issued by Mr. Welsh last Friday and so Ms. Williams.

MS. WILLIAMS:  Yes, Your Honor.  Well, to

52

start off, Your Honor, on May the 3rd he issued, Mr. Welsh's subpoenas to Christopher Woods. He issued a subpoena duces tecum to Mr. Woods regarding the medical records.

That was discussed in the prior hearing with the State and I just wanted to readdress that, that Mr. Woods does not have possession of the medical records. He is not the custodian of records for the medical records nor was Mr. Thomas, Brian Thomas. Mr. Thomas was not the custodian of records.

Sharisse Johnson is the custodian of records for medical records of the facility. She was not subpoenaed in this case, Your Honor, so we're asking that the subpoena duces tecum asking or requesting for Mr. Woods to bring medical records be denied based on the fact he's not in possession of them.

THE COURT: All right. Anything else?

MS. WILLIAMS: That's the first part. Then secondly, Mr. Welsh asked, also requested that Mr. Woods bring the CD of the use of force incident on the CD or the video use of force incident. Mr. Welsh is in possession of that CD. That was produced to him by the State a few week ago and he referenced that in a grievance that he filed with the County or the County Jail. So, Mr. Welsh has access to that CD, Your Honor.

Rogers, Harvey & Crutcher   (806) 744-7754

53

So I believe it would be moot for Mr. Woods to bring the CD, given the fact that he already has it in his possession --

THE COURT:  Okay.

MS. WILIAMS:  That's that one.

As of Friday, and I'm just going to stick with Mr. Woods right now just to address all issues.  As of Friday Mr. Woods was also subpoenaed to appear in court, but that's already been established that he's going to appear when summoned by the State to do so or summoned by the Court.

Also, the SMU logbook, that's already been decided by the Court that that was not going to be allowed in this case.  Mr. Welsh subpoenaed Mr. Woods to bring the SMU logbook once again.  You've already decided that so I just ask that you reconfirm your order, Your Honor, regarding the SMU logbook.

Also, the use of force incidents regarding or the disciplinary record of Mr. Welsh, Mr. Welsh is in possession of his disciplinary record as it relates to this incident.  As it relates to this incident?

MR. WELSH:  No, that's not what I'm actually looking for.  What the State said was that they provided me with the, what they were going to write up,

54

but not the actual write-up and what my response to the write-up was. When you have a write-up in a case, like in the disciplinary, they say how do you plead and do you have any statements you wish to make and those are the things that I'm looking for Mr. Woods to provide.

MS. WILLIAMS: I'm not sure how that's going to be relevant, but that's not my case to argue. If Mr. Woods does have any additional disciplinary records, I will request that he bring those records with him at the time that he appears. And just to be specific or more specific, disciplinary records regarding this particular incident, Your Honor.

THE COURT: Okay. And Mr. Woods shook his head affirmatively to that so okay. I mean Mr. Welsh, I'm sorry, not Mr. Woods.

MS. WILLIAMS: I understand. I believe that's it for Mr. Woods. There are other individuals that I need to argue, but I will give Mr. Welsh a chance to respond to Mr. Woods.

THE COURT: Okay.

MR. WELSH: Yes, sir. The Court ordered that the State is not to provide the SMU logbook, not that I can't subpoena this evidence. I've argued its relevancy. The court said that the prosecution is not --

55

THE COURT: Okay.

MR. WELSH: -- to put it in there. Once again I say, not only does the logbook provide mitigating evidence, but the logbook also shows a clear defensive legal theory that --

THE COURT: Okay.

MR. WELSH: -- I can never know that -- I mean --

THE COURT: All right. I will order Mr. Woods to go ahead and provide the logbook as to any entries related to the defendant here for the time immediately before and after this incident.

MR. WELSH: November would be fine.

MS. WILLIAMS: November of 2016 --

MR. WELSH: '17.

MS. WILLIAMS: Or '17, I'm sorry, Your Honor. And just to be, because it will be redacted because there's other confidential information in the logbook.

THE COURT: Sure. Just only information related to him.

MS. WILLIAMS: Okay.

