UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

LONNIE KADE WELSH,
Institutional ID No. 6516607

            Plaintiff,

v.

No. 5:20-CV-00024-H

LAMB COUNTY, *et al.*,

            Defendants.

## OPINION AND ORDER

Two distinct claims remain in this civil-rights action: Plaintiff's substantive due process claim about the conditions of his confinement in a holding cell for three days, and a First Amendment policy claim about the denial of books. In this order, the Court will only address Plaintiff's conditions-of-confinement claim that Defendants Gary Maddox and Misty Diaz denied him drinking water for three days.

Defendants Misty Diaz and Gary Maddox moved for summary judgment on the ground that they are entitled to qualified immunity with respect to Plaintiff's conditions-of-confinement claim. Dkt. No. 112. Defendants support their motion with a brief and appendix in support. Dkt. Nos. 113, 114, 115. Defendants also request that the Court declare Plaintiff a vexatious litigant based on this allegedly fraudulent claim and his long history of abusive litigation. Dkt. No. 113. Plaintiff filed a responsive brief in opposition and attached his own appendix in support. Dkt. Nos. 118. Defendants moved to strike Plaintiff's response as untimely, objected to Plaintiff's attachments, and replied to the response. Dkt. Nos. 120, 121.

Although the Court focuses here on Defendants' motion for summary judgment and request for a vexatious-litigant designation, it must also address a few other relevant pending motions. First, Plaintiff moved to amend his complaint. Dkt. No. 108. Defendants oppose the motion to amend, arguing that it is both untimely and improperly expansive. Dkt. No. 111. Plaintiff also moved to compel discovery—surveillance video from his three-day confinement in the holding cell. Dkt. No. 110. Defendants oppose the motion to compel discovery because "video which does not exist cannot be produced." Dkt. No. 116. Plaintiff then moved to strike Defendants' response to his discovery motion and requested that the Court sanction Defendants for spoliation of evidence. Dkt. No. 117. Defendants responded. Dkt. No. 119.

As explained below, the Court grants in part and denies in part Plaintiff's motion to amend his complaint and denies his motions to compel discovery, to strike Defendants' response, and for sanctions. Additionally, the Court finds that Defendants Maddox and Diaz are entitled to qualified immunity on Plaintiff's conditions-of-confinement claim and grants the motion for summary judgment. Finally, the Court finds that Plaintiff's history of abusive litigation and his nebulous claim here have wasted considerable judicial resources. Thus, the Court readily agrees with other courts that have found Plaintiff to be a vexatious litigant.

## 1.   Background

### A.   Plaintiff's litigation history

Plaintiff is an experienced and determined litigant who has filed more than twenty federal civil actions challenging various aspects of his confinement in different institutions over the past several years. At least fourteen of those civil actions have been filed in this

2

Court.[1]  But he is a frequent filer elsewhere, too.  He has been deemed a vexatious litigant by the Texas state-court system and "is prohibited from filing pro se any new litigation in a court of this State without first obtaining permission from the local administrative judge." *In re Welsh*, No. 09-23-00027-CV, 2023 WL 2175768, at *1 (Tex. App. Feb. 23, 2023). Additionally, the Supreme Court of the United States found that Plaintiff "has repeatedly abused th[e] Court's process." *See Welsh v. Lamb Cnty.*, No. 22-10311, 2024 WL 81580, at *2 (5th Cir. Jan. 8, 2024) (citing *Welsh v. Collier*, 143 S. Ct. 1046 (2023)).  The Fifth Circuit has noticed Plaintiff's "multitude" of filings and his tendency to name the same defendants and raise parallel issues or similar claims across multiple cases.  *Id.*  And the Fifth Circuit recently sanctioned Plaintiff in two separate cases for continuously "fil[ing] frivolous or repetitive pleadings."  *See* Dkt. Nos. 122, 124; *Welsh v. Thorne*, No. 23-11109, 2024 WL 1956145, at *2 (5th Cir. May 3, 2024); *Welsh v. McLane*, No. 23-50912, 2024 WL 1008593, at *1 (5th Cir. Mar. 8, 2024).

## B.    The history of the water claim

Plaintiff was detained in the Texas Civil Commitment Center when he filed this suit, and he is proceeding pro se and *in forma pauperis*.  His claim here, however, stems from his three-day confinement in a holding cell in the Lamb County Jail between January 27–31, 2018, when he was awaiting trial on criminal charges.  It has been established that Plaintiff was placed in the holding cell for observation after his aggressive and bizarre behavior continued to escalate despite officers' efforts to resolve matters through less restrictive

---

[1] *See* Nos. 5:17-CV-00083-C, 5:17-CV-00095-C, 5:17-CV-00173-C, 5:18-CV-00020-C, 5:19-CV-00255-H, 5:20-CV-00024-H, 5:20-CV-00077-C, 5:21-CV-00156-H, 5:22-CV-00098-C, 5:22-CV-00183-H, 5:22-CV-00237-BQ, 5:23-CV-00028-BQ, 5:23-CV-00158-H, and 5:24-CV-00069-H.

means. *See* Dkt. No. 93. The Court dismissed Plaintiff's substantive due process claim about the conditions in the holding cell after finding that he failed to allege any harm above a *de minimis* level, and Plaintiff appealed the dismissal.

The Fifth Circuit agreed that the conditions Plaintiff emphasized throughout his original and amended complaints and in his responses to the Court's questionnaire—the temporary denial of recreation time, bedding, hygiene, and other property items, and providing him a food loaf instead of regular hot meals, "indeed appear[ed] de minimis." Dkt. No. 97; *Welsh v. Lamb County*, No. 2210124, 2023 WL 3918995, at *2 (5th Cir. June 9, 2023). But the Fifth Circuit reversed the Court's dismissal and remanded the claim for further consideration because of Plaintiff's late-added, "most troubling allegation"—that Defendants made him "drink from the toilet for substance [sic] and to satisfy his thirst." *Id.*

Plaintiff omitted this "most troubling allegation" about the denial of drinking water from his original complaint and from his amended complaint. *See* Dkt. Nos. 1; 8. Likewise, there was no mention of it in his responses to the Magistrate Judge's questionnaire—even when asked to "[p]rovide all facts forming the basis of [his substantive due process] allegation." *See* Dkt. No. 18 at 24. Rather, as pointed out by the Fifth Circuit, Plaintiff made this new, egregious allegation for the first time in his objections to the Magistrate Judge's Findings, Conclusions, and Recommendation. *See* Dkt. No. 25. But even then, Plaintiff mentioned it only briefly, in less than one full line of text out of 40 pages of objections, without any explanation or elaboration. *Id.* at 17. And the only support he offered for this claim was the transcript from a state-court criminal proceeding, where he told the trial judge in similarly sparse fashion that "[he] had to drink out of the toilet because they wouldn't bring [him] water."

4

Plaintiff next mentioned the denial of water in his motion to alter or amend the Court's judgment under Rule 59(e), nearly two years after he filed his original complaint. *See* Dkt. No. 37. There, he alleged that he "was deprived of drinking water to the point that he was driven so mad with thirst, that he was compelled to drink from the non-function tolit due to the lack of running water [all sic]." *Id.* at 2. But by that time, it was too late—the Court found that these factual allegations and legal arguments could have been raised before entry of the judgment. *See* Dkt. No. 48.

In his briefing before the Fifth Circuit, Plaintiff made the alarming—and broad— claim that he was "deni[ed] drinking water, to the point that [he] was driven mad with thirst, forced to drink from a used toilet bowl." Fifth Cir. No. 22-10124 at Dkt. No. 22 at 16. He emphasized that "the denial of drinking water . . . forced and compelled [him] out of the necessity for life to drink out if [sic] a toilet bowl for substance [sic]." *Id.* at 17.

The Fifth Circuit found that the late-added factual allegation—"the denial of drinking water for several days, requiring Welsh to drink out of the toilet"—"defeat[ed] the sole basis for the dismissal of this claim." *See* Dkt. No. 97. So the Fifth Circuit remanded the claim and instructed the Court to consider the full scope of Plaintiff's factual allegations. *Id.*

## 2. Plaintiff's motions to compel discovery and for sanctions

Plaintiff seeks to compel Defendants to produce surveillance video from his time in the holding cell. Dkt. No. 110. Defendants respond that no such video exists, at least not anymore. Dkt. Nos. 113; 116. Defendants explain that Plaintiff was in the holding cell from late in the evening of January 26, 2018, through the morning of January 31, 2018.

Dkt. No. 116 at 2. Because there were no relevant issues with Plaintiff during this time,[2] any video footage would have been written over after 30 days based on storage limitations. *Id.* Moreover, Lamb County replaced their server on September 17, 2020. Dkt. Nos. 116; 114 at 10–11. Defendants assert that when they learned of Plaintiff's water claim, they located the old server from 2018 and provided it to an IT professional to search for the relevant video. Despite his best efforts, no video could be retrieved.

Plaintiff moved to strike Defendants' response and requested unspecified sanctions against Defendants for spoliation of evidence. Dkt. No. 117. He asserts that Defendants acted in bad faith by failing to retain the video. *Id.* Plaintiff argues that Defendants should have been aware of the potential for a lawsuit well before he filed one. First, he asserts that he filed a grievance about the conditions in the holding cell, which should have placed them on notice that the video should be retained. *Id.* Then he states in conclusory fashion that Defendants "knew of pending litigation as early as 2019 and could have retrieved the information contained in the data base" at that time. But Plaintiff did not file this case until January 28, 2020, so it is unclear why Plaintiff believes Defendants would have known about the case before it was filed. Plaintiff also asserts that the video should have been provided with the authenticated records ordered by the Magistrate Judge on March 6, 2020. And Plaintiff asserts that Defendants should have attempted to retrieve the video on September 24, 2021, presumably because that is when the Court accepted the findings,

---

[2] Defendants explain that the only issue that arose during Plaintiff's confinement in the holding cell was an inappropriate comment he made to a female jailer, for which he was disciplined, and which was detailed earlier in this litigation. But because there was no audio component on the video surveillance equipment at the time, the video was not helpful during the disciplinary proceeding related to Plaintiff's comment, so the video was not retained.