MR. WELSH: I'd like to go to the disciplinary, Your Honor, as discussed part, you know, since I had to give up my whole case strategy here.

56

THE COURT:  Now wait.  Okay.

MR. WELSH:  I did -- We're talking about the disciplinary --

THE COURT:  Just a moment.

MR. WELSH:  Yes, sir.

THE COURT:  Okay.  Anything that she's trying to quash you can address at this time.

MR. WELSH:  Okay.

THE COURT:  If there are other issues beyond what she's not -- regarding things that she's not going to move to quash, those are going to be provided to you so you don't need to argue those at this point.

MR. WELSH:  Did you move to squash the disciplinary?

MS. WILLIAMS:  We -- The Court just ruled that --

THE COURT:  Yeah, he's going to bring that.

MR. WELSH:  The SMU logbook, but the --

THE COURT:  They're going to bring the disciplinary records.

MR. WELSH:  Okay.  Ma'am, I was confused. I'm sorry.

THE COURT:  Okay.  All right.

MR. WELSH:  Now, as far as the medical

57

records go, the Court basically put an injunction on me from subpoenaing Brian Thomas, but that's not --

THE COURT: No. I never restricted you. Now, they're making the motion to quash the subpoena of medical records from Brian Thomas because he is not the custodian of the record.

MR. WELSH: Okay.

THE COURT: That's like me ordering you to bring President Trump to these proceedings and you go I don't have any control over that. Mr. Thomas does not have control, access, or he's not, according to them, doesn't have and can't get to your medical records. You have to subpoena the person that has those.

MR. WELSH: Well, I would have to say if I was provided with an expert I would have been able to know these things.

But let me go on. The Court did rule on a motion that, when I was under counsel, for the State to provide all medical records. And again I would have to say that my medical records, even if they're in the custody of CCRS, are also in the hands of TCCO and these are --

THE COURT: The State was ordered to provide medical records related to this incident.

MR. WELSH: Okay.

58

THE COURT:  The State does not have access to your other medical records.  Those are governed by federal law; okay?  And so if you want to get your medical records, they're yours, you need to do whatever it takes to get those.  But I'm not going to order the State to produce something that they don't have access to.

MR. WELSH:  And I have to say that Mr. Woods is de facto head of that unit and does have access to my medical records.

THE COURT:  Argue what you like so.

Okay.  Anything further regarding --

MS. WILLIAMS:  Yes, Your Honor, and just to clarify, it was stated that the Motion to Quash was for Brian Thomas and the medical records, that is for Mr. Woods.

THE COURT:  It's going to go to Mr. Woods --

MS. WILLIAMS:  Christopher Woods.

THE COURT:  -- as well so.

MS. WILLIAMS:  Right.  Mr. Welsh never subpoenaed Brian Thomas regarding the medical records.

THE COURT:  Oh, okay.

MS. WILLIAMS:  But it would have been the same --

59

THE COURT:  Okay.  All right.  I misunderstood you.

MS. WILLIAMS:  And in addition to that, Your Honor, moving on, I believe we've covered everything with Mr. Woods.  He is going to appear.  I'll talk to him and advise him of the logbook and the entries from November, 2017, and also to bring the disciplinary records for this particular isolated incident pertaining to Mr. Welsh.

Moving on to Mr. John Wellman.  Mr. Wellman was also subpoenaed to appear at court regarding this incident, Your Honor, and we're objecting to that or asking for that to be quashed, his summons to be quashed, based on the fact Mr. Wellman was not present at the time of this incident, he was not involved in any way with this incident, he was not -- He was in fact not at the facility.  He was not at work that day, Your Honor, and the relevance of Mr. Wellman being called, there is no relevance.  So we're asking that his subpoena be quashed based on the fact that it would not lead to evidence to support Mr. Welch's case in chief.

MR. WELSH:  Your Honor, Mr. Wellman has documented in the SMU logbook several different entries and he would be providing testimony on the SMU logbook.

THE COURT:  Related to this incident?

Rogers, Harvey & Crutcher   (806) 744-7754

60

MR. WELSH:  Yes, directly, Your Honor, but based off of what I'm seeking based off November 3rd, his entry into the SMU logbook based off of being able to contact the Littlefield Police Department.