6

conclusions, and recommendation of the Magistrate Judge and directed that Defendants be served with process on some of Plaintiff's claims.[3]

In a later filing, Plaintiff points to the transcript from a pretrial hearing held on May 14, 2018 in his state criminal proceedings. Dkt. No. 118. The transcript provided by Plaintiff does show that he complained to the state trial judge that he was denied water and other comforts in the holding cell, and he asked for the video. Dkt. No. 118-3 at 10–11. But it also shows that the pretrial hearing took place almost five months after Plaintiff was released from the holding cell, and, at that time, the prosecutor suggested that she could not "provide something that does not exist or has not been preserved." *Id.* at 20. Moreover, the trial judge admonished Plaintiff that his criminal trial was "not a 1983 case or anything else . . . . We're not litigating a civil case." *Id.* at 40. And the trial judge again emphasized that "there are a lot of things that might be relevant in a different cause of action which have no relevance to these proceedings and we are not going to try a civil case in this court on a 1983 incident or anything else." *Id.* at 41. So the judge determined that only evidence relevant to Plaintiff's criminal case would be presented to the jury. *Id.* At most, this transcript shows that Plaintiff was informed in May 2018 that the video was no longer available, and that, in any event, it was irrelevant to the criminal proceedings. Although the trial judge informed Plaintiff that his claims may be better suited for a civil action under Section 1983, Plaintiff waited more than 18 months before filing this suit.

Defendants respond that the timeline of Plaintiff's claims prevented retention of the holding-cell video. Dkt. No. 119. They contend that an administrative grievance is not enough to trigger the retention of video evidence, particularly considering Plaintiff's prolific

---

[3] Defendants were served on October 19 and October 26, 2021. *See* Dkt. Nos. 34, 39.

grievance activity. And Defendants again explain that other videos used as evidence here were retained under Lamb County's policy because they captured use-of-force incidents or disciplinary infractions. But because there were no use-of-force or similar incidents in the holding cell, and the only disciplinary incident involving Plaintiff in the holding cell was not captured on the video, the video was subject to the 30-day write-over policy.

Defendants point out that Plaintiff initiated this lawsuit two years after his confinement in the holding cell. By the time Defendants were served in October 2021, it had been three years and ten months since Plaintiff's confinement in the holding cell, which is well outside of Lamb County's 30-day retention period. And, at that point, Plaintiff had only vaguely mentioned the denial-of-water claim once, and his holding-cell conditions claims had been dismissed. Defendants did not receive actual notice of this claim and the necessity for them to answer or respond to the claim until the Fifth Circuit's remand—more than five years after Plaintiff's brief confinement in the holding cell.

A court may sanction a party for spoliation only if it finds "[(1)] the existence of a duty to preserve the information, [(2)] a culpable breach of that duty, and [(3)] resulting prejudice to the innocent party." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011). Culpability requires "evidence of 'bad faith.'" *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 614 (S.D. Tex. 2010) (collecting cases). Here, Plaintiff has failed to show that Defendants had a duty to preserve the video while preservation was still possible. And he has provided no evidence that Defendants acted in bad faith in failing to retrieve the video from an out-of-use server years later. Finally, given Plaintiff's delays in attempting to develop this claim, he cannot show that he is an innocent party who was prejudiced by the unavailability of the evidence. The Court denies Plaintiff's

8

motion to compel, Dkt. No. 110, and his motion to strike and request for sanctions, Dkt. No. 117.

## 3.    Plaintiff's new factual allegations

### A.    Plaintiff's motion to amend

The Court entered a scheduling order, requiring, among other things, that amended pleadings be filed by December 15, 2023. Dkt. No. 104. Plaintiff moved to amend and attached a proposed amended complaint four days after the deadline. Dkt. No. 108.

Defendants responded, asking the Court to deny Plaintiff's motion as untimely and improperly expansive. Specifically, Defendants contend that the motion was untimely because the mailbox rule does not apply to Plaintiff as a civil detainee. They also argue that his proposed amendment re-urges his complaints about the other, relatively minor discomforts in the holding cell.[4] Defendants point out that the Court dismissed Plaintiff's claims that he was given a food loaf, that he was denied bedding and hygiene items, that he was denied recreation and telephone privileges, and that his legal and personal property was confiscated. Defendants also argue that Plaintiff should not be permitted to replead these allegations because the Fifth Circuit agreed that these allegations, on their own, did not rise to the level of a constitutional violation. Even so, Defendants relied heavily on the proposed amended complaint in their motion for summary judgment, as discussed below.

Federal Rule of Civil Procedure 16(b)(4) governs modifications to a court's schedule. Under that rule, the Court considers four factors in determining whether to permit an untimely amendment: "(1) the explanation for the failure to timely move for leave to

---

[4] Defendants also objected to the portions of the proposed amended complaint dealing with the book-policy claim, but the Court will address those issues separately.

9

amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Banks v. Spence*, No. 22-11252, 2024 WL 3872898, at *1 (5th Cir. Aug. 20, 2024) (citing *S&W Enters., L.L.C. v. SouthTrust Bank of Ala.*, *NA*, 315 F.3d 533, 536 (5th Cir. 2003). Often, "the lack of an explanation [is] sufficient to deny amendment." *Banks*, 2024 WL 3872898, at *1.

Defendants' objections to the motion to amend are well-taken. Plaintiff's motion to amend was filed late, without explanation or apology. *See Welsh v. Unknown Male Shift Supervisor*, 2023 WL 6533457, at *2 (5th Cir. Oct. 6, 2023) (finding Plaintiff's motion—filed one day after the deadline—late without applying the mailbox rule). And Plaintiff re-urges factual allegations and claims that have been dismissed. For example, Plaintiff asks for damages for violations of his rights under the Privileges and Immunities Clause, even though this Court and the Fifth Circuit have explained that "the Privileges and Immunities Clause is inapt because it 'prevents a state from discriminating against citizens of another state in favor of its own citizens.'" Dkt. No. 30 at 29; *Welsh v. Correct Care Recovery Sols.*, 845 F. App'x 311, 320 (5th Cir. 2021) (quoting *White v. Thomas*, 660 F.2d 680, 685 (5th Cir. 1981)). And Plaintiff again describes the temporary denial of recreation and telephone privileges, bedding, hygiene, and other personal property items, and the provision of a food loaf instead of regular food, even though the Fifth Circuit agreed that these claims "appear de minimis."

But the amendment is also important. In his proposed amendment, Plaintiff provides details about his water claim for the first time. As explained above, Plaintiff did not include this claim in any prior complaint or amended complaint. Instead, the claim originated from a single line out of Plaintiff's lengthy objections to the Magistrate Judge's

10

FCR. So, Plaintiff's new proposed amended complaint is the first complaint to include the claim, and the first pleading to include any specific factual allegations in support of the claim. Additionally, although Defendants oppose the amendment, they relied heavily on Plaintiff's allegations as amended in briefing the pending motion for summary judgment. Thus, the Court concludes that permitting the late amendment will not prejudice Defendants, and no continuance is necessary because the motion for summary judgment addresses the new allegations and is ripe for disposition. Thus, despite Plaintiff's tardy submission, and his attempts to expand his allegations beyond the scope of his remaining live claims, the Court grants in part Plaintiff's motion to amend[5] and accepts Plaintiff's amended complaint as it relates to the toilet-water claim, to consider "the full scope of Plaintiff's factual allegations."

## B.    Plaintiff's self-sworn declaration

Plaintiff also submitted an appendix with his brief in opposition to Defendants' motion for summary judgment. Dkt. No. 118. Defendants moved to strike the filing, arguing that it, too, was untimely. Dkt. No. 120. Again, Defendants point out that the mailbox rule does not apply to Plaintiff because he is not a prisoner. Plaintiff's brief and appendix were received and filed by the Clerk six days after his filing deadline. And Defendants argue that even if the mailbox rule applied, it was mailed one day after the deadline. Thus, Defendants ask the Court to strike Plaintiff's brief and appendix.

---

[5] Plaintiff's motion to amend, as it pertains to Plaintiff's book-policy claim, was superseded by Plaintiff's later motion to supplement. Dkt. No. 126. The Court will address the book-policy claim and any amendments or supplements to it in a separate order. In any event, for purposes of this order, the Court only considers the portions of Plaintiff's amended complaint relevant to his toilet-water claim.

11

Alternatively, Defendants address Plaintiff's responsive arguments and object to certain portions of Plaintiff's appendix in their reply. Dkt. No. 121.

Again, the Court finds that Plaintiff's filing was unapologetically late. But for essentially the same reasons as discussed above, the Court permits the late-filed response and appendix, because again, he offers important new allegations and argument. And again, the Court finds that there is minimal prejudice to Defendants and that permitting the late-filed response will not cause further delay. Finally, at this stage, the Court will not exclude Plaintiff's offered evidence in whole but grants in part Defendants' objections to certain portions as explained in the analysis section below. *See Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995) (explaining that "[e]vidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial").

## C. Plaintiff's new factual allegations

Plaintiff's new pleadings finally add much-needed context to his water claim. He also adds new, specific factual allegations that fill in the gaps previously bridged by inference and implication. And in doing so, he changes his story significantly.

Now, despite his prior insinuations to the contrary, Plaintiff admits that he was given drinking water with meals. *See* Dkt. Nos. 108-1 at 3; 118-2. But he maintains that there was no running water in the holding cell. He also explains that he "do[es] not have complete memories" of the time, Dkt. No. 118 at 12–13, and that he has "blocked some [memories] out because it was a traumatic event," Dkt. No. 118-2 at 3. He states that he remembers two officers giving him water, and he "assume[s] that [others] might have given [him] water . . . but [he] do[es] not remember if they did or not." *Id.* at 4.