MS. WILLIAMS:  Can I respond, Your Honor?

THE COURT:  Yes.

Ms. Williams:  The SMU logbook is not disclosed to Mr. Welsh so Mr. Welsh has no idea what's in the logbook.  He's not privy to that information because it does entail a lot of confidential information.

Based on the conversation that I've had with Mr. Wellman, he has nothing to do with this case. He was not involved.  Even when asked to write a statement, just because that's protocol, he said I can't write a statement because I don't know what happened the day.  I don't have any knowledge of what happened that day, only from what someone told me Welsh was arrested, but that's it so.

THE COURT:  Okay.  Is he an employee out at the facility?

MS. WILLIAMS:  He is.

THE COURT:  Okay.  I am not going to quash that at the time.

Rogers, Harvey & Crutcher  (806) 744-7754

61

MS. WILLIAMS:  Okay.

THE COURT:  Okay?  So he's going to have to be available if called as a witness by the defense.

MS. WILLIAMS:  Okay.  But not today at 1:30?

THE COURT:  Not today.  No, we'll do him the same way as everybody else.

MS. WILLIAMS:  Sure.  Okay.

THE COURT:  We'll give him notice of when we anticipate we'll need him and then we will call him when we need him to come up here and testify.

MS. WILLIAMS:  Okay.  That's fine.

THE COURT:  Okay.  And like the others, he'll come in plain clothes or something.

MS. WILLIAMS:  Sure.

THE COURT:  I don't want anything identifying the facility.

MS. WILLIAMS:  Sure.  Yes, Your Honor.

THE COURT:  Okay.  All right.

MS. WILLIAMS:  Moving on to Mr. Wellman, as of Friday, Your Honor, and this is a verbal Motion to Quash regarding John or --

MR. WELSH:  James.

MS. WILLIAMS:  -- James.  I believe his name is Jeff, but you put James.

62

MR. WELSH: Oh, okay.

MS. WILLIAMS: But Mr. Kirkland was not involved in this case as well. Again, like Mr. Wellman, he had nothing to do with the incident, did not write a report regarding the incident, and his testimony would not be relevant to their case.

THE COURT: Okay. And he likewise is an employee there?

MS. WILLIAMS: He is, Your Honor.

THE COURT: Okay. And do you think he's relevant to your defense?

MR. WELSH: I would have to know that the -- Well, what the subpoenas were issued on Friday, Your Honor, to be, to absolutely know for sure. Because he may not be, if Peter Caswell TCCO was subpoenaed. That being said --

MS. WILLIAMS: I don't represent TCCO, Your Honor, so I'm not --

MR. WELSH: And that's not what I'm saying. What I'm saying is, I don't know if he would be relevant or not because I don't know if I -- If Mr. Peter Caswell was subpoenaed I could get the testimony for him and I won't have to rely on Jeff Kirkland, I guess, to provide the testimony. And so I would need to look at --

63

THE COURT: Okay. What I'm going to do, the same way that I've done the other potential witnesses.

MS. WILLIAMS: Okay, Your Honor.

THE COURT: He'll be available. We'll give notice if Mr. Welsh determines that he needs to call him and let him know.

MS. WILLIAMS: Yes, Your Honor.

And then lastly, Rivera Vega, or Vega Rivera was subpoenaed. We're not going to object to his appearance at court because he was involved in the incident and he was there. He was involved in the use of force so he is a fact witness to this case.

THE COURT: Okay.

MS. WILLIAMS: So if Mr. Welsh would like to call him, we're not going to object to that, Your Honor.

Another concern that I had and that's why Mr. Woods is here, Mr. Welsh also subpoenaed nine residents. I'm not representing the residents, but it is going to cause a great effect on the staff that I am representing.

THE COURT: Uh-huh.

MS. WILLIAMS: So, I'm not sure, Your Honor, if the residents are going to be required to

64

appear because they weren't involved in this incident, they weren't involved in the case at all whatsoever, but if you are ordering the residents to appear, then logistically I would ask that they're not allowed to all appear at the same time, that it staggered so the security could be accommodated.