12

He explains that he was given only a "small 6-ounce cup of water" with meals, which was insufficient, so "[d]uring extreme thirst [he] was forced to drink water from the toilet." Dkt. No. 108-1 at 3–4. He "remember[s] having to drink from the toilet several times." Dkt. No. 118-2 at 3. He contends that Defendant Diaz ordered the restrictions, and Defendant Maddox approved them. Dkt. No. 108-1 at 4. Later, he claims that "all the conditions imposed upon [him] w[ere] from [Defendant] Gary Maddox." Dkt. No. 118-2 at 5. And, although he contends that "[t]he jailers were under instruction not to give [him] any drinking water unless with meals," Dkt. No. 108-1 at 3, he recalls that jailer "Al Hernandez gave [him] water late at night but told [him] not to tell anyone." Dkt. No. 118-2 at 5. He claims that he was not given any milk while he was in the holding cell. *Id.* at 5–6.

Plaintiff contends that "some time after [he] was placed in the holding cell some jailer turned off the water." Dkt. No. 118-2 at 3. He states that he noticed that the water was shut off after he urinated in the toilet, and his urine was bloody. *Id.* So the Court infers that this was before his trip to the emergency room for his urinary tract infection.[6] Plaintiff asserts that he began urinating down a drain rather than using the toilet, but that he was "allowed to flush the toilet after [he] defecated." *Id.*

He asserts that "at about 4:00 a.m."—roughly four hours after he returned from the emergency room and less than eight hours after he was placed in the holding cell—his "mouth was [so] dry that [he] could not stand it anymore," so "[he] drank from the toilet that contained [his] bloody urine." Dkt. No. 118-2 at 4. He claims that he "could not help

---

[6] He later recalls that the water "was turned off approximately 17:15." *Id.* But that is about three hours before he was placed in the cell, which is inconsistent with his earlier statement that the water was shut off after he was placed in the cell. The undisputed evidence shows that Plaintiff was not placed in the holding cell until 8:36 pm—20:36 military time—and that he went to the emergency room a couple of hours after that.

but think [he] was going to die if [he] d[id]n't get some water because [his] thirst was so severe." He avers that "there was no urine in the toilet after the first night so [he] drank more freely from the toilet instead of suffering thirst from 5 p.m. to 5 a.m." *Id.* at 5. And he acknowledges that he made a choice—that his "mind was of the opinion that it was better to drink from the toilet than to suffer of thirst" between mealtimes. *Id.*

## 4.    Defendants' motion for summary judgment

### A.    Defendants' evidence and arguments

Defendants paint a very different picture of the three days Plaintiff spent in the holding cell. First, they argue, very plainly, that Plaintiff is lying about the denial of water. They assert that no evidence supports his claims, and that, to the contrary, the great weight of the evidence shows that his claims are not true. Alternatively, Defendants argue that even assuming Plaintiff's shifting narrative is true, he has failed to demonstrate a violation of his clearly established constitutional rights. So they contend that they are entitled to summary judgment on qualified immunity.

In support of the motion, Defendants submitted an appendix containing over 300 pages of summary-judgment evidence, including self-sworn declarations from Defendants Misty Diaz and Gary Maddox, self-sworn declarations from five jailers who were responsible for observing Plaintiff in the holding cell and conducting checks on him, and a self-sworn declaration from a retained criminal justice consultant and expert. Defendants' appendix also includes copies of the Lamb County Inmate Handbook (dated May 4, 2016), Plaintiff's signed acknowledgment that he received a copy of the handbook on November 28, 2017, the Lamb County Jail Menu that was used in 2018, work orders for the Lamb County Jail from 2017–2018, Daily Inspection Logs from January 18–February 5,

14

2018, and a 2016–2018 Jail Event Summary Report with Comments. The appendix included Plaintiff's telephone and recreation logs from the relevant time period. And Defendants submitted officer reports of incidents with the Plaintiff on January 26–27, 2018, and a duty roster of officers assigned to the holding cell between January 26–30, 2018. Defendants also provided photos of the holding cell from different angles and photos of the sink, toilet, and plumbing shut-off points. Finally, Defendants included the self-sworn declaration of Lamb County's information-technology vendor, attesting to his unsuccessful efforts to retrieve video from an out-of-service server of Plaintiff's 2018 confinement in the holding cell.

The summary judgment evidence shows that Plaintiff was placed in the holding cell at 8:34 pm on January 26, 2018. Dkt. No. 114 at 108. But he was taken to the emergency department at the Lamb County Healthcare Center at 10:00 pm, where was evaluated and diagnosed with a urinary tract infection. *Id.* at 171–81. He was discharged at 11:57 pm. *Id.* at 178. There is no indication from the medical records that Plaintiff complained of extreme thirst or reported that he had been denied water while he was at the healthcare center.

Defendants next point to their self-sworn declarations to refute Plaintiff's allegations. They assert that Lamb County inmates are each given an 8-ounce cup to fill from the sink in single-person cells or from water coolers in multi-person cells. Defendants Diaz and Maddox attest that Plaintiff's county-issued cup was not confiscated, that the water in his cell was not shut off, and that he could fill his cup with unlimited water from the holding cell sink throughout the day. Dkt. No. 114 at 7; Dkt. No. 115 at 158. Defendants state that Plaintiff was also given a 4-ounce portion of milk with each meal, corroborated by their

15

sworn declarations as well as the menu in place at the Lamb County Jail in 2018. Dkt. No. 114 at 7, 183; Dkt. No. 115 at 131, 158.

Defendants Diaz and Maddox unequivocally deny ordering that the water to the holding cell be shut off. They each state that they did not deny Plaintiff water or order anyone else to deny him water or limit his access to water in any way. Dkt. No. 114 at 7; Dkt. No. 115 at 158. And they each attest that they are unaware of any problems with the plumbing or any other circumstance that would have prevented Plaintiff from obtaining unlimited amounts of water from the sink in the holding cell. *Id.* Moreover, five of the officers who were assigned to the holding-cell area, and who conducted checks on Plaintiff every twenty minutes while he was in the holding cell, provided sworn declarations. Each officer declares that they did not deny Plaintiff water, that nobody instructed them to deny Plaintiff water, that they were unaware of any problems with the water in the holding cell, and that they never observed Plaintiff drink from the toilet. Dkt. No. 115 at 130–31, 133–34, 136–37, 139–40, 142–43. These officers each state that Plaintiff never reported to them that he was being denied water, that he was suffering from extreme thirst, or that he felt compelled to drink from the toilet. *Id.*

Defendants also show that Plaintiff was prescribed medication after his emergency room visit. Dkt. No. 114 at 178. None of the officers who administered Plaintiff's medication reported any concerns over Plaintiff's access to water. One of the officers who gave Plaintiff medication on January 29, 30, and 31, 2018 in the holding cell recalls that Plaintiff took his medication with water, by filling his cup from the sink in the holding cell. Dkt. No. 115 at 142.

Defendant Diaz explains, and the photos of the cell demonstrate, that the holding cell is observable from the control room, the front of the jail, and from the hallway. Dkt. No. 114 at 9–10. After all, Plaintiff was placed in the holding cell for closer observation. *Id.* Diaz also explains that none of the officers working in the control room or the front of the jail reported seeing Plaintiff drink from his toilet or any other concerns from their observation of him in the cell. Nor did any officer walking by report any concerns. The records show also that jailers checked the holding cell approximately every twenty minutes throughout Plaintiff's confinement there. And again, these officers have denied that they observed any issues or that Plaintiff reported any issues to them.

Additionally, Defendants submitted Daily Inspection Reports, which are filled out by jailers at the beginning of each shift to report any problems found in any cells. *See* Dkt. No. 114 at 9; Dkt. No. 115 at 66–106. The reports show that no plumbing or other issues were reported for the holding cell while he was confined there, nor were any plumbing or other issues reported for the holding cell in the weeks before or after Plaintiff's stint there. *Id.* And Defendants attached copies of work orders for the Lamb County Jail, showing that problems are typically addressed within one day, and that there were no work orders submitted for the holding cell for plumbing or other issues while Plaintiff was in the cell. Dkt. No. 114 at 8; Dkt. No. 115 at 5–64.

And Defendants provided photos and records showing that there are separate hot- and cold-water shut-off points for the sink in the holding cell, and a cut-off valve for the toilet in the holding cell. Diaz explains that the water can be shut off at these three points, but "this is not done unless there is a plumbing issue . . . or if an inmate is flooding a cell." In either instance, the water is shut off only until the situation is resolved. But neither

17

happened while Plaintiff was in the holding cell. The water was not shut off, and the plumbing system was functioning normally during the relevant time. Dkt. No. 114 at 9.

Finally, Defendants rely on their declarations, as well as the declarations of the other officers assigned to the holding-cell area, to support their contention that Plaintiff was not denied a mattress, bedding, or hygiene items. They contend that he was denied access to his plastic property tote, which contained his legal work and stationery, because of his aggressive behavior and concerns that he could use the tote as a weapon. Dkt. No. 114 at 10. These items were returned to him on January 29, when he was no longer exhibiting aggressive behavior. *Id.* They assert that the only privilege denied Plaintiff during the relevant three-day period was time in the dayroom. But they point to records showing that Plaintiff was offered more recreation time when he left the holding cell on January 31, 2018 to make up for his missed dayroom time. Similarly, Defendants deny that Plaintiff was ever fed a food loaf at the Lamb County Jail. Defendant Diaz—the jail administrator—explains that "food loafs are not a food item served to any inmates at the Lamb County Jail" and that all inmates are given the same meals from the approved menu, unless they are on a special medical or religious diet. Dkt. No. 114 at 6–7. Thus, Defendants assert that Plaintiff was given the same meals as other inmates while he was in the holding cell, and he was provided a cup of milk with each meal. *Id.*

So Defendants contend that Plaintiff had unlimited access to water in the holding cell, that he was given regular meals with milk, and that he was not deprived bedding or hygiene items. Defendants provide records, photographs, and affidavits in support of their contentions, and they argue that Plaintiff has provided no evidence to the contrary. In sum, Defendants claim that Plaintiff is lying, and they support their position with detailed

18

documents and sworn declarations. Alternatively, Defendants argue that Plaintiff has failed to overcome their assertion of qualified immunity, even if his factual allegations are accepted as true.

In support of their alternative argument, Defendants point to the dismissal of similar allegations in other district courts in the Fifth Circuit. *See Desroche v. Strain*, 507 F. Supp. 2d 571, 575–76 (E.D. La. 2007) (pretrial detainee's complaint about the conditions of his 10-day stint in a holding cell, including the denial of clean drinking water, dismissed at screening for failure to raise a constitutional harm); *Scott v. Forrest Cnty.*, 2022 WL 4088760, at *5 (S.D. Miss. Aug. 8, 2022) (inmate's denial-of-water claim dismissed because during the four to seven days that the water was shut off, detainees were provided access to water every few hours and were provided milk with breakfast and water with lunch and dinner); *Jarvis v. Hall*, 2022 WL 108018, at *4 (N.D. Miss. Jan 10, 2022), aff'd, No. 22-60098, 2023 WL 3818377 (5th Cir. June 5, 2023) (dismissing prisoner's claim that guards provided inadequate amounts of water—eight 16-ounce bottles of water during a seven-day stay in a temporary cell—because it did not rise to the level of a constitutional violation).

Defendants also rely on a similar case from the Eighth Circuit, where prison officials were entitled to summary judgment on a prisoner's claim that he was placed in a strip cell for four days without clothes, running water, or bedding, but was given three meals a day with milk. *See Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995). Defendants also discuss several other cases to renew their arguments that Plaintiff's other alleged discomforts—the denial of bedding, the denial of toothbrush and toothpaste, and the provision of food loafs instead of regular meal service—fail to rise to the level of a constitutional violation. Ultimately, under either theory, Defendants argue that they are entitled to qualified-

immunity summary judgment because they did not violate Plaintiff's clearly established constitutional rights.

## B.   Plaintiff's response

Plaintiff filed a response in opposition to the motion for summary judgment with a brief in support. Dkt. No. 118. He also submitted a 108-page appendix containing copies of grievances, his self-sworn declaration on the denial of drinking water, copies of transcripts from his May 14, 2018 pretrial hearing in his state criminal proceedings, other miscellaneous jail reports, and the unsworn declarations of two other civil detainees and former Lamb County Jail inmates. Dkt. No. 118-1–9.

First, Plaintiff argues that he has provided some evidence to support his conditions-of-confinement claim, including his self-sworn declaration, state-court trial transcripts, and grievances. He explains that his allegations are corroborated by the state-court transcript, which shows that in his pretrial hearing in May 2018, he told the state trial judge that he "had to drink out of the toilet because they wouldn't bring me water." Dkt. No. 118-3 at 10. And he points to a grievance, dated January 29, 2018, in which he complained in part about "[t]he holding or seizure of [his] person in intake without clothing, running water, personal property, First Amendment association rights by confiscation of stationary material, and the feeding of a food loaf."[7] Dkt. No. 118-1 at 4–5.

He also bolsters his claims with new details in his self-sworn declaration, dated January 27, 2024, as discussed above. Dkt. No. 118-2. And he includes the self-sworn declarations of Alonzo May and Jonathan Ackley, each dated January 30, 2024, to support

---

[7] He also includes a copy of his grievance appeal, from which he omits any reference to a denial of water. Dkt. No. 118-1 at 7.

his claim that he was never given milk. According to their declarations, neither May nor Ackley were inmates at the Lamb County Jail when Plaintiff was confined in the holding cell. May states that he spent two months in the Lamb County Jail in late 2018 and early 2019, and during that time he never received milk with any meal. Ackley states that when he was detained in the Lamb County Jail in 2020, two years after Plaintiff's relevant confinement, he received milk twice a week with breakfast and never with any other meal. Dkt. No. 118-9.

Next, Plaintiff asserts that Defendants' evidence should be discounted and some of it should be stricken as untimely. He claims that Defendants have "consistently misrepresented the truth," so the Court should not credit their declarations or the declarations of their employees. And he asks the Court to strike Defendants' declarations because they were prepared and sworn after the close of discovery. He does not explain why this argument should bar Defendants' declarations, but not his own proffered declarations, dated around the same time.

Then, Plaintiff acknowledges that his story has changed, but he insists that the changes are not significant. He states that the changes in his allegations stem "from not remembering all the details due to mental suppression of a traumatic event." Dkt. No. 18 at 12. And he avers that "[i]t is not that the allegations have significantly changed it is that new facts have come forth," in his memory of the events. He contends that he "expected the video to be the conclusive proof on the merits of the claim."

Still, he argues that even as altered, his allegations are enough to show a constitutional violation. He points to cases from the Sixth, Seventh, and Ninth Circuits to show that the provision of only limited, inadequate amounts of water can violate the

21

Constitution. *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) (holding that "[a]ll but the most plainly incompetent jail officials would be aware that it is constitutionally unacceptable to fail to provide inmates with enough water for consumption and sanitation over a three-day period"); *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 512 (6th Cir. 2001) (finding that a prisoner's allegation that he was given only two half pints of milk and one 16.5 ounce bottle of water over three days was sufficient to state a viable Eighth Amendment claim); *Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000) (finding that inmates presented a triable Eighth Amendment claim where they alleged, among other things, that they received inadequate drinking water for four days).

Plaintiff also argues that the Court should afford extra weight to his claim because he was exposed to human waste—he first drank from the toilet when it was contaminated with his own urine. Dkt. No. 118 (citing *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004)). He compares his case to *Canupp v. Paul*, 716 F. App'x 836 (11th Cir. 2017), in which the prisoner-plaintiff "was given so little water that he had to resort to drinking out of the same toilet in which he was defecating and vomiting," for two weeks in an isolation cell, and, as a result, he contracted dysentery. The Eleventh Circuit concluded that summary judgment was not appropriate because "a reasonable jury could find that such a meager amount of water over a fourteen-day period was an extreme deprivation that posed an unreasonable risk of serious damage to [the plaintiff's] future health or safety." *Id.* at 840 (internal quotation marks and brackets omitted). Here, Plaintiff argues that he "may have spent a little less time with inadequate water but the deprivation was still severe."

Again, Plaintiff urges the Court to consider the totality of the conditions he alleges. He repeats that he was not only denied running water, but he was denied a mattress,

22

bedding, hygiene items, recreation, and telephone privileges, and he was fed a food loaf instead of regular meals.  Dkt. No. 118 at 25.

Finally, Plaintiff asserts that "Defendants have slandered [his] character and called into question his truthfulness because he had forgotten some details[,] . . . . However it is clear that the defendants are trying to . . . spread[] miss information [sic] in order to negate their culpability."  *Id.* at 27–28.  He argues that the records provided by Defendants show a few inconsistencies with regard to the Lamb County book policy, whether they fed him a food loaf, and who performed checks on the holding cell.  Relevant here, he asserts that a jail official responded to his grievance by stating, "Jail Standards inspects our jail . . . . A food loaf is sufficient by jail standards under the circumstances you brought on yourself."  He contends that this response proves both that Defendants fed him a food loaf and that they did so in order to punish him.  And he points to conflicting reports saying that Assistant Jail Administrator Ricky Torres conducted a check on the holding cell at 7:07 pm (between checks by Mary Esther Sanchez at 6:58 pm and 7:30 pm), when elsewhere Torres reported that he was at the E.R. until 7:15 pm on that day, where he was getting checked out for injuries he sustained in an earlier altercation with Plaintiff.  So Plaintiff asserts that, based on these perceived inconsistencies, the Court should not credit anything Defendants or other jail employees say.

Ultimately, Plaintiff argues that Defendants are not entitled to qualified immunity, and he asks the Court to deny the motion for summary judgment and set this case for trial.  Defendants replied, Dkt. No. 121, repeating their arguments that the summary judgment evidence proves they did not deny Plaintiff water.  They also contend that the cases Plaintiff cites are either inapplicable or distinguishable.  *Id.*  And they maintain that even if his claims

23

were accepted as true, he has not shown a violation of his clearly established constitutional rights.

## C. Legal standards

### i. Fourteenth Amendment

There is no constitutionally significant distinction between the rights of pretrial detainees and convicted inmates when it comes to basic human needs. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). Officials "must provide humane conditions of confinement . . . and must take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). But unlike convicted prisoners, pretrial detainees are entitled to be free from conditions that amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Even so, not all discomforts associated with detention amount to punishment in the constitutional sense, even restrictions that the detainee would not experience if he were released. *Id.* at 540. Courts should not underestimate the difficulties of operating a detention center. *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012) (citing *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)). "A detention facility's protocols for isolating individuals, controlling the movement of its staff and detainees, and providing medical care are part and parcel of the conditions in which the facility maintains custody over detainees." *Sacal-Micha v. Longoria*, 449 F. Supp. 3d 656, 2020 WL 1518861, at *4 (S.D. Tex. Mar. 27, 2020).

The analysis of constitutional challenges by pretrial detainees begins with determining whether the allegation challenges a "condition of confinement" or an "episodic act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (citing *Hare*, 74 F.3d at 644)). A "condition of confinement" case attacks "general conditions, practices, rules, or

24

restrictions of pretrial confinement." *Id.* On the other hand, if a plaintiff's allegations are based on a specific act or omission of one or more officials, the action is characterized as an "episodic act or omission" case. *See Olabisiomotosho v. City of Houston,* 185 F.3d 521, 526 (5th Cir.1999); *Hare,* 74 F.3d at 645.

### a. Conditions-of-confinement claims

When a pretrial detainee complains about general conditions of confinement, a constitutional violation exists only if the court finds that the conditions of confinement are not reasonably related to a legitimate, non-punitive governmental objective. *See Hare,* 74 F.3d at 640 (citing *Bell* 441 U.S. at 538–39); *see also Scott,* 114 F.3d at 53. To succeed on a conditions claim, the plaintiff must prove (1) a rule or restriction, an intended condition or practice, or a *de facto* policy as evidenced by sufficiently extended or pervasive acts of jail officials; (2) not reasonably related to a legitimate governmental objective; and (3) that violated his constitutional rights. *Elder v. Hockley Cnty. Comm'r Ct.*, 589 F. App'x 664, 668 (5th Cir. 2014) (citing *Hare*, 74 F.3d at 645)). To establish the first prong, a detainee challenging jail conditions must show more than an isolated incident; he "must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs." *Elder*, 589 F. App'x at 668 (citations omitted).

"[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell*, 441 U.S. at 539. But even for detainees, "'[t]here is, of

25

course, a *de minimis* level of imposition with which the Constitution is not concerned.'"
*Hamilton v. Lyons,* 74 F.3d 99, 106 (5th Cir. 1996) (citing *Bell,* 441 U.S. at 539 n. 21).

### b.    Episodic acts or omissions

In episodic act or omission cases, "an actor usually is interposed between the
detainee and the municipality." *Scott,* 114 F.3d at 53. In these cases, the plaintiff is suing
an individual defendant, rather than an entity, and must show that the official(s) acted with
subjective deliberate indifference.[8] *Olabisiomotosho,* 185 F.3d at 526 (citing *Flores v. Cnty. of
Hardeman,* 124 F.3d 736, 738–39 (5th Cir. 1997)). An official acts with subjective deliberate
indifference when he "had subjective knowledge of a substantial risk of serious harm to a
pretrial detainee but responded with deliberate indifference to that risk." *Hare,* 74 F.3d at
650.

Although the Fifth Circuit has carefully distinguished the conditions-of-confinement
cases from those alleging a specific act or omission, it has also noted that "the reasonable-
relationship test employed in conditions cases is 'functionally equivalent to' the deliberate
indifference standard employed in episodic cases." *Scott,* 114 F.3d at 54 (citing *Hare,* 74 F.3d
at 643).

### ii.    Summary judgment

Summary judgment is appropriate where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[8] Some circuits have opted to extend the objective reasonableness standard from *Kingsley v.
Hendrickson*, 576 U.S. 389, 395–96 (2015), to all Fourteenth Amendment claims brought by pretrial
detainees. *See Hardeman*, 933 F.3d at 822. But the Fifth Circuit has "continued to rely on *Hare* and
to apply a subjective standard post-*Kingsley.*" *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415,
420 n.4 (5th Cir. 2017); *see also See Cope v. Coleman Cnty.*, 2024 WL 3177781, at *5 n.7 (5th Cir.
2024).

26

56(a). In considering a motion for summary judgment, courts must not make credibility determinations or weigh evidence but must instead draw all reasonable inferences for the non-moving party. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008); *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002). That said, summary judgment "may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

When the non-moving party fails to file a timely response to a proper motion for summary judgment, he cannot satisfy his burden to "designate specific facts showing that there is a genuine issue for trial," and summary judgment must be granted. *Stults v. Conoco, Inc.*, 76 F.3d 651, 656–57 (5th Cir. 1996). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)). To the extent, however, that a pro se plaintiff's allegations are verified under penalty of perjury, they "are deemed competent summary judgment evidence." *Al-Raid v. Ingle*, 69 F.3d 28, 32 (5th Cir. 1995).

### iii. Section 1983 and qualified immunity

Section 1983 "provides a claim against anyone who 'under color of any ordinance, regulation, custom, or usage, of any State' violates another's constitutional rights." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). "A plaintiff makes out a [Section] 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation

27

was committed by someone acting under color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293–94 (5th Cir. 2019) (quoting *Brown v. Miller*, 519 F.3d 23, 236 (5th Cir. 2008)).

But even if a defendant can be shown to have violated another's constitutional rights, the defendant may not be liable under Section 1983. Defendants who perform discretionary duties—such as police officers and jailers—may invoke the affirmative defense of qualified immunity in response to a plaintiff's Section 1983 suit. Qualified immunity applies "when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

In analyzing whether an individual defendant is entitled to qualified immunity, the court considers whether the plaintiff has alleged any violation of a clearly established right, and, if so, whether the individual defendant's conduct was objectively reasonable. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991); *Duckett v. City of Cedar Park*, 950 F.2d 272, 276–80 (5th Cir. 1992). In so doing, the court should not assume that plaintiff has stated a claim, i.e., asserted a violation of a constitutional right. *Siegert*, 500 U.S. at 232. Rather, the court must be sure that, if the facts alleged by plaintiff are true, a violation has clearly occurred. *Connelly v. Comptroller*, 876 F.2d 1209, 1212 (5th Cir. 1989). Even if defendants are alleged to have acted in unison, the court must address the actions of each individually to determine whether qualified immunity applies. *Cass v. City of Abilene*, 814 F.3 721, 730–31 (5th Cir. 2016); *Meadours v. Ermel*, 483 F.3 417, 421–22 (5th Cir. 2007); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999).

A mistake in judgment does not cause an officer to lose his qualified immunity defense. The Supreme Court explained long ago that "[t]he qualified immunity standard

28

gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341–43 (1986)). And "an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley*, 475 U.S. at 341. Further, that the officer himself may have created the situation does not change the analysis. That he could have handled the situation better does not affect his entitlement to qualified immunity. *Young v. City of Killeen*, 775 F.2d 1349, 1352–53 (5th Cir. 1985).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and modifications omitted). "There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). In the typical case, the plaintiff "identif[ies] a case or body of relevant case law in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Id.* (quotation marks and citations omitted). This approach "do[es] not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S.731, 741 (2011). In rare cases, however, "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 64; *cf. Taylor v. Riojas*, 592 U.S. 7, 9(2020) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that [the plaintiff's] conditions of confinement offended the Constitution.").

29

The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal quotation marks and citation omitted). Likewise, the Supreme Court has stated that the purpose of the doctrine is to "give[ ] government officials breathing room to make reasonable but mistaken judgments." *Stanton v. Sims*, 571 U.S. 3, 6 (2013). "Accordingly, 'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). When a defendant invokes qualified immunity in his answer, the burden shifts to the plaintiff to show that the defense is unavailable. *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019).

Defeating an invocation of qualified immunity requires that the plaintiff "point to summary judgment evidence (1) that [the official] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was clearly established at the time." *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (internal quotation marks omitted). So, while the "plaintiff's factual assertions are taken as true to determine whether they are legally sufficient to defeat the defendant's motion for summary judgment," *Baldwin v. Dorsey*, 964 F.3d 320, 325 (5th Cir. 2020), the plaintiff bears a heavy burden in overcoming a defendant's good-faith invocation of qualified immunity. *Mendez v. Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016).

A plaintiff "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Although Supreme Court precedent does not require a case directly on point, existing precedent must place the statutory or constitutional question beyond debate.

30

*Pauly*, 580 U.S. at 79. That is, the clearly established law on which a plaintiff relies should not be defined at a high level of generality but must be particularized to the facts of the case. *Id.* Thus, failure to identify a case in which an officer acting under similar circumstances was held to have violated a plaintiff's rights will most likely defeat the plaintiff's ability to overcome a qualified immunity defense. *Id.*; *Surratt v. McClarin*, 851 F.3d 389, 392 (5th Cir. 2017).

## D. Analysis

### i. Material facts

The Court notes again that although the records show that Plaintiff was in the cell for five days, from January 26 through January 31, 2018, the parties generally agree that the more restrictive conditions at the heart of Plaintiff's complaint were limited to a three-day period—January 27, 28, and 29. The parties do not agree about much else.

The parties tell very different stories, and both sides ask the Court to find that the opposing party is lying. And as detailed above, no video exists to clear things up. It is well established that the Court cannot make credibility determinations at this stage. *See Delta & Pine Land Co*, 530 F.3d at 398–99; *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations [and] weighing of the evidence . . . are jury functions, not those of a judge."). So before the Court may complete a qualified immunity analysis, it must determine the relevant facts. *Scott v. Harris*, 550 U.S. at 378. When the parties' versions of events differ substantially, as they do here, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion," which "usually means adopting . . . the plaintiff's version of the facts." *Id.* (internal quotation marks and brackets omitted). In other words, "t]he

31

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

Here, Plaintiff's claim succeeds or fails on his late-added claim that Defendants denied him water for three days. *See* Dkt. No. 97; *Welsh v. Lamb Cnty.*, No. 22-10124, 2023 WL 3918995, at *3 (5th Cir. June 9, 2023) (explaining that "[t]his added factual allegation defeats the sole basis for the dismissal of this claim"). So the Court must look to his specific factual allegations about the denial of water and his relevant evidence to determine whether he has overcome Defendants' assertion of qualified immunity.

And, as discussed above, Plaintiff's allegations about the denial of water have changed considerably. He now admits that Defendants gave him a cup of water with meals, and that, at least once during his three-day confinement, a jailer brought him extra water at night. Dkt. No. 118-2 at 4–5. And he acknowledges that his "memories on the denial of water are not complete." *Id.* at 3. But he "do[es] remember having to drink from the toilet several times." *Id.* The timeline of Plaintiff's confinement in the holding cell is critical to the analysis of this claim.

The summary judgment evidence shows, and Plaintiff does not refute, that he was placed in the holding cell at 8:36 pm. Plaintiff claims that the water to the cell was shut off some time after that. Dkt. No. 118-2 at 3. He states that he "had not drunk anything early [sic] that day." *Id.* But he does not allege that he was denied access to water before he was placed in the cell.[9]

---

[9] Indeed, the Court has previously discussed the video footage showing that Plaintiff had access to water in both of the cells he occupied earlier on January 26. His first cell had a water cooler—Plaintiff used the lid of the water cooler in a confrontation with officers. Dkt. No. 93. Plaintiff was then moved to an isolation cell that contained a working sink, which Plaintiff used to wet toilet paper and attempt to cover the surveillance camera. Dkt. Nos. 22, 30, 93. So it is undisputed—and indisputable—that Plaintiff had access to water earlier in the day on January 26, 2018.

In the first hour and a half that he was in the holding cell, Plaintiff urinated in the toilet in the holding cell, noticed that his urine was bloody, and was taken to the local emergency room for examination. The records do not reflect, and Plaintiff does not allege, that he complained to anyone at the emergency room that he was thirsty or dehydrated. Plaintiff provided a urine sample and had his blood drawn for testing, his vitals were checked, and a CT scan was completed. The unrefuted medical records show that Plaintiff was administered two oral tab medications at the medical center at 10:48 pm, which he presumably swallowed with water. Dkt. No. 114 at 174. He was discharged around midnight.

Plaintiff asserts that the first time he drank from the toilet was about four hours later—at 4:00 am on January 27, 2018—when the toilet was still contaminated with his bloody urine. Dkt. No. 118-2 at 4. He claims that by that time, his "thirst was unbearable" and he "could not help but think [he] was going to die if [he] d[id]n't get some water because [his] thirst was so severe." *Id.* He now recalls that a jailer brought him water with his lunch later that day, and he admits that he does not remember if other officers brought him water with other meals, but he "assume[s] that they might have." *Id.* Even so, he claims that he "had to go from 5:00 p.m. to about 6:00 a.m. between dinner and breakfast without having any water to drink." *Id.* He claims that, after the first night, he was able to flush the toilet once a day, and he began urinating down a drain instead. *Id.* at 5. Then, he "drank more freely from the toilet instead of suffering from 5 p.m. to 5 a.m." *Id.* He explains that his "mind was of the opinion that it was better to drink from the toilet than to suffer of thirst." *Id.* And he claims that a jailer gave him water late at night on January 29, 2018. He states that he "know[s] beyond doubt that [he] was given no milk to drink" while

33

he was in the holding cell. Plaintiff does not dispute the records showing that he received his prescribed oral tab medication at 5:00 pm on Saturday, January 27, 2018, and at least twice per day, at 5:00 am and 5:00 pm,[10] for the rest of his time in the holding cell (and afterward until he finished the prescribed course). Dkt. No. 114 at 185–89. Nor does he dispute that he took his medication with water, although he disputes, by implication, that he got water from the holding cell sink to take his medication. Dkt. No. 115 at 142. So the Court infers that medication times are among the other times that Plaintiff "could have received water . . . but do[es] not fully remember." Dkt. No. 118 at 16.

Plaintiff's claim has changed from alleging a complete denial of all water to alleging limited access to water at meals and at least once during the night, as well as with his medication. And Plaintiff's allegations have changed from claiming that Defendants "forced" him to drink from the toilet to acknowledging that, for the most part, he chose "freely" to drink from the toilet because he preferred it to waiting for the next scheduled mealtime. Plaintiff's most egregious claim—that he drank from the toilet when it was contaminated with his own urine—allegedly happened mere hours after the water was shut off. The Court finds it relevant, as well, to note again that Plaintiff was placed in the holding cell in the first place for observation because of his erratic and bizarre behavior.

### ii.    Evidence

Next, the Court considers the evidence offered by both parties. Although the Court cannot weigh the evidence at this stage, Plaintiff must present more than conclusional

---

[10] The records indicate that, in addition to a required antibiotic, Plaintiff was prescribed Tylenol or ibuprofen "as needed," which was offered up to four times per day. The records reflect that the optional medication was "NR"—not requested—most of these times, but they suggest that optional pain medication may have been administered a few additional times, including 5:00 am and 10:00 pm on January 28 and 5:00 am on January 29. Dkt. No. 114 at 187–89. Again, the Court notes that Plaintiff does not refute that he received medication or that he swallowed his medication with water.

allegations, unsupported assertions, or presentation of only a scintilla of evidence to overcome Defendants' motion for summary judgment. *See Hemphill*, 805 F.3d at 538. Defendants assert that there is no evidence that Plaintiff was denied water when he was in the holding cell. They point to the extensive records included in their appendix, which reflect no evidence that (1) Plaintiff complained about thirst, dehydration, or denial of water when he visited the emergency room; (2) any officer shut off the water, knew that the water was shut off, or observed Plaintiff drink from the toilet; or (3) there were any plumbing issues or related work orders before, during, or after Plaintiff's time in the holding cell.

But Plaintiff did submit a self-sworn declaration under penalty of perjury, asserting that the water to the holding cell was shut off and that for three days his drinking water was limited to one cup of water with meals and an extra, unspecified amount of water sometime during the third night. For the most part, Plaintiff's allegations, verified under penalty of perjury, "are deemed competent summary judgment evidence." *Al-Raid*, 69 F.3d at 32. And he corroborates his self-sworn declaration with two other references to the denial of water—first in his January 29, 2018 grievance, where he complains in part about the denial of running water, and second in his May 2018 state-court pretrial hearing. Thus, the Court must conclude that some evidence supports Plaintiff's claims, and it may not weigh that evidence against that offered by Defendants.

That said, the Court can only consider Plaintiff's evidence "to the extent [that it is] not based on hearsay or other information excludable at trial." *See Fowler*, 68 F.3d at 126. Defendants object to portions of Plaintiff's self-sworn declaration that are excludable as hearsay. *See* Dkt. No. 121 at 10 (objecting to paragraphs 14, 16, 25, 33, 34, 41, and 42 of Plaintiff's declaration). The Court sustains Defendants' objection and strikes the portions of

35

Plaintiff's declaration that contain hearsay. Specifically, the Court does not consider paragraphs 14, 16, 25, or 42. And the Court excludes the last section of both paragraphs 33 ("what he told me about the Sheriff ordering it at meals") and 34 ("but told me not to tell anyone"). The Court will not strike paragraph 41. Defendants also ask the Court to strike as irrelevant evidence related to separate periods of confinement, which have no bearing on Plaintiff's water claim. Dkt. No. 121 at 10. The Court agrees and does not consider grievances from separate periods of confinement or declarations of other inmates describing their experiences at other times in the Lamb County Jail.

### iii.     Constitutional violation

The Court next analyzes Plaintiff's factual allegations and the competent summary judgment evidence as described above through the lens of qualified immunity. In doing so, it must determine whether Plaintiff has raised a genuine issue of material fact that Defendants violated his clearly established Fourteenth Amendment rights.

Plaintiff's water claim is best analyzed as an episodic act or omission case rather than a conditions claim. Although Plaintiff generally complains about the conditions in his holding cell, he bases this claim on the specific actions of Defendants in allegedly shutting off the water to his cell. If the Court assessed this claim under the conditions standard, Plaintiff would fail on the first prong. He has alleged an isolated incident perpetrated by individual actors, rather than demonstrating a widespread pattern of serious deficiencies in providing for his basic human needs. *See Elder*, 589 F. App'x at 668. Importantly, he does not allege that limited access to water is a standard condition of confinement in the holding cell or that his water was restricted consistent with any official policy or prevalent practice. He does not refute the summary judgment evidence showing that Lamb County's policy or

36

practice was for inmates in the holding cell to have unlimited access to water unless exigent circumstances required it to be shut off. He admits that the cell had a toilet and sink, but he alleges that Defendants shut off the water contrary to the policy described in the summary judgment record. Thus, he must show that Defendants acted with subjective deliberate indifference to his health or safety. In other words, he must demonstrate that Defendants Diaz and Maddox each knew of a substantial risk of serious harm and each disregarded that risk.

Plaintiff has neither presented nor identified any evidence that demonstrates subjective deliberate indifference for either defendant. Instead, he offers only his own conclusions and inadmissible hearsay. His conclusions that Diaz, Maddox, or both ordered the water shut off are wholly unsupported by the summary judgment evidence. Nor has Plaintiff demonstrated that either Defendant Diaz or Defendant Maddox knew that the water to the cell was shut off, that Plaintiff was given inadequate access to water, that he was thirsty, or that he drank from the toilet. Plaintiff submitted a grievance on January 29, 2018, which listed, among other things, that he was denied running water in the holding cell. But neither Diaz nor Maddox signed the response to the grievance, so this evidence does not establish subjective knowledge for either defendant. Plaintiff also avers that he "discussed the water being off" with Defendant Diaz sometime on January 29. So at most, he has shown that Diaz was aware of the shut-off sometime on the third day. He does not allege that he informed her that he was suffering from extreme thirst, drinking from the toilet, or that the drinking water provided at mealtimes was inadequate. And, according to Plaintiff, the water in his cell was restored the following morning, at 8:00 am on January 30.

37

The records show that jailers checked on Plaintiff in the holding cell about every 20 minutes, and none of these jailers reported any issues to Defendants Diaz or Maddox. It is undisputed that neither Defendant Diaz nor Defendant Maddox personally performed any of these checks. The records also show that the holding cell was inspected daily, and the inspections revealed no plumbing or other issues in the holding cell while it was occupied by Plaintiff. And as discussed above, Lamb County's general policy or practice was that inmates in the holding cell enjoy unlimited access to water. Plaintiff has provided no evidence that Defendant Maddox knew Plaintiff was denied water at any time while he was in the holding cell. And at most, Plaintiff can show that Defendant Diaz became aware that there was no running water sometime on January 29. But even so, he has failed to point to any evidence that she was aware of a substantial risk to his health or safety. Moreover, he alleges that the running water was restored early the next morning. Thus, even accepting Plaintiff's allegations as true, Plaintiff has failed to establish that either Defendant Diaz or Defendant Maddox acted with subjective deliberate indifference to his health or safety. In other words, Plaintiff has failed to show that Defendants Diaz or Maddox violated his Fourteenth Amendment rights. Thus, he has not satisfied his burden of overcoming Defendants' good-faith invocation of qualified immunity.

### iv. Clearly established right

Moreover, Plaintiff has not shown that going three days with only limited access to drinking water at mealtimes, with medication twice per day, and occasionally overnight was objectively unreasonable in light of clearly established law in January 2018.

Sometimes, the denial of adequate drinking water can violate the Constitution, requiring courts to do a fact-intensive analysis. *See McKines v. Sims*, 2024 WL 1301352, at

*4 (S.D. Miss. Mar. 5, 2024) (collecting cases), *report and recommendation adopted*, 2024 WL 1287627 (S.D. Miss. Mar. 26, 2024). For example, the Fifth Circuit has found that an inmate going 27 hours with only a carton of milk and a cup of water to drink with vague allegations of unsanitary or crowded conditions did not rise above "mere discomfort or inconvenience." *Clark v. Harris*, 30 F.3d 1493, 1994 WL 398477 (5th Cir. 1994). Likewise, many district courts in this circuit have found no constitutional violation under similar circumstances. *See Duvall v. Burns*, 2016 WL 7664308, at *6 (E.D. Tex. Oct. 24, 2016) (finding it constitutionally acceptable that a prisoner was denied running water in an isolation cell for three days because he was "provided with drinks three times a day at mealtime, alleviating any danger of serious dehydration"), *report and recommendation adopted*, 2017 WL 67991 (E.D. Tex. Jan. 6, 2017); *Garrett v. Smith*, 2021 WL 1215871, at *9 (E.D. La. Jan. 14, 2021) (finding that an inmate's claim that he was held in a holding cell for 15 days with limited clothing, sleeping on concrete, and receiving a cup of water with every meal did "not rise to the level of an extreme deprivation of the type that might offend the Constitution"), *report and recommendation adopted*, 2021 WL 1212535 (E.D. La. Mar. 31, 2021); *Palomo v. Collier*, 2023 WL 6014400 (S.D. Tex. Apr. 14, 2023) (dismissing prisoner's claim that he was placed in a cold cell with no functional toilet for six days and no drinkable water for two days, resulting in constipation and a brief period of hallucination), *report and recommendation adopted*, 2023 WL 5610908 (S.D. Tex. Aug. 30, 2023). On the other hand, "an extended period without access to any means of hydration is unconstitutional and was clearly established as such before 2018." *Maxwell v. Almanza*, No. 1:18-CV-00179, Dkt. No. 208 at 16–17 (N.D. Tex. Aug. 6, 2024) (noting that "most reported cases where a prisoner alleges a period of inadequate hydration [involve] *some* fluids or . . . access to means of

39

hydration" such as "receiv[ing] something to drink during meals"), *report and recommendation adopted* at Dkt. No. 214 (N.D. Tex. Sept. 9, 2014).

Courts outside the Fifth Circuit have likewise grappled with denial-of-water claims in different factual contexts. As noted by Plaintiff, the Seventh Circuit found it "constitutionally unacceptable" when pretrial detainees were given only five bottles of water per day for three days to use for drinking, hygiene, medication, and sanitation, compounded by the fact that inmates were exposed to hundreds of unflushable toilets, resulting in "standing feces and urine," and creating a stench that attracted insects. *Hardeman*, 933 F.3d at 824 (explaining that "it is also plausible that the grossly unsanitary conditions throughout the jail were compounded by inmates' dehydration-induced weakness and illness, thereby transforming what might otherwise have been a mere inconvenience into a problem of constitutional magnitude"). And the Ninth Circuit reversed a grant of summary judgment when prisoners alleged that they were left outside for four days in hot, humid weather, sometimes raining, without shelter or regular bathroom access, with restricted access to water, and their meals and milk were allowed to spoil in the heat. *Johnson*, 217 F.3d at 732. The Sixth Circuit found that a prisoner had stated a viable Eighth Amendment claim when he was given only one 16.5-ounce bottle of water and two half-pints of milk over a three-day period. *Dellis*, 257 F.3d at 512 (noting that the plaintiff clarified that this was his total fluid intake over the three-day period, rather than his intake each day as the district court assumed). The Eleventh Circuit also found a constitutional violation under more extreme circumstances, when a prisoner was placed in an isolation cell for 14 days with no safe drinking water, was forced to drink from his toilet on a near-daily basis, and contracted

40

dysentery from the prolonged exposure to his own excrement. *Canupp*, 716 F. App'x at 840–41.

But not every case involving limited access to water is serious enough to implicate the Constitution. The Eighth Circuit found no constitutional violation when a prisoner was held in a cell without clothes, a mattress, or running water for four days, but he was provided milk with meals, which he did not like to drink. *Williams*, 49 F.3d at 445–47. The Eighth Circuit likewise found that prison officials were entitled to qualified immunity when an inmate was placed in a strip cell for two days without clothing, bedding, or running water, with a concrete slab for a bed and cold air blowing on him. *Seltzer-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir. 1995). And the Third Circuit concluded that there was no constitutional violation when an inmate was denied running water in his cell for 77 hours, but water was available in medical areas and milk was available at breakfast each day. *Collier v. Adams*, 602 F. App'x 850, 851–52 (3rd Cir. 2015). The Seventh Circuit has also found that requiring a disabled pretrial detainee to wear the same clothes, sleep on a mattress on the floor, and receive beverages only with meals for two days did not "rise[] to the level of severity necessary to state a constitutional violation." *Tesch v. Cnty. of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998).

These cases demonstrate the importance of the specific factual allegations and context around claims that involve temporarily limiting an inmate's access to water. Here, the Court first finds that the context and specific nature of Plaintiff's claims are easily distinguishable from the extreme deprivations described in *Hardeman*, *Johnson*, *Dellis*, and *Cannup*. Plaintiff does not dispute that he was given a cup of water with meals three times per day. Nor does he dispute that he was given oral medication with water twice a day.

41

And he admits that he was given extra water, in an unspecified amount, in the middle of the night one of the three nights in the holding cell. Additionally, unlike the plaintiffs in *Hardeman* and *Cannup*, Plaintiff could flush his toilet at least once per day. He does not allege that the holding cell was unsanitary or crowded. And unlike the plaintiffs in *Johnson*, Plaintiff had shelter and a temperature-controlled environment. Plaintiff's case is also distinguishable from *Dellis* because he was given water multiple times per day, every day that he was in the holding cell, rather than having to ration one small amount of water over his three-day confinement. Finally, Plaintiff acknowledges that he did not experience any sickness or physical side effects from the limited water intake or from drinking from the toilet. He complains only that it caused "severe mental sickness of depression, anxiety, and sleepless nights due to worry," and that the "mental burden" caused headaches and nausea.[11]

Plaintiff's circumstances more closely resemble those in *Williams*, *Seltzer-Bey*, *Collier*, and *Tesch*. Plaintiff's water claim is also similar to those that have been dismissed by other district courts in this circuit. Each of those cases involved temporary conditions akin to Plaintiff's three-day confinement in the holding cell. And most of those cases share other elements in common with Plaintiff's claims, like the lack of bedding material. The other temporary conditions Plaintiff describes—denial of bedding and hygiene material, denial of recreation and telephone privileges, and provision of a food loaf—are mere inconveniences that do not transform this complaint into a claim of constitutional magnitude. Like the Fifth Circuit plaintiffs in *Duvall*, *Garrett*, and *Palomo*, as well as the out-of-circuit plaintiffs in

---

[11] Plaintiff makes it clear that any physical symptoms he experienced were related to his anxiety about the situation. Dkt. No. 108-1 at 7. And Plaintiff attributes the same physical symptoms—headaches and nausea—to his "intense worry" over his First Amendment rights in describing his separate book-policy claim. *Id.* at 8.

42

*Williams*, *Seltzer-Bey*, *Collier*, and *Tesch*, Plaintiff received water periodically, and although his cell may have been uncomfortable, it was sanitary and protected from the elements. The totality of the circumstances described by Plaintiff are not serious enough to rise to a constitutional violation.

Given this precedent, the Court cannot conclude that Defendants Diaz and Maddox violated Plaintiff's clearly established rights. Even though some courts have found constitutional violations under more extreme circumstances, many courts in this circuit and outside of this circuit have found limiting a detainee's access to water to be constitutionally permissible under less severe circumstances. And the fact-intensive nature of these inquiries has not established a rule sufficiently clear that every reasonable official would understand where to draw the line. *See Reichle*, 566 U.S. at 664.

\*     \*     \*

Even accepting Plaintiff's version of the facts as true, he has failed to show that Defendants Diaz and Maddox violated his clearly established Fourteenth Amendment rights. Specifically, Plaintiff has not shown that either Diaz or Maddox was deliberately indifferent to his health or safety or that their actions were objectively unreasonable in light of clearly established law. In short, Plaintiff has failed to overcome Defendants' good-faith assertion of qualified immunity.

## 5.    Defendants' request for sanctions

### A.    Defendants' motion and Plaintiff's response

Finally, the Court addresses Defendants' request that the Court sanction Plaintiff and designate him as a vexatious litigant. Defendants base this request not only on the history and changing nature of Plaintiff's water claim but on Plaintiff's broader history of repetitive,

frivolous, and abusive litigation. Defendants assert that Plaintiff's water claim was false or fraudulent, that he brought it for purposes of harassment, and that the way he developed the claim wasted substantial time and resources. Defendants also point generally to Plaintiff's vast litigation history, including multiple warnings and sanctions from other courts.

Plaintiff had an opportunity to respond to Defendants' request. He did not address or acknowledge his history of abusive litigation. But he generally asserts that he should not be punished here for "[d]isclosing what he remembered" even though "he had forgotten some details" when he first raised this claim. Dkt. No. 118 at 24. And he contends that "it is clear that the defendants are trying to manipulate this court's judgment by spreading miss information [sic] in order to negate their culpability."

### B. Legal standard

Courts generally treat motions for a vexatious-litigant designation as motions for sanctions under Rule 11. *See Fox v. Pope*, No. 3:00-CV-2537-R, 2001 WL 167913, at *3 (N.D. Tex. Jan. 19, 2001) (deciding to treat a "Vexatious Litigant Motion" as a motion for sanctions pursuant to Rule 11 because Rule 11 permits the imposition of sanctions for the very behavior of which the defendants complained); *Liptak v. Former State Judge Paul Banner*, 2002 WL 378454 (N.D. Tex. Mar. 7, 2002) (treating a "Motion for Order Determining Plaintiff to be a Vexatious Litigant" as a motion for sanctions under Rule 11). "Rule 11(b) provides that by presenting a filing to a court, . . . litigants are certifying that to the best of their belief, after reasonable inquiry, (1) the filing is not being presented for an improper purpose, such as harassment, delay, or increasing costs; (2) any claims and/or defenses in the filing are supported by either existing law or by a nonfrivolous argument for changing existing law or establishing new law; and (3) factual contentions have or will likely have

44

evidentiary support." *Copeland v. Minton*, No. 3:16-CV-726-L, 2016 WL 7971584, at *8 (N.D. Tex. Dec. 29, 2016) (citing Fed. R. Civ. P. 11(b)), *report and recommendation adopted*, 3:16-CV-726-L, 2017 WL 303025 (N.D. Tex. Jan. 23, 2017). "The purpose of the rule is to 'deter baseless filings in district court, and 'to spare innocent parties and overburdened courts from the filing of frivolous lawsuits.'" *Id.* (internal citations omitted) (quoting *Zuffante v. Stephens*, No. 3:13-CV-1146-B, 2013 WL 4829193, at *1 (N.D. Tex. Sept. 9, 2013)).

Rule 11 applies equally to attorneys and unrepresented parties. *Bowling v. Willis*, No. 4:18-CV-610-ALM-CAN, 2019 WL 5692189, at *2 (E.D. Tex. Aug. 9, 2019) (citing *Hicks v. Bexar Cnty., Tex.*, 973 F. Supp. 653, 687 (W.D. Tex. 1997), *aff'd*, 137 F.3d 1352 (5th Cir. 1998)), *report and recommendation adopted sub nom. Bowling v. Dahlheimer*, No. 4:18-CV-610, 2019 WL 4727421 (E.D. Tex. Sept. 27, 2019). "*Pro se* litigants have 'no license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets.'" *Thomas*, 2019 WL 5690478, at *2.

"After notice and opportunity to respond, courts finding a Rule 11(b) violation may impose appropriate sanctions." *Copeland*, 2016 WL 7971584, at *8 (citing Fed. R. Civ. P. 11(c)(1)). "These may include monetary and injunctive sanctions and even dismissal." *Id.* (internal citations omitted) (citing *Bell v. Dunn, Johnston & Brown*, No. 3:10-cv-1-M-BH, 2011 WL 759473, at *3 (N.D. Tex. Feb. 7, 2011), *report and recommendation adopted*, No. 3:10-CV-1-M, 2011 WL 726114 (N.D. Tex. Mar. 1, 2011)). "Courts have a duty to 'impose the least severe sanction adequate' to deter future conduct." *Id.* (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 196 (5th Cir. 1993)); *accord* Fed. R. Civ. P. 11(c)(4). "The moving party has the burden

to overcome the presumption that pleadings are filed in good faith." *Id.* (citing *Tompkins v. Cyr*, 202 F.3d 770, 788 (5th Cir. 2000)).

In addition to the authority of Rule 11, "[t]he district court has the power under 28 U.S.C. § 1651(a) to enjoin litigants who are abusing the court system by harassing their opponents." *McMullen v. Cain*, 2017 WL 4510594, at *2 (W.D. Tex. Feb. 23, 2017) (quoting *Harrelson v. United States*, 613 F.2d 114, 116 (5th Cir. 1980)), *report and recommendation adopted*, 2017 WL 4506814 (W.D. Tex. June 22, 2017). "The court's power to enter such orders flows not only from various statutes and rules relating to sanctions, but the inherent power of the court to protect its jurisdiction and judgments and to control its docket." *Farguson v. MBank Houston, N.A*, 808 F.2d 359, 360 (5th Cir. 1986). A prefiling injunction "must be tailored to protect the courts and innocent parties, while preserving the legitimate rights of litigants." *Id.* "Sanctions may be appropriate when a *pro se* litigant has a history of submitting multiple frivolous claims." *Campbell v. Maye*, 2010 WL 2671725, at *5 (W.D. Tex. June 30, 2010), *aff'd*, 428 F. App'x 382 (5th Cir. 2011) (citing Fed. R. Civ. P. 11); *Mendoza*, 989 F.2d at 195–97.

Before a court imposes a prefiling injunction or other sanctions to deter vexatious filings, "a court must weigh all the relevant circumstances, including the following four factors: (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions." *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008).

## C.   Analysis

Plaintiff's history of litigation speaks for itself. He has earned sanctions for vexatious, harassing, or duplicative lawsuits from the state courts, the Fifth Circuit, and the Supreme Court of the United States. Several of his civil actions in federal district court have been dismissed as frivolous or for failure to state a claim.[12] So the first factor easily weighs in favor sanctions.

There is also evidence that Plaintiff pursued this claim to harass the defendants. Plaintiff has admitted to Defendants that he is at least partially motivated by harassing them and driving up the costs of litigation. Dkt. No. 101 at 8–9. He admitted that he "[wi]ll risk everything to prove a point." *Id.* And he boasted, "I'll be frank. I hate [the defendants]. I rather get nothing and make them spend a lot of money to teach them a lesson." At the same time, he pointed out that each phase of litigation, from discovery, to trial, to appeal would be "expensive and time consuming" for Defendants.

Plaintiff is right—this litigation has no doubt been expensive and time consuming for Defendants. It has also cost considerable court resources. The Court cannot say that Plaintiff's denial-of-water claim is wholly frivolous. But the history and development of this particular claim suggests bad faith.

Plaintiff waited until the last possible moment—his objections to the Magistrate Judge's report—to even mention this claim, even though he had at least three opportunities to raise it before then. And more importantly, when he did mention it, he did so only

---

[12] *See Welsh v. Correct Care, L.L.C.*, No. 5:17-CV-00095 (N.D. Tex. Feb. 20, 2020) (dismissed with prejudice for failure to state a claim); *Welsh v. Maginnis*, No. 4:20-CV-003526 (S.D. Tex Nov. 2, 2020) (dismissed with prejudice as frivolous and for failure to state a claim); *Welsh v. Collier*, No. 1:20-CV-00337 (W.D. Tex. July 20, 2021) (dismissed with prejudice for failure to state a claim); *Welsh v. Thorne*, No. 5:21-CV-00156 (N.D. Tex. Oct. 4, 2023) (dismissed as frivolous and for failure to state a claim).

vaguely. He continued to rely on only broad and dramatic generalizations through his appeal. He only recently provided specific factual allegations, which he also filed late. And in doing so, he changed his story—and reduced the seriousness of the claim—significantly. Plaintiff's delayed amendment and his prolonged reliance on only vague, incomplete generalizations cost this Court, the Fifth Circuit, and the defendants substantial time and resources. As a result, the Court concludes that the second and third factors also favor sanctions.

Lastly, the Court considers the adequacy of alternative options. The Court notes that the Fifth Circuit has twice imposed a temporary filing bar conditioned on payment of a $100 monetary sanction, and both times, Plaintiff promptly paid. The Fifth Circuit also directed Plaintiff to "review all pending matters and move to dismiss any that are frivolous, repetitive, or otherwise abusive." *See Welsh v. Thorne*, No. 23-11109, 2024 WL 1956145 (5th Cir. May 3, 2024). Plaintiff does not appear to have taken the Fifth Circuit's warnings and sanctions seriously. Soon thereafter, he filed a new, 201-page complaint in this Court against 77 defendants, describing a variety of distinct, misjoined claims spanning over a year and half. *See Welsh v. Mgmt. and Training Corp.*, No. 5:24-CV-00069 (N.D. Tex.).

The Court also notes that this order—granting summary judgment for Defendants on Plaintiff's water claim—does not resolve all of Plaintiff's claims. Plaintiff's book-policy claim remains pending. And, aside from this case, Plaintiff has six other civil-rights complaints pending in this Court.

## D.    Appropriate sanctions and warning

Based on all the relevant circumstances, including Plaintiff's litigation history, evidence of bad faith in pursuing this claim, and the burden Plaintiff's litigation practices

48

have imposed on the Court and the opposing parties, the Court finds that Plaintiff is a vexatious litigant. As a result, the Court finds that sanctions are appropriate. And, because the Fifth Circuit's $100 monetary sanctions did not deter Plaintiff's abusive filings, the Court finds that more severe sanctions are necessary. Thus, **the Court imposes a monetary sanction of $500**. Plaintiff is barred from filing any new civil action in this Court, either directly or indirectly by transfer or removal from another court, until he has paid the sanction in full. **The Clerk is directed to file for administrative purposes, and immediately terminate any civil action filed by Plaintiff in violation of this order. Plaintiff is warned that violating this sanction order will result in additional, increasingly severe sanctions.**

Additionally, the Court finds that Plaintiff remains subject to the Fifth Circuit's direction to review his pending actions and dismiss any repetitive, frivolous, or otherwise abusive claims. The Court **warns** Plaintiff that it will impose more severe sanctions—including a broader prefiling injunction—the next time it finds that Plaintiff has filed repetitive, abusive, or frivolous claims or that he has pursued any claim in bad faith. Should that happen, the Court will bar Plaintiff from filing any new pleadings without first obtaining permission, and it may also impose larger monetary sanctions.

This warning applies to any pro se civil action filed by Plaintiff, whether he proceeds *in forma pauperis* or not. Additionally, the Court reminds Plaintiff that it will strictly enforce all applicable pleading standards and local rules regardless of Plaintiff's pro se status. *See Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981) (explaining that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law").

**6.    Conclusion**

For the reasons discussed above, the Court finds that Defendants are entitled to qualified immunity on Plaintiff's conditions-of-confinement claim and grants Defendants' motion for summary judgment. Thus, Plaintiff's water claim is dismissed with prejudice.

The Court also grants Defendants' request for sanctions, designates Plaintiff as a vexatious litigant, and imposes the sanctions described above.

Dated September 16, 2024.

JAMES WESLEY HENDRIX
United States District Judge