THE COURT: Okay. And that's fine. We will call them as we need them and so we'll deal with that as we get, but I'm not going to ask them to bring all nine over at the same time.

MS. WILLIAMS: Sure. Okay.

I believe that's it. And all other subpoenas were just re-subpoenaing the people that were subpoenaed before.

THE COURT: Okay. Mr. Welsh, do you --

MR. WELSH: No, sir.

THE COURT: Okay. All right.

Then your Motion to Quash is granted as to Mr. Woods and Mr. Thomas as previously announced and you'll provide or have them available, the other individuals so. Or I guess I'm not directing you to have them available but --

MS. WILLIAMS: Right.

THE COURT: -- just that Motion to Quash on theirs is not granted so.

65

If there's nothing further then we're adjourned.  Go ahead and take him back.  He'll need to be back here by 1:15, 1:30.  I mean, we're going to start at 1:30 I anticipate.

(Court adjourned at 12:08 p.m.)

66

REPORTER'S CERTIFICATE

THE STATE OF TEXAS  )
COUNTY OF LAMB      )

I, Charles Walker, Certified Court Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 11th day of August, 2018.


                    /s/ Charles Walker
                    _____
                    Charles Walker, Texas CSR 185
                    Expiration Date:  12/31/2018
                    ROGERS, HARVEY & CRUTCHER
                    Firm Registration No. 168
                    709 Broadway
                    Lubbock, Texas 79401
                    PHONE 806-744-7754
                    FAX 806-744-7965

**Exhibit D Affidavit Concerning the Admonishment To Forego Counsel**

I Lonnie Kade Welsh do hereby under the penalty of perjury swear that the following is true and correct:

I was admonished that attorney Jim Shaw would be my stand by counsel. After about two weeks from the day of the admonishment he wouldn't answer my letters anymore. At one pre-trial setting I don't remember which one I asked him what happened? He told me he didn't know that he thought he was going to be my stand by counsel but that changed. He never did clarify why it changed. But I think he knows. I also was under the understanding that I was going to have access to the law library in Lubbock. I would have never ever, ever had represented myself if I knew I wouldn't have any law library access or stand by counsel. I even asked the court later what happen where is Jim Shaw, I need stand-by counsel. The court refused me. The court accepted the Assistant District Attorney's idea that I some how asked for that result. I never asked for that result and I was forced to go to trial unprepared and without assistance and the trial transcripts prove that.

Singed under the penalty of perjury on ___//___ day of __Aug__ , 2020.


_Lonnie Kade Welsh_

Lonnie Kade Welsh

47

**Exhibit E Affidavit Concerning The Lamb County Book Policy**

48

I Lonnie Kade Welsh do hereby under the penalty of perjury swear that the following is true and correct:

I was denied all book request. I asked for several series of books that included some of my favorite authors Robert Lungrid, Brent Weeks, and Crandon Sanderson. Not to mention the Dictionary. And there is not a dictionary in the Library or if there was it was gone by the time I got to the jail. I didn't keep begging for every book known to man as the magistrate suggested I should. I have no idea what the remark all books means. I know Diaz and Thompson told me no on the books I asked for not because of content or anything else but because the Jail according to them does not allow books.

Singed under the penalty of perjury on ___/ /___ day of _Aug_ , 2020.


Lonnie Kade Welsh

onnie Kade Welsh #1816607
Tex Civ Comm Cent
2600 South Sunset
Littlefield, TX 79339

$2.80
US POSTAGE
FIRST-CLASS

United States District Court
Office of The Clerk
1205 Texas Ave RM 209
Lubbock, TX 79401

RECEIVED
SEP 15 2020
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

part 1 of 2

SHIPPED SEP 1 1 2020

RECEIVED
SEP 15 2020
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

Lonnie Kade Welsh #CS16607
Tex Civ Comm Cent
2600 South Sunset
Littlefield, TX 79339

$2.80 9
US POSTAGE
FIRST-CLASS

United States District Court
Office of the Clerk
1205 Texas Ave RM#209
Lubbock, TX 79401
part 2 of 2

RECEIVED
SEP 1 5 2020
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

SHIPPED SEP 1 1 2